05-15-00495-CV

ACCEPTED
05-15-00495-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
4/17/2015 8:35:00 AM
LISA MATZ
CLERK

# No. _____

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS

4/17/2015 8:35:00 AM

LISA MATZ
Clerk

In The

# COURT OF APPEALS

## FIFTH DISTRICT OF TEXAS
Dallas, Texas

---

**In Re Island Hospitality Management, Inc.,
Post Properties, Inc. and
Post Addison Circle Limited Partnership**

---

Petition from Cause No. DC-13-04564
193rd Judicial District Court, Dallas County, Texas
Honorable Carl Ginsberg, Presiding Judge

---

**MANDAMUS RECORD**

---

# INDEX OF MANDAMUS RECORD

Certification Pursuant to Texas Rule of Appellate Procedure 52.7

Plaintiff's Third Amended Petition      Tab 1

Defendant Island Hospitality Management, Inc.'s
Second Amended Answer      Tab 2

Defendants Post Addison Circle Limited Partnership
and Post Properties, Inc.'s Second Amended Answer      Tab 3

Defendant Island Hospitality Management, Inc.'s
Motion to Examine Plaintiff Jane Doe      Tab 4

Plaintiff's Response to Defendant Island Hospitality
Management, Inc.'s Motion to Examine Plaintiff Jane Doe      Tab 5

Defendant Island Hospitality Management, Inc.'s
Reply to Plaintiff's Response to Island's Motion
to Examine Plaintiff Jane Doe      Tab 6

Order Denying Defendant Island Hospitality Management, Inc.'s
Motion to Examine Plaintiff Jane Doe      Tab 7

Defendants Island Hospitality Management, Inc.'s,
Post Properties, Inc.'s, and Post Addison Circle Limited Partnership's
Joint Motion for Reconsideration to Examine Plaintiff Jane Doe      Tab 8

Defendants' Joint Motion for Emergency Hearing on
Defendants' Joint Motion for Reconsideration to Examine
Plaintiff Jane Doe      Tab 9

Order Denying Motions to Reconsider
Motion to Allow Psychological Examination      Tab 10

## CERTIFICATION PURSUANT TO
## TEXAS RULE OF APPELLATE PROCEDURE 52.7

BEFORE ME, the undersigned authority, on this day personally appeared Michael A. Yanof, the undersigned Affiant, who being first duly sworn, did depose and say the following:

"My name is Michael A. Yanof. I am over the age of eighteen, of sound mind, capable of making this Affidavit, and fully competent to testify to the matters stated herein as lead appellate counsel for Relators in this Petition for Writ of Mandamus. I have personal knowledge of the facts stated herein, and they are true and correct.

I certify that each document attached hereto as the Relators' Record is:

1.) a true and correct copy of a pleading or filing in the underlying proceeding; and

2.) is material to Relators' claim for relief in their Petition for Writ of Mandamus."

_____
Michael A. Yanof, Affiant

**SUBSCRIBED AND SWORN TO BEFORE ME,** on the 16th day of April, 2015, to certify which witness my hand and official seal.

JONI SULLIVAN
Notary Public
STATE OF TEXAS
My Comm. Exp. Aug. 16, 2018

_____
Notary Public in and for the State of Texas

## Cause Number: DC-13-04564

| | | |
|---|---|---|
| JANE DOE,[1] | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **193rd JUDICIAL DISTRICT COURT** |
| | § | |
| ISLAND HOSPITALITY MANAGEMENT, | § | |
| INC.; HYATT HOTELS CORPORATION; | § | |
| HYATT HOUSE FRANCHISING, L.L.C.; | § | |
| GRAND PRIX FLOATING LESSEE, LLC; | § | |
| INK ACQUISITION, LLC; INK | § | |
| ACQUISITION II, LLC; INK | § | |
| ACQUISITION III, LLC; INK LESSEE, | § | |
| LLC; INK LESSEE HOLDING, LLC; | § | |
| CHATHAM TRS HOLDING, INC.; | § | |
| CHATHAM LODGING, L.P.; JEFFREY | § | |
| H. FISHER, Individually; POST | § | |
| PROPERTIES, INC.; POST ADDISION | § | |
| CIRCLE LIMITED PARTNERSHIP; | § | |
| PASTAZIOS PIZZA, INC.; AJREDIN | § | |
| "DANNY" DEARI; DRITAN KREKA; and | § | |
| DOES 1-25, | § | |
| | § | |
| *Defendants.* | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S THIRD AMENDED PETITION

Plaintiff JANE DOE[1] ("Plaintiff") files *Plaintiff's Third Amended Petition* ("Petition")

against Defendants ISLAND HOSPITALITY MANAGEMENT, INC.; HYATT HOTELS

CORPORATION; HYATT HOUSE FRANCHISING, L.L.C.; GRAND PRIX FLOATING

LESSEE, LLC; INK ACQUISITION, LLC; INK ACQUISITION II, LLC; INK ACQUISITION

III, LLC; INK LESSEE, LLC; INK LESSEE HOLDING, LLC; CHATHAM TRS HOLDING,

INC.; CHATHAM LODGING, L.P.; JEFFREY H. FISHER, Individually; POST PROPERTIES,

---

[1] Due to the extremely personal and sensitive nature of this lawsuit, Plaintiff is proceeding under the pseudonym of "Jane Doe"; however, Defendants have full knowledge of Plaintiff's identity due to Defendants' involvement in the underlying acts and omissions that form the basis of this Petition. To the extent that Defendants or Defendants' counsel are genuinely unaware of Plaintiff's identity (which would likely be impossible due to criminal proceedings against at least one Defendant in Dallas County, Texas, Case No. F1111106), Plaintiff's counsel is happy to state

INC.; POST ADDISON CIRCLE LIMITED PARTNERSHIP; PASTAZIOS PIZZA, INC.; AJREDIN "DANNY" DEARI; DRITAN KREKA; and DOES 1-25 (unless otherwise noted herein, "Defendants" refers to all named Defendants, collectively), and for causes of action respectfully shows this Court as follows:

## I.
### DISCOVERY CONTROL PLAN

1.      Pursuant to this Court's uniform Scheduling Order, discovery in this case is being conducted under a Level 3 Discovery Control Plan.

## II.
### PARTIES

2.      Plaintiff is a natural person who resides in Collin County, Texas.

3.      Defendant ISLAND HOSPITALITY MANAGEMENT, INC. (hereinafter, "Island Hospitality") is a Florida corporation that has generally appeared in this case.

4.      Defendant HYATT HOTELS CORPORATION (hereinafter, "Hyatt") is a Delaware corporation with its principal place of business in Chicago, Illinois and has generally appeared in this case.

5.      Defendant HYATT HOUSE FRANCHISING, L.L.C. (hereinafter, "Hyatt House") is a Kansas limited liability company that has generally appeared in this case.

6.      Defendant GRAND PRIX FLOATING LESSEE, LLC (hereinafter, "Grand Prix") is a Delaware limited liability company that has generally appeared in this case.

7.      Defendant INK ACQUISITION, LLC (hereinafter, "Ink Acquisition") is a Florida limited liability company that has generally appeared in this case.

8.       Defendant INK ACQUISITION II, LLC (hereinafter, "Ink Acquisition II") is a Florida limited liability company that has generally appeared in this case.

9. Defendant INK ACQUISITION III, LLC (hereinafter, "Ink Acquisition III") is a Florida limited liability company that has generally appeared in this case.

10. Defendant INK LESSEE, LLC (hereinafter, "Ink Lessee") is a Delaware limited liability company that has generally appeared in this case.

11. Defendant INK LESSEE HOLDING, LLC (hereinafter, "Ink Lessee Holding") is a Delaware limited liability company that has generally appeared in this case.

12. Defendant CHATHAM TRS HOLDING, INC. (hereinafter, "Chatham Holding") is a Florida limited liability company that has generally appeared in this case.

13. Defendant CHATHAM LODGING, L.P. (hereinafter, "Chatham Lodging") is a Delaware limited partnership that has generally appeared in this case.

14. Defendant JEFFREY H. FISHER (hereinafter, "Fisher") is a natural person who is believed to be a resident of, and domiciled in, the State of Florida and has generally appeared in this case.

15. Defendant POST PROPERTIES, INC. is a Georgia corporation that has generally appeared in this case.

16. Defendant POST ADDISON CIRCLE LIMITED PARTNERSHIP is a Georgia limited partnership that that has generally appeared in this case.

17. Defendant PASTAZIOS PIZZA, INC. (hereinafter, "PPI") is a Texas corporation that has generally appeared in this case.

18. Defendant AJREDIN "DANNY" DEARI (hereinafter, "Deari") is a natural person who has generally appeared in this case.

19. Defendant DRITAN KREKA (hereinafter, "Kreka") is a natural person who has generally appeared in this case.

20.     Upon information and belief, Plaintiff alleges that the true identities and residences of Defendants JOHN DOE 13-25, respectively, are currently unknown to Plaintiff at this time. Plaintiff shall proceed with due diligence to discover the identities of Defendants JOHN DOE 13-25, respectively, and after said Defendants' true identities have been discovered, Plaintiff will amend this Petition accordingly.

21.     Upon information and belief, Plaintiff alleges that, at all material times, Defendants Hyatt, Hyatt House, Island Hospitality Management, Grand Prix, Ink Acquisition, Ink Acquisition II, Ink Acquisition III, Ink Lessee, Ink Lessee Holding, Chatham Holding, Chatham Lodging, and Fisher (collectively referred to herein as "Alter Ego Defendant" or "Alter Ego Defendants") were the agents, servants, employees, partners, authorized agents and/or joint venturers of every other Alter Ego Defendant and the acts of each Alter Ego Defendant was within the course and scope of the agency, employment, partnership, joint enterprise, and/or joint venture such that each Alter Ego Defendant is jointly and severally liable for the damages Alter Ego Defendants caused Plaintiff as alleged herein and, further, that each Alter Ego Defendant is jointly and severally responsible for the acts and/or omissions of every other Alter Ego Defendant. Plaintiff specifically alleges and asserts the alter ego theory of liability against the Alter Ego Defendants because the Alter Ego Defendants are simply the alter ego of each other due to such a unity of interest and ownership between the business entities and its equitable owner or owners that the separate personalities of the business entities and shareholder/equitable owner or owners do not, in reality, exist, and because if the acts complained of herein are those of the business entities themselves than an inequitable result to Plaintiff would occur. Thus, Plaintiff specifically alleges that any and all acts or omissions taken by any of the Alter Ego Defendants, indeed, acts or omissions taken by all Alter Ego Defendants.

22.     Upon information and belief, Plaintiff alleges that, at all material times, Defendants POST PROPERTIES, INC. and POST ADDISON CIRCLE LIMITED PARTNERSHIP (collectively, referred to herein as "Post Properties") were the agents, servants, employees, partners, authorized agents and/or joint venturers of one another and the acts of each entity was within the course and scope of the agency, employment, partnership, joint enterprise, and/or joint venture such that each entity is jointly and severally liable for the damages Post Properties caused Plaintiff as alleged herein and, further, that the Post Properties Defendants are jointly and severally responsible for the acts and/or omissions of one another. Plaintiff specifically alleges and asserts the alter ego theory of liability against Post Properties because Post Properties are simply the alter ego of one another due to such a unity of interest and ownership between the business entities and its equitable owner or owners that the separate personalities of the business entities and shareholder/equitable owner or owners do not, in reality, exist, and because if the acts complained of herein are those of the business entities themselves than an inequitable result to Plaintiff would occur. Thus, Plaintiff specifically alleges that any and all acts or omissions taken by Post Properties were, indeed, acts or omissions taken by each entity.

### III.
### JURISDICTION

23.     This Court has subject matter jurisdiction over this lawsuit because the amount in controversy exceeds the minimum jurisdictional requirements.

24.     In accordance with TEX. R. CIV. P. 47, Plaintiff seeks monetary relief in excess of $1,000,000.00 due to Defendants' tortious, outrageous, and grossly negligent conduct.

25.     This Court has personal jurisdiction over Defendants Deari, Kreka, PPI, Hyatt, and Island Hospitality because the foregoing Defendants have generally appeared in this case.

26. This Court has personal jurisdiction over Defendants Hyatt House, Grand Prix, Ink Acquisition, Ink Acquisition II, Ink Acquisition III, Ink Lessee, Ink Lessee Holding, Chatham Holding, Chatham Lodging, Fisher, and Post Properties because each of the aforementioned Defendants (1) engage in, and transact business within, the State of Texas, (2) maintain continuous and systematic contacts with the State of Texas, (3) purposefully avail, or availed, itself to the laws of the State of Texas, (4) committed a tort or torts, in whole or in part, in the State of Texas against a Texas resident, and (5) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Texas and involved said Defendants.

27. Removal of this case to a federal court is inappropriate and statutorily unauthorized because (1) complete diversity of parties is lacking, (2) at least one Defendant is a forum-state defendant by virtue of its status as a Texas business entity and/or principal place of business being located in Texas, and (3) Plaintiff has not alleged a federal question, federal cause of action, or alleged facts that would give rise to a federal question, federal cause of action, and/or "federal officer" removal jurisdiction; therefore, any attempt to remove this case to a federal court is frivolous and gives rise to sanctionable conduct.

## IV.
### VENUE

28. Pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002(a), venue is proper in Dallas County, Texas because (1) all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Dallas County, Texas, and (2) some or all of the Defendants resided in Dallas County, Texas at the time Plaintiff's causes of action accrued.

29. Pursuant to TEX. CIV. PRAC. & REM. CODE § 15.005, because venue is proper in Dallas County, Texas as to at least one Defendant, venue is proper in Dallas County, Texas as to all Defendants.

30.     Plaintiff expressly incorporates by reference, as if fully set forth herein, paragraphs 1 through 29 of Plaintiff's Petition.

31.     In early 2011, Plaintiff was 18 years old and a recent graduate from high school. Plaintiff excelled in school academically, graduating as the valedictorian of her class.

32.     Like many young adults, Plaintiff was in search of an entry-level job at a local business in order to earn disposable income and garner working experience. While networking for such a job, Plaintiff was introduced to Defendant Deari and Defendant Kreka. Plaintiff was told that Deari and Kreka were the owners of two local bar/restaurants, and would be willing to meet with her to lend any insight they may have.

33.     On or about April 26, 2011, Plaintiff met Deari and Kreka at a restaurant in Dallas, Texas. Although this meeting was not employment-related, Plaintiff met with said Defendants merely to continue networking.

34.     Deari asked Plaintiff how old she was and Plaintiff informed both men that she was 18 years old. At the time, Defendant Deari was approximately 49 years old and Defendant Kreka was approximately 33 years old. The two Defendants subsequently tried to order Plaintiff an alcoholic beverage; however, the restaurant's server refused to bring the beverage because Plaintiff was underage.

35.     Undeterred, Deari and Kreka decided that it would be easiest to order Plaintiff beverages at Defendant PPI's Addison, Texas location. Indeed, Defendant Deari was, and is, the registered agent, director, and president of PPI.  On information and belief, Plaintiff alleges that PPI, as lessee, leases the physical space for its Addison, Texas location from Defendant Post Properties, as lessor (as confirmed by Century Surety Company, CCP672836 and said

Defendants' original, first, and second amended leases for said property).

36. As the two men had planned, Defendant Deari and Defendant Kreka convinced Plaintiff to drive to PPI. Prior to their arrival, Defendant Deari purchased hard liquor from a store with the intention of personally serving the alcohol to Plaintiff. Neither Deari nor PPI were licensed by the Texas Alcoholic Beverage Commission to sell or serve hard liquor.

37. Upon arrival at PPI, Defendants Kreka and Deari began serving, retrieving, and otherwise giving Plaintiff multiple "shots" of hard liquor. Defendant PPI's other employees— who were acting within the course and scope of their employment—also negligently served Plaintiff beer without ever asking for identification. Defendants Deari and Kreka repeatedly and aggressively pressured Plaintiff into consuming—and Plaintiff, indeed, consumed—alcoholic beverages despite their knowledge that Plaintiff was not of legal age to drink. Just as Defendants Deari and Kreka planned, Plaintiff became intoxicated and she was, in fact, obviously intoxicated. PPI's other employees negligently failed to identify Plaintiff's over-service.

38. After Plaintiff had consumed multiple shots of hard liquor and servings of beer, Deari and Kreka decided that their next stop should be to take Plaintiff to a local adult entertainment establishment. Deari retrieved his vehicle from PPI's parking lot and told Kreka and Plaintiff to get into the vehicle. Kreka moved into the driver's seat and Plaintiff, who was highly intoxicated, sat in the back of the vehicle. Plaintiff then lost consciousness.

39. Plaintiff's next memory is vomiting in a gas station parking lot before losing consciousness again. Sometime thereafter, Plaintiff regained consciousness in a hotel room located at 4900 Edwin Lewis Drive, Addison, Texas 75001 wherein she had been involuntarily disrobed and was actively being raped by Defendant Deari. Said hotel is a premise that was, and is, owned, operated, controlled, managed, and/or otherwise possessed by the Alter Ego

Defendants as owner, franchisor, franchisee, assignor, assignee, lessor, lessee, transferor, transferee, manager, and as the alter egos of each other and/or Hyatt and/or Fisher. Said premises lacked any reasonable degree of security that could have, and would have, prevented or mitigated the reasonably foreseeable attack on Plaintiff.

40.     Plaintiff repeatedly insisted that Defendant Deari stop the attack, but he did not. It was only after Plaintiff made multiple demands for Defendant Deari to stop did the sexual assault eventually end. Fearful of another attack, Plaintiff locked herself in the bathroom.

41.     While still in the hotel room—and without ever being impeded by the Alter Ego Defendants—Defendant Deari called Defendant Kreka on the telephone and told him that Plaintiff was "really freaking out, dude", and asked for Kreka to retrieve him from the Alter Ego Defendants' premises. With the knowledge that a sexual assault had just occurred (one in which Defendant Kreka conspired to commit, facilitated, aided, and abetted), Kreka retrieved Deari from the crime scene (again, unimpeded by the Alter Ego Defendants) thereby assisting Deari's evasion of law enforcement.

42.     Plaintiff alleges that the Alter Ego Defendants knew, or reasonably should have known, of the reasonably foreseeable, unreasonable risks of harm from criminal activity at its premises to Plaintiff taking into account the history, frequency, proximity, regularity, publicity, and similarity of criminal conduct on or near the Alter Ego Defendants' property. The Alter Ego Defendants negligently and grossly negligently allowed Defendant Deari and Defendant Kreka to reserve a room at its hotel, enter it with an unconscious 18 year-old woman, rape her, and come and go from its property in an unimpeded fashion such that Defendants could evade a police investigation without resistance.

43.     After the attack on Plaintiff ceased and Deari and Kreka left the Alter Ego

Defendants' premises, a friend of Plaintiff's arrived at the hotel to help. After learning what happened, the friend immediately notified the Addison Police Department. While investigating the crime scene, Defendant Deari—while smoking a cigar—came back to the hotel (presumably to retrieve the underwear he left, which was taken into evidence by the police department), and Deari was arrested, charged with the crime of sexual assault, indicted, and has a criminal trial pending. At this point in time, Defendant Kreka has not been charged for the crimes he aided, abetted, facilitated, and conspired to commit; however, on information and belief Plaintiff alleges that the State of Texas is well within the statute of limitations for such a crime to arrest, charge, and indict Kreka for his involvement in the attack on Plaintiff.

44.     Plaintiff was immediately transmitted to the hospital and underwent a series of examinations, tests, and administered massive quantities of treatments for the injuries she incurred during the rape.

45.     Within a matter of days following the sexual assault, Plaintiff went back to the hospital after she experienced severe pain in her pubic region. Upon information and belief, the doctors informed Plaintiff that she had contracted herpes, an incurable sexually-transmitted disease, during the rape. The doctors conducted a blood test on Plaintiff wherein the specific strand of herpes was identified. It has recently been discovered that the results of a mandatory blood/sexually-transmitted disease test ordered by the Court in "The State of Texas v. Danny Deari" has confirmed that Plaintiff's attacker (who did not utilize latex contraception during the attack), Defendant Deari, is infected with the same derivation of the herpes virus and undoubtedly infected Plaintiff.

46.     As a proximate result of the despicable, extreme, outrageous, tortious, and grossly negligent acts and omissions by Defendants alleged herein, Plaintiff has foreseeably suffered,

and will continue to suffer, through extreme emotional distress, pain, mental anguish, and suffering as the sexual assault is constantly replayed in her mind and the aftermath displayed on her body. Plaintiff is forced to shoulder the burden of Defendants' horrible acts for the rest of her life which, according to the federal government's "National Vital Statistics Reports", is expected to be another 61.6 years.[2] Plaintiff has incurred, and will continue to incur, substantial damages that were all proximately caused by Defendants.

## VI.
### CAUSES OF ACTION

#### COUNT 1: ASSAULT – THREAT OF BODILY INJURY

47.     Plaintiff's first cause of action is alleged against Defendants Deari and Kreka, only. As used in this cause of action, "Defendants" refers to Defendant Deari and Defendant Kreka.

48.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 47 of Plaintiff's Petition.

49.     On or about April 26, 2011, Defendants intentionally or knowingly threatened Plaintiff with imminent bodily injury. Defendants' threat of imminent bodily injury caused Plaintiff to be apprehensive, which was a foreseeable result of Defendants' actions.

50.     Defendants are liable for the threat of bodily injury committed against Plaintiff because Defendants participated in the tortious acts themselves or, alternatively, assisted the tortious act against Plaintiff in furtherance of the civil conspiracy to do so or, alternatively, aided and abetted each other to allow the ultimate threat of bodily injury against Plaintiff to take place.

51.     Defendants' threat of imminent bodily injury to Plaintiff was a cause of the damages alleged herein.

---

[2] *See* U.S. Department of Health and Human Service, NATIONAL VITAL STATISTICS REPORTS Vol. 61, No.3, September 24, 2012 at 20.

## COUNT 2: ASSAULT (BATTERY) –BODILY INJURY AND OFFENSIVE CONTACT

52.     Plaintiff's second cause of action is alleged against Defendants Deari and Kreka, only. As used in this cause of action, "Defendants" refers to Defendants Deari and Kreka.

53.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 52 of Plaintiff's Petition.

54.     Plaintiff incorporates by reference, as if fully set forth herein, the statutory language of TEX. PENAL CODE §§ 22.01, 22.011 describing the felonies of "Assault" and "Sexual Assault". Plaintiff alleges that Plaintiff was the victim of the aforementioned crimes that Defendants committed against Plaintiff on or about April 26, 2011, and that said crimes have caused Plaintiff's damages alleged herein.

55.     Defendants intentionally, knowingly, and/or recklessly made physical contact with Plaintiff's person causing bodily injury—that is, physical pain, illness, or impairments of Plaintiff's physical condition—and Plaintiff did not, and could not, consent to the harmful physical contact.

56.     Alternatively, Defendants intentionally or knowingly caused to be made physical contact with Plaintiff when Defendants knew, or reasonably should have believed, that Plaintiff would regard the contact as offensive or provocative. Indeed, said physical contact was offensive, provocative, and committed by Defendants despite never having consent from Plaintiff.

57.     As a causal result of Defendants' battery of Plaintiff's person, Plaintiff suffered immediate, consequential, and subsequent injuries—including pain, illness, and physical impairment—that were foreseeable to Defendants.  The assault committed by Defendants on Plaintiff's person was a cause of the damages alleged by Plaintiff herein.

58.     Defendants are liable for the crimes, assault, battery, and sexual assault of which Plaintiff is a victim because Defendants participated in the tortious and felonious acts themselves or, alternatively, assisted the crimes, assault, battery, and sexual assault against Plaintiff in furtherance of the civil conspiracy to do so or, alternatively, aided and abetted the crimes, assault, battery, and sexual assault by providing intoxicating substances to Plaintiff, a mode of transportation for the crimes, assault, battery, and sexual assault to occur, and/or a location— which was foreseeably unsafe and unreasonably dangerous—for the crimes, assault, battery, and sexual assault to take place.

59.     In addition to committing, conspiring to commit, or aiding and abetting assault, battery, and/or sexual assault against Plaintiff, the investigation is still ongoing as to whether or not Defendants individually—or collectively in furtherance of a conspiracy and/or whilst aiding and abetting each other—should be charged with, criminally prosecuted for, and civilly held liable for the felony of "Aggravated Sexual Assault", as defined by TEX. PENAL CODE § 22.021 and fully incorporated by reference herein.

**COUNT 3: SEXUAL ASSAULT—TEX. PENAL CODE § 22.011**

60.     Plaintiff's third cause of action is alleged against Defendants Deari and Kreka, only. As used in this cause of action, "Defendants" refers to Defendants Deari and Kreka.

61.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 60 of Plaintiff's Petition.

**COUNT 4: FALSE IMPRISONMENT**

62.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 60 of Plaintiff's Petition.

63.     Without legal authority or justification, Defendants willfully detained or

participated in the detainment of Plaintiff without Plaintiff's consent. Defendants accomplished the unlawful detainment of Plaintiff with violence, threats that were calculated to inspire—and, in fact, inspired—a reasonable fear of injury to Plaintiff, intoxicating substances, and/or other means that were intended to cause—and, in fact, caused—Plaintiff to be unable to exercise her will in going anywhere she was lawfully allowed to go. Said false imprisonment took place at the hotel owned and operated by the Alter Ego Defendants, interior of the restaurant possessed, owned and/or controlled by Post Properties and PPI (due to Plaintiff's physical inability and/or lawful ability to leave in such an unconscious and/or intoxicated state), and exterior of the restaurant in the "common area" possessed, owned and/or controlled by Post Properties and PPI.

64.     The false imprisonment committed by Defendants against Plaintiff was a proximate cause of the damages alleged by Plaintiff herein.

### COUNT 5: NEGLIGENCE

65.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 64 of Plaintiff's Original Petition.

66.     Defendants owed Plaintiff legal duties that Defendants breached thereby proximately causing Plaintiff's damages.

67.     For example, the Alter Ego Defendants, for example, as innkeepers owed Plaintiff a duty to use the appropriate legal standard of care in maintaining its premises in a safe and secure condition and to inspect the premises to ensure the safety of its occupants, a duty to protect Plaintiff against unreasonable and foreseeable risks of harm from the criminal acts of third parties due to the Alter Ego Defendants' status (as landowner and, further, the heightened duty owed by an innkeeper) and ability to control the security and safety of the premises, a duty not to injure Plaintiff in a willful, wanton, or grossly negligent manner or allow another to do so

on its premises when it knew, or reasonably should have known, such conduct would take place, a duty to make safe conditions on its property in order to protect Plaintiff, and a duty to treat Plaintiff in a manner that would not subject her to physical or mental injury. As alleged fully herein, there can be no dispute that the Alter Ego Defendants breached each and every one of the duties it owed Plaintiff. Defendants PPI and Post Properties, for example, had a duty to use the appropriate legal standard of care to ensure that invitees at the PPI Addison, Texas location would be safe, secure, and that the normal and lawful activities that would otherwise take place at the restaurant would not harm its invitees. Defendants PPI and Post Properties breached these duties owed to Plaintiff. Post Properties also had a duty to protect Plaintiff, and the public as a whole, from unlawful lessees of its property by conducting a reasonable investigation into its lessees and/or terminate a lease upon the happening of an unlawful event (such as PPI's citation from the Texas Alcoholic Beverage Commission in 2002 for serving a minor alcohol) and, further, a duty to control the activities taking place on the "common area" outside of the restaurant to ensure the safety of the individuals on said property; however, Post Properties clearly breached these duties and, moreover, actually extended PPI's lease just days after the attack on Plaintiff occurred and to this day has not terminated said lease. Defendant PPI had a duty to control its employees, a duty to supervise its employee's activities, a duty to prevent an employee from causing an unreasonable risk of harm to Plaintiff, a duty to use the appropriate legal standard of care in hiring and retaining its employees, a duty to not place Plaintiff in harm's way of foreseeable criminal activity, and a duty to treat Plaintiff in a manner that would not subject her to physical or mental injury. PPI breached those duties it owed Plaintiff by, amongst other things, negligently providing intoxicating substances to Plaintiff, negligently hiring its employees, negligently supervising its employees, and/or placing her in harm's way. Defendant

Kreka, by way of example, owed Plaintiff a legal duty to protect Plaintiff from harm when the danger was caused, in part, by Kreka and the harm was apparent to Kreka such that he was in a position to protect Plaintiff from the harm, a duty to not place Plaintiff in harm's way of foreseeable criminal activity, a duty to not operate a vehicle when legally intoxicated thereby placing Plaintiff in danger and, ultimately, causing her to arrive at the location where she was sexually assaulted, and a duty to treat Plaintiff in a manner that would not subject her to physical or mental injury. Defendant Kreka breached each and every one of these duties as detailed in this Petition.

68.     Defendants breached the duties it owed to Plaintiff thereby proximately causing Plaintiff's injuries and the damages alleged herein.

COUNT 6: PREMISES LIABILITY

69.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 68 of Plaintiff's Petition.

70.     Plaintiff's cause of action for Premises Liability is alleged against the Alter Ego Defendants, PPI, and Post Properties, only. Plaintiff reserves the right to supplement and amend this cause of action. As used in this cause of action, "Defendants" refers to the Alter Ego Defendants, PPI, and Post Properties.

71.     The Alter Ego Defendants facilitated the assault and tortious conduct on Plaintiff through the use or misuse of the property—located at 4900 Edwin Lewis Drive, Addison, Texas 75001—owned, operated, controlled by, franchised by, licensed by, managed, leased, assigned, and/or otherwise possessed by the Alter Ego Defendants and, further, PPI and Post Properties facilitated the assault and tortious conduct on Plaintiff through the use or misuse of PPI's Addison, Texas location that was owned, operated, controlled by, franchised by, licensed by,

managed, leased, assigned, and/or otherwise possessed by PPI and Post Properties.

72. Defendants owed Plaintiff a duty to use the appropriate standard of care in protecting Plaintiff from unreasonable and reasonably foreseeable risks of harm (including criminal activity at its premises considering the history, frequency, proximity, regularity, publicity, and similarity of criminal conduct on or near the Alter Ego Defendants' property) especially in light of Defendants' status as landowner and/or innkeeper that possessed the ability to control the security and safety of the premise and its employees. Defendants had a duty to inspect and make safe any dangerous conditions or situations on its property or give Plaintiff an adequate warning of the dangerous conditions or situations; however, Defendants failed to do so.

73. Defendants breached the legal duties it owed Plaintiff thereby proximately causing Plaintiff's damages alleged herein.

**COUNT 7: DRAM SHOP LIABILITY**

74. Plaintiff's cause of action for Dram Shop Liability is alleged against Post Properties and Deari—in his capacity as registered agent, director, and president of PPI—, only. Further, Plaintiff alleges this cause of action in the alternative to Counts 4-6 against Post Properties. As used in this cause of action, "Dram Shop Defendants" refers to PPI, Deari, and Post Properties (in the alternative to Counts 4-6 against Post Properties). Plaintiff reserves the right to supplement and amend this cause of action.

75. Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 74 of Plaintiff's Petition.

76. On or about April 26, 2011, the Dram Shop Defendants held Texas Alcoholic Beverage Commission licenses for the sale or service of alcoholic beverages and did, in fact, sell or serve multiple alcoholic beverages to Plaintiff who, at the time, was an 18 year-old "adult

recipient" of said beverages. However, Dram Shop Defendants were not authorized to sell hard liquor at PPI's Addison, Texas location.

77. To the extent that the Dram Shop Defendants did not hold Texas Alcoholic Beverage Commission licenses for the sale or service of alcoholic beverages on or about April 26, 2011, Plaintiff alternatively alleges that the Dram Shop Defendants did not have said licenses yet still sold Plaintiff, an 18 year-old "adult receipt", alcoholic beverages.

78. After the Dram Shop Defendants provided the alcoholic beverages to Plaintiff, it was apparent, or readily became apparent, to the Dram Shop Defendants that Plaintiff was obviously intoxicated.

79. Plaintiff's intoxication—as a result of the Dram Shop Defendants' acts or omissions—was one of the proximate causes of the injuries incurred and the damages alleged by Plaintiff herein.

COUNT 8: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS [ALTERNATIVE REMEDY]

80. Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 79 of Plaintiff's Petition.

81. As an alternative remedy to Plaintiff's claims detailed in this Petition at Section (VI)(Count 1—Count 7), Plaintiff alleges that no alternative cause of action would provide Plaintiff with a remedy for the severe emotional distress incurred by Plaintiff which was proximately caused by Defendants' tortious conduct.

82. Plaintiff—an individual—was and is a victim of Defendants' intentional or reckless actions that were calculated to cause severe emotional distress to Plaintiff.

83. Defendants' intentional or reckless actions towards Plaintiff were extreme and outrageous and, ultimately, proximately caused Plaintiff to suffer severe emotional distress.

<u>COUNT 9: PARTICIPATORY LIABILITY—AIDING AND ABETTING AND CONCERT OF ACTION</u>

84.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 83 of Plaintiff's Petition.

85.     Among the Defendants was a primary actor, or primary actors, who committed an underlying tort, or torts, against Plaintiff.  Defendants had knowledge that the primary actor's conduct constituted a tort and Defendants gave the primary actor assistance, substantial assistance, and/or encouragement to commit the tort against Plaintiff. Defendants' assistance, substantial assistance, and/or encouragement was a substantial factor in causing the tort to be completed and a substantial factor in the damages incurred by Plaintiff as alleged herein.

86.     Alternatively, Defendants' own conduct—separate and apart from the primary actor—was a breach of duty to Plaintiff and a substantial factor in causing Plaintiff's injuries.

87.     Due to Defendants' joint assistance, encouragement, aiding and abetting, and/or concert of action, Plaintiff alleges that Defendants should be held jointly and severally responsible for the whole of damages incurred by Plaintiff.

<u>COUNT 10: PARTICIPATORY LIABILITY—CONSPIRACY</u>

88.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 87 of Plaintiff's Petition.

89.     As fully described in this Petition, Defendants are, and were, individuals or individual entities that acted together as a combination of two or more individuals or entities.

90.     Throughout Defendants' interactions with Plaintiff on or about April 26, 2011, the object of Defendants' combination was to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.

91.     Defendants had a meeting of the minds on the object or course of action of its

conspiracy, and at least one Defendant committed an unlawful, overt act in furtherance of Defendants' object or course of action.

92.     Plaintiff suffered the damages alleged herein as a proximate result of Defendants' wrongful act or acts.

COUNT 11: EXEMPLARY DAMAGES

93.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 92 of Plaintiff's Original Petition.

94.     Defendants' tortious conduct was malicious, fraudulent, and/or grossly negligent.

95.     Defendants' malicious, fraudulent, and/or grossly negligent was carried out by Defendants personally, through Defendants' authorized agents, managers, officers, directors, vice-principals, and/or principals of the Defendants who were acting within the course and scope of their agency, employment, partnership, and/or joint venture.  Alternatively, Defendants' malicious, fraudulent, and/or grossly negligent conduct was subsequently approved by or ratified by Defendants.

96.     Defendants intentionally breached the legal duties it owed Plaintiff such that it could take undue advantage of Plaintiff and/or otherwise maliciously treat Plaintiff. The acts or omissions of Defendants, when viewed objectively from the Defendants' standpoint, involved an extreme degree of risk when considering the probability and magnitude of the potential harm to Plaintiff and others.

97.     Additionally, Defendants had actual, subjective awareness of the risk to Plaintiff and others but proceeded anyway with a conscience indifference to the rights, safety, or welfare of Plaintiff and others.

98.     Defendants' conduct was performed and/or designed with a specific intent to

cause substantial injury or harm to Plaintiff. As alleged herein, Defendants' conduct is an example of why punitive damages exist, and Plaintiff alleges that Defendants' conduct rises to the level warranting the imposition of exemplary damages against Defendants at trial.

## VII.
### DAMAGES

99.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 98 of Plaintiff's Petition.

100.    Plaintiff has incurred significant damages due to Defendants' criminal, tortious, and outrageous conduct. Plaintiff seeks all losses sustained as a natural, probable, foreseeable, and/or proximate result of Defendants' wrongful conduct, including:

a.  General damages;

b.  Actual damages;

c.  Physical pain and suffering incurred in the past and future;

d.  Mental anguish incurred in the past and future;

e.  Disfigurement incurred in the past and future;

f.  Physical impairment incurred in the past and future;

g.  Medical expenses incurred in the past and future;

h.  Loss of earning capacity incurred in the past and future;

i.  Lost wages incurred in the past and future;

j.  All reasonable and necessary attorneys' fees that Plaintiff is forced to incur pursuant to Texas common law and equity;

k.  Exemplary damages;

l.  Costs of court;

m.  Pre-judgment interest;

n. Post-judgment interest; and

o. All other relief, in law and in equity, to which Plaintiff may be justly entitled.

## VIII.
### DEMAND FOR JURY

101. Plaintiff demands a jury trial and tenders the appropriate fee.

## IX.
### REQUEST FOR DISCLOSURE

102. Plaintiff hereby demands that all Defendants make the disclosures, within the timeframe provided therein, required by TEX. R. CIV. P. 194(a)-(l)

## X.
### PRAYER

103. WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer herein. Plaintiff further prays that, upon trial by jury, she have judgment against Defendants for the damages alleged herein, as well as all other relief, in law and in equity, to which Plaintiff may prove herself to be justly entitled.

Respectfully submitted,

_____

**ROYCE WEST**
State Bar No. 21206800
royce.w@westllp.com
**VERETTA FRAZIER**
State Bar No. 00793264
veretta.f@westllp.com
**NIGEL REDMOND**
State Bar No. 24058852
nigel.r@westllp.com
**WEST & ASSOCIATES, L.L.P.**
P.O. Box 3960
Dallas, Texas 75208-1260
Ofc.:   (214) 941-1881
Fax:   (214) 941-1399

**G. MICHAEL GRUBER**
State Bar No. 08555400
mgruber@ghjhlaw.com
**ERIC POLICASTRO**
State Bar No. 24068809
epolicastro@ghjhlaw.com
**TREY CRAWFORD**
State Bar No. 24059623
tcrawford@ghjhlaw.com
**GRUBER HURST JOHANSEN HAIL SHANK LLP**
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
214.855.6800 (main)
214.855.6808 (facsimile)

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, pursuant to TEX. R. CIV. P. 21, 21a, a true and correct copy of the foregoing was filed on November 25, 2013 and was served on November 25, 2013 to the following individuals:

| Via Facsimile | Via Facsimile |
|---|---|
| *Hyatt Hotels Corporation*<br>*Hyatt House Franchising, LLC*<br>*Island Hospitality Management, Inc.*<br>*Ink Acquisition, LLC*<br>*Ink Acquisition II, LLC*<br>*Ink Acquisition III, LLC*<br>*Ink Lessee, LLC*<br>*Ink Lessee Holding, LLC*<br>*Grand Prix Floating Lessee, LLC*<br>*Chatham Lodging, LP*<br>*Chatham TRS Holding, Inc.*<br>*Jeffrey H. Fisher*<br><br>Ramona Martinez<br>**Cobb Martinez Woodward PLLC**<br>Facsimile: (214) 220-5252 | *Post Properties, Inc.*<br>*Post Addison Circle Limited Partnership*<br><br>Randy Nelson<br>**Thompson Coe Cousins & Irons, LLP**<br>Facsimile: (214) 871-8209 |
| **Via Facsimile**<br><br>*Ajredin "Danny" Deari*<br>*Pastazios Pizza, Inc.*<br><br>Samuel H. Johnson<br>**Johnson Broome, P.C.**<br>Facsimile: (972) 584-6054 | ***Via Certified Mail, Return Receipt Requested***<br><br>*Dritan Kreka, pro se*<br><br>5549 Big River Drive<br>The Colony, Texas 75056 |
| **Via Facsimile**<br><br>Royce West<br>Nigel Redmond<br>**WEST & ASSOCIATES, L.L.P.**<br>Fax:    (214) 941-1399 | |

_____
Eric Policastro

CAUSE NO. DC-13-04564-L

| | | |
|---|---|---|
| JANE DOE | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | |
| | § | |
| AJREDIN "DANNY" DEARI; DRITAN | § | |
| KREKA; PASTAZIOS PIZZA, INC.; | § | |
| ISLAND HOSPITALITY MANAGE- | § | |
| MENT, INC.; HYATT HOTELS | § | |
| CORPORATION; HYATT HOUSE | § | |
| FRANCHISING, LLC; GRAND PRIX | § | DALLAS COUNTY, TEXAS |
| FLOATING LESSEE, LLC; INK | § | |
| ACQUISITION, LLC; INK | § | |
| ACQUISITION II, LLC; INK | § | |
| ACQUISITION III, LLC; INK LESSEE, | § | |
| LLC; INK LESSEE HOLDING, LLC; | § | |
| CHATHAM TRS HOLDING, INC.; | § | |
| CHATHAM LODGING, LP; JEFFREY | § | |
| H. FISHER, Individually; POST | § | |
| PROPERTIES, INC.; and DOES 1-25 | § | 193RD JUDICIAL DISTRICT |

## DEFENDANT ISLAND HOSPITALITY
## MANAGEMENT, INC.'S SECOND AMENDED ANSWER

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Island Hospitality Management, Inc. ("Defendant"), one of the Defendants in the above-entitled and numbered cause, and files its Second Amended Answer, and would respectfully show the Court as follows:

I.

### GENERAL DENIAL

Defendant generally denies the allegations contained in Plaintiff's live petition, demands strict proof thereof, and says this is a matter for jury decision. Defendant further demands a trial by jury.

MANDAMUS RECORD - TAB 2

## II.

## AFFIRMATIVE DEFENSES

Defendant asserts the following affirmative and other defenses:

a. Plaintiff's own acts or omissions caused or contributed to Plaintiff's injury.

b. Plaintiff failed to mitigate her damages.

c. Plaintiff's claims are barred under the doctrines of sole proximate cause, new and independent cause, and/or intervening cause.

d. Plaintiff's claims are barred because Plaintiff consented to the alleged conduct of one or more of the defendants.

e. Plaintiff's claims are barred because Defendant is not a responsible party.

f. Plaintiff's claim for intentional infliction of emotional distress is barred because Plaintiff has the right to recover, if at all, under an alternative tort.

g. Plaintiff's claims are barred as a result of discharge in bankruptcy and/or entity restructuring.

h. Pleading further, Defendant would show that the incident in question and the damages alleged by Plaintiff, if any, were caused, solely or partially, or proximately caused by the fault or negligence of some person or third party over whom Defendant had no right of nor actual control nor legal responsibility.

i. Pleading further, Defendant would show the incident in question and the damages alleged by Plaintiff were the result of the negligence and/or intentional acts of third party criminals whom this Defendant had no actual or legal right to control. In this regard, Defendant would show that such negligence and/or intentional acts were the sole proximate cause, or

alternatively, the new, independent, and/or intervening cause of the incident in question and damages suffered.

j.  Defendant asserts its right to have evidence regarding lost wage, loss of earning capacity, loss of pecuniary value or loss of inheritance limited pursuant to TEX. CIV. PRAC. & REM. CODE § 18.091. Further, Defendant asserts its right to have the jury instructed whether such damages are subject to federal or state income tax.

k.  Defendant asserts its right to have evidence regarding the amount billed and/or written off for medical expenses excluded pursuant to TEX. CIV. PRAC. & REM. CODE § 41.0105.

l.  Defendant further pleads it cannot be held to answer for punitive or exemplary damages for acts or omissions of any employee or agent.

m.  Defendant would show that its liability is limited by the provisions of Chapter 41 of the TEX. CIV. PRAC. & REM. CODE; and any award of punitive damages is barred to the extent it is inconsistent with the standards and limitations set forth in *BMW of North Am, Inc. v. Gore*, 517 U.S. 559 (1996); and *State Farm Mutual Automobile Ins. Co. v. Campbell*, 123 S. Ct. 1513 (2003). Consideration of any punitive damages in this civil action violates the due process clause of the Fifth and Fourteenth Amendments of the U.S. Constitution. An award of punitive damages is a punishment and a quasi-criminal sanction for which Defendant is not afforded specific procedural safeguards prescribed by the Fourth, Fifth and Sixth Amendments to the U.S.

Constitution. An award of punitive damages violates Article 1, Sections 3, 13, and 19 of the Texas Constitution.

n.  Pleading further, Defendant states it is entitled under TEX. CIV. PRAC. & REM. CODE Chapter 41 to a limitation on the amount of recovery of exemplary damages pursuant to statute.

o.  By way of further answer, if same be necessary, Defendant affirmatively pleads there can be no award of exemplary damages against Defendant because of the criminal acts of another pursuant to § 41.005 of the TEX. CIV. PRAC. & REM. CODE.

p.  Defendant asserts its right to proportionate responsibility, contribution, comparative fault, indemnity and/or credit pursuant to Chapters 32 and 33 of the TEX. CIV. PRAC. & REM. CODE.

## III.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Defendant prays that upon final hearing hereof, Plaintiff take nothing by this suit, that Defendant recover its costs, and that Defendant have such other and further relief, both at law and in equity, to which Defendant may be justly entitled.

Respectfully submitted,

COBB MARTINEZ WOODWARD PLLC
1700 Pacific Avenue, Suite 3100
Dallas, TX 75201
(214) 220-5202 (direct phone)
(214) 220-5252 (direct fax)

By: _____
RAMONA MARTINEZ
Texas Bar No. 13144010
email: rmartinez@cobbmartinez.com
MATTHEW E. LAST
Texas Bar No. 24054910
email: mlast@cobbmartinez.com

ATTORNEYS FOR DEFENDANT
ISLAND HOSPITALITY MANAGEMENT,
INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document has been forwarded to the following counsel of record either by telefax, electronic mail, certified mail, return receipt requested, and/or regular U.S. mail on this 31st day of March, 2014:

Eric Policastro
Gruber Hurst Johansen Hail Shank
1445 Ross Avenue, Suite 2500
Dallas, TX 75202-2711
fax: 214.855.6808
*Attorney for Plaintiff*

Royce West
West & Associates
P.O. Box 3960
Dallas, TX 75208-1260
fax: 214.941.1399
*Attorney for Plaintiff*

Samuel H. Johnson
Johnson Broome, PC
2591 Dallas Parkway, Suite 300
Frisco, TX 75034
fax: 972.584.6054
*Attorney for Defendants Deari &
Pastazios Pizza*

Lisa A. Songy
Shannon Gracey Ratliff & Miller
Bank of America Plaza
901 Main Street, Suite 4600
Dallas, TX 75202
fax: 214.245.3097
*Attorney for Defendant Kreka*

*Matthew E. Last*

RAMONA MARTINEZ
MATTHEW E. LAST

DC - 13 - 04564
AAMD
AMENDED ANSWER - AMENDED GENERAL
384987



CAUSE NO. DC-13-04564

FILED

13 NOV 26 PM 2:52

GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO., TEXAS

_____ DEPUTY

| | | |
|---|---|---|
| JANE DOE, | § | |
| | § | |
| Plaintiff | § | IN THE DISTRICT COURT |
| v. | § | |
| | § | |
| AJREDIN "DANNY" DEARI, DRITAN | § | |
| KREKA, PASTAZIOS PIZZA, INC., | § | |
| ISLAND HOSPITALITY | § | |
| MANAGEMENT, INC., HYATT HOTELS | § | |
| CORPORATION, HYATT HOUSE | § | 193RD JUDICIAL DISTRICT |
| FRANCHISING, L.L.C., GRAND PRIX | § | |
| FLOATING LESSEE, LLC, INK | § | |
| ACQUISITION, LLC, INK | § | |
| ACQUISITION II, LLC, INK | § | |
| ACQUISITON III, LLC, INK LESSEE, | § | |
| LLC, INK LESSEE HOLDING, LLC, | § | |
| CHATHAM TRS HOLDING, INC., | § | |
| CHATHAM LODGING, L.P., JEFFREY | § | DALLAS COUNTY, TEXAS |
| H. FISHER, INDIVIDUALLY, POST | § | |
| ADDISON CIRCLE LIMITED | § | |
| PARTNERSHIP, AND DOES 1-25, | § | |
| Defendants. | | |

## DEFENDANTS' SECOND AMENDED ANSWER

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME Defendants, POST ADDISON CIRCLE LIMITED PARTNERSHIP and POST PROPERTIES, INC. (hereinafter collectively referred to as "Defendants") file this their Second Amended Answer to Plaintiff's Petition, and would respectfully show the Court as follows:

### I. GENERAL DENIAL

Defendants, POST ADDISON CIRCLE LIMITED PARTNERSHIP and POST PROPERTIES, INC., assert a general denial as authorized by Rule 92 of the TEXAS RULES OF CIVIL PROCEDURE, and Defendants respectfully request that Plaintiff be required to prove the

charges and allegations made against POST ADDISON CIRCLE LIMITED PARTNERSHIP and POST PROPERTIES, INC. by a preponderance of the evidence as is required by the Constitution and Laws of the State of Texas.

## II. AFFIRMATIVE DEFENSES

Defendants specifically plead that on the occasion in question, Jane Doe failed to exercise ordinary care for her own safety and, such failure constitutes negligence which was a proximate, producing, contributing, or sole proximate cause of the alleged damages, if any, Plaintiff alleges to have suffered.

Defendants specifically plead that Plaintiff's claims are barred in whole or in part, or should be reduced, due to the negligence and comparative responsibility of Jane Doe.

Defendants specifically plead that Plaintiff's alleged damages are the result of an intervening, superseding, or new and independent cause for which these Defendants have no responsibility.

Defendants specifically plead that Plaintiff failed to mitigate her damages, if any.

Defendants plead that any injuries, damages, or disabilities claimed or complained of by Plaintiff are the result, in whole or in part, of pre-existing conditions or disabilities.

Defendants specifically plead that pursuant to Civ. Prac. Rem. Code §41.0105, in addition to any other limitation under law, recovery of medical or health care expenses incurred is limited to the amount actually paid or incurred by or on behalf of the Plaintiff.

Pursuant to § 18.091 of the TEXAS CIVIL PRACTICE & REMEDIES CODE, to the extent that the Plaintiff seeks recovery for loss of earnings and/or loss of earning capacity, then the Defendants would show that the Plaintiff must present evidence to prove the loss in the form of a

net loss after reduction for income tax payments or unpaid tax liability pursuant to any federal income tax law.

Defendants invoke their statutory and common law rights to contribution, indemnity and/or proportionate responsibility, including, but not limited to that under Chapters 32 and 33 of the Tex. Civ. Prac. & Rem. Code against all co-Defendants. In the unlikely event that one or more Defendants is found liable or settles with Plaintiff, Defendants pray for judgment for contribution, indemnity, offset, credit, and/or proportionate responsibility from any and all such co-Defendants.

Defendants specifically plead that Defendant Post Properties, Inc. can not be held liable in the capacity that it has been sued.

Defendants further plead that they cannot be liable under the Texas Dram Shop Act as they are not "providers" pursuant to T.A.B.C. §2.03, 2.01.

Defendants plead that there can be no award of exemplary damages against Defendants because of the criminal acts of another pursuant to § 41.005 of the TEXAS CIVIL PRACTICE & REMEDIES CODE.

By way of further affirmative defense, Defendants would show that the claims made against them for exemplary and/or punitive damages are in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article 1, Sections 3 and 19 of the Texas Constitution, in that such claims made are arbitrary, unreasonable and in violation of Defendants' right to due process of law and equal protection of law.

Defendants specifically deny that Plaintiff is entitled to recover punitive or exemplary damages herein on the grounds that the imposition of punitive damages as sought by Plaintiff would be fundamentally unfair and Defendants would show that no legal basis or facts are

alleged that would allow punitive damages against Defendants herein; and if not dismissed Defendants request a bifurcated trial on this issue.

Defendants deny that they are liable to Plaintiff for any amount of money whatsoever and challenge the allegations of punitive damages as wholly unjustified and unconstitutional, and further says that in any event, the recovery of exemplary damages herein is limited by law, pursuant to Section 41.001, et. seq., as contained in Chapter 41 of the Texas Civil Practices & Remedies Code.

## III. CROSS-CLAIM

In her petition, Plaintiff alleges that Defendants Ajredin "Danny" Deari ("Deari") and Dritan Kreka ("Kreka") served her alcohol at Pastazio's Pizza and that subsequently, Deari sexually assaulted Plaintiff and that Kreka aided and abetted Deari. Based on Plaintiff's allegations, Defendants Cross-Claim against Defendants Ajredin "Danny" Deari and Dritan Kreka for statutory and common law contribution, including, but not limited to, contribution under Chapters 32 and 33 of the Tex. Civ. Prac. & Rem. Code.

In the unlikely event that Defendants are held liable, Defendants POST ADDISON CIRCLE LIMITED PARTNERSHIP and POST PROPERTIES, INC. assert that they are entitled to contribution from Deari and Kreka by reason of their negligence and/or intentional acts. Furthermore, Defendants specifically assert that the negligence and/or intentional conduct of Deari and Kreka was a sole and proximate cause or the producing cause of any damages to Plaintiff.

Finally, while Deari and Kreka are currently Defendants to the present suit, Defendants request that the jury be allowed to assess a percentage of responsibility to Deari and Kreka

pursuant to TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(4) if they are not parties to this lawsuit at the time of trial.

## IV. PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants, POST ADDISON CIRCLE LIMITED PARTNERSHIP and POST PROPERTIES, INC. pray that Plaintiff recover nothing of and from these Defendants, and that they receive all costs of Court and such other and further relief, both at law and in equity, to which they may show themselves to be justly entitled.

Respectfully submitted,

**THOMPSON, COE, COUSINS & IRONS, L.L.P.**

*Randy A. Nelson w/permission by*
*Sarah Rogers*
*24046239*

By: Randy A. Nelson
    State Bar No. 14904800
    Sarah L. Rogers
    State Bar No. 24046239
700 N. Pearl, 25th Floor
Dallas, Texas 75201
Telephone: (214) 871-8228
Telecopy: (214) 871-8209
E-Mail: rnelson@thompsoncoe.com

**ATTORNEYS FOR DEFENDANTS POST ADDISON CIRCLE LIMITED PARTNERSHIP AND POST PROPERTIES, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 25th day of November, 2013, a true and correct copy of the foregoing document has been served on all known counsel of record by facsimile and/or certified mail.

Eric Policastro
Trey Crawford
Gruber Hurst Johansen Hail Shank, LLP
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
214-855-6800
214-855-6808 (Fax)
**Attorneys for Plaintiff**

Dritan Kreka
5549 Big River Drive
The Colony, Texas 75056
**Defendant**

Samuel H. Johnson
**Johnson Broome, PC**
John S. Kenefick
Jason M. Jung
2591 Dallas Parkway, Suite 300
Frisco, Texas 75074
972-918-5274
972-584-6054 (Fax)
**Attorneys for Defendant, Ajredin "Danny" Deari and Pastazios Pizza, Inc.**

Royce West
Veretta Frazier
Nigel Redmond
West & Associates, LLP
P.O. Box 3960
Dallas, Texas 75208-1260
**Attorneys for Plaintiff**

Ramona Martinez
Cobb Martinez Woodward PLLC
1700 Pacific Avenue, Suite 3100
Dallas, Texas 75201
214-220-5200
214-220-5252 (Fax)
**Attorney for Defendants, Hyatt House Franchising, LLC, Island Hospitality Management, Inc., Ink Acquisition, LLC, Ink Acquisition II, LLC, Ink Acquisition III, LLC, Ink Lessee, LLC, Ink Lessee Holding, LLC, Grand Prix Floating Lessee, LLC, Chatham Lodging, LP, Chatham TRS Holding, Inc., Jeffrey H. Fisher, and Hyatt Hotels Corporation**

Randy A. Nelson
Sarah L. Rogers

MANDAMUS RECORD - TAB 3

| | | |
|---|---|---|
| JANE DOE | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | |
| | § | |
| AJREDIN "DANNY" DEARI; DRITAN | § | |
| KREKA; PASTAZIOS PIZZA, INC.; | § | |
| ISLAND HOSPITALITY MANAGE- | § | |
| MENT, INC.; HYATT HOTELS | § | |
| CORPORATION; HYATT HOUSE | § | |
| FRANCHISING, LLC; GRAND PRIX | § | DALLAS COUNTY, TEXAS |
| FLOATING LESSEE, LLC; INK | § | |
| ACQUISITION, LLC; INK | § | |
| ACQUISITION II, LLC; INK | § | |
| ACQUISITION III, LLC; INK LESSEE, | § | |
| LLC; INK LESSEE HOLDING, LLC; | § | |
| CHATHAM TRS HOLDING, INC.; | § | |
| CHATHAM LODGING, LP; JEFFREY | § | |
| H. FISHER, Individually; POST | § | |
| PROPERTIES, INC.; and DOES 1-25 | § | 193RD JUDICIAL DISTRICT |

## DEFENDANT ISLAND HOSPITALITY MANAGEMENT, INC.'S
## MOTION TO EXAMINE PLAINTIFF JANE DOE

Defendant Island Hospitality Management, Inc. ("Defendant") files this Motion to Examine Plaintiff Jane Doe, as follows:

### I. Background

1. Plaintiff has sued Defendant for, among other things, mental anguish and psychological-related damages are a result of an alleged sexual assault.

2. In support of her claims, Plaintiff retained a psychologist as a testifying expert, Dr. William Flynn.

3. Dr. Flynn was deposed on December 19, 2014. At the deposition, Dr. Flynn testified that he conducted a psychological examination of Plaintiff, and that his opinions were based upon and in reliance upon the examination. Dr. Flynn has produced records from the psychological examination.

4. On January 16, 2015, Defendant designated Dr. Lisa Clayton as a testifying expert, to testify in response to Dr. Flynn. Dr. Clayton has requested that she, like Dr. Flynn, be able to examine Plaintiff to develop her expert opinions.

5. On January 21, 2015, after a hearing on a Motion to Compel the Deposition of John Harris, Plaintiff's security expert, Defendant asked Plaintiff for dates on which Dr. Clayton could examine Plaintiff. Plaintiff's counsel seemed opposed to the request, but did not give a definitive answer.

6. After that date and after additional requests, Plaintiff's counsel has refused to make Plaintiff available for an examination by Dr. Clayton. Plaintiff is taking the position that discovery closed on June, 9, 2014. Plaintiff's position is inconsistent with the fact that (a) Plaintiff's expert Dr. Flynn examined Plaintiff in August 2014, after the alleged close of discovery, (b) the Court has ruled that certain expert discovery and designation periods are ongoing, given the circumstances of the case, including the deposition of Plaintiff's expert John Harris (now scheduled for March), (c) Defendant's designation of Dr. Clayton was not due until January 18, 2015, and (d) Plaintiff's made a request in January 2015 under Rule 196 to inspect the hotel premises, and Plaintiff conducted that discovery on February 4, 2015.

## II. Arguments and Authorities

7. The court may order the mental examination of a party or person under the party's control if the movant shows good cause and any of the following:

   a. The party's mental condition is in controversy (Tex. R. Civ. P. 204.1(c)(1));

   b. The party has designated a psychologist as a testifying expert (Tex. R. Civ. P. 204.1(c)(2)); or

c. The party has disclosed a psychologist's records for possible use at trial (Tex. R. Civ. P. 204.1(c)(2)).

8. Here, there is good cause for the Court to order the psychological examination of Plaintiff because the examination is relevant to the case. *Coates v. Whittington*, 758 S.W.2d 749, 753 (Tex. 1988). Specifically:

a. Plaintiff has a claim in controversy for mental anguish;

b. Plaintiff has designated a psychologist as a testifying expert;

c. Plaintiff has disclosed psychology records for possible use at trial; and

d. Plaintiff's testifying psychologist expert was afforded an opportunity to conduct a mental examination and, thus, Plaintiff would have an unfair advantage and Defendant would be prejudiced if Defendant's expert did not have the same opportunity as Plaintiff's expert. It is not possible for Defendant to obtain the information that would result from the examination through less intrusive means. *Coates*, 758 S.W.2d at 753.

9. Plaintiff's position that discovery is closed is inconsistent with the following:

(a) Plaintiff's expert Dr. Flynn examined Plaintiff in August 2014, after the alleged close of discovery,

(b) the Court has ruled that certain expert discovery and designation periods are ongoing, given the circumstances of the case, including the deposition of Plaintiff's expert John Harris (now scheduled for March),

(c) Defendant's designation of Dr. Clayton was not due until January 18, 2015, and

(d) Plaintiff's made a request in January 2015 under Rule 196 to inspect the hotel premises, and Plaintiff conducted that discovery on February 4, 2015. Defendant was

cooperative in facilitating the inspection and allowing the parties to conduct discovery without court intervention, but Plaintiff is refusing to do the same.

For those reasons, among others, limited expert discovery is ongoing. Further, Plaintiff should be estopped from arguing all discovery closed and/or waived that argument when Plaintiff engaged in the above inconsistent acts.

## III.    Conclusion

WHEREFORE, PREMISES CONSIDERED Defendant requests that the Court grant this Motion to Examine Plaintiff, order Plaintiff to be produced for a psychological examination conducted by Dr. Lisa Clayton, and grant such further and additional relief to which Defendant may be entitled.

**Respectfully submitted**,

**COBB MARTINEZ WOODWARD PLLC**
1700 Pacific Avenue, Suite 3100
Dallas, TX  75201
(214) 220-5202 (direct phone)
(214) 220-5252 (direct fax)

By: _____
    **RAMONA MARTINEZ**
    Texas Bar No. 13144010
    email: rmartinez@cobbmartinez.com
    **DAVID S. DENTON**
    Texas Bar No. 24036471
    email: ddenton@cobbmartinez.com
    **MATTHEW E. LAST**
    Texas Bar No. 24054910
    email: mlast@cobbmartinez.com

**ATTORNEYS FOR DEFENDANT ISLAND HOSPITALITY MANAGEMENT, INC.**

## CERTIFICATE OF CONFERENCE

Counsel for movant and counsel for respondent have personally conducted a conference at which there was a substantive discussion of every item presented to the Court in this motion and despite best efforts the counsel have not been able to resolve those matters presented:

Certified to the 6th day of February, 2015 by

/s/ *David S. Denton*

**RAMONA MARTINEZ**
**DAVID S. DENTION**
**MATTHEW E. LAST**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document has been forwarded to the following counsel of record by e-service, email, certified mail, return receipt requested, and/or regular U.S. mail on this 6th day of February, 2015:

Eric Policastro
Gruber Hurst Johansen Hail Shank
1445 Ross Avenue, Suite 2500
Dallas, TX 75202-2711
fax: 214.855.6808
*Attorney for Plaintiff*

Dritan Kreka
5549 Big River Drive
The Colony, TX 75056
*Defendant Kreka*

Samuel H. Johnson
Johnson Broome, PC
2591 Dallas Parkway, Suite 300
Frisco, TX 75034
fax: 972.584.6054
*Attorney for Defendants Deari &*
*Pastazios Pizza*

Randy A. Nelson
Thompson Coe Cousins & Irons
700 North Pearl Street
25th Floor – Plaza of the Americas
Dallas, TX 75201
*Attorney for Post Properties*

**RAMONA MARTINEZ**
**MATTHEW E. LAST**

**Cause Number: DC-13-04564**

| | | |
|---|---|---|
| **JANE DOE,** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **193rd JUDICIAL DISTRICT COURT** |
| | § | |
| **ISLAND HOSPITALITY MANAGEMENT,** | § | |
| **INC.; HYATT HOTELS CORPORATION;** | § | |
| **HYATT HOUSE FRANCHISING, L.L.C.;** | § | |
| **GRAND PRIX FLOATING LESSEE, LLC;** | § | |
| **INK ACQUISITION, LLC; INK** | § | |
| **ACQUISITION II, LLC; INK** | § | |
| **ACQUISITION III, LLC; INK LESSEE,** | § | |
| **LLC; INK LESSEE HOLDING, LLC;** | § | |
| **CHATHAM TRS HOLDING, INC.;** | § | |
| **CHATHAM LODGING, L.P.; JEFFREY** | § | |
| **H. FISHER, Individually; POST** | § | |
| **PROPERTIES, INC.; POST ADDISION** | § | |
| **CIRCLE LIMITED PARTNERSHIP;** | § | |
| **PASTAZIOS PIZZA, INC.; AJREDIN** | § | |
| **"DANNY" DEARI; DRITAN KREKA; and** | § | |
| **DOES 1-25,** | § | |
| | § | |
| *Defendants.* | § | **DALLAS COUNTY, TEXAS** |

**PLAINTIFF'S RESPONSE TO DEFENDANT ISLAND HOSPITALITY
MANAGEMENT, INC.'S MOTION TO EXAMINE PLAINTIFF JANE DOE**

COMES NOW Plaintiff Jane Doe ("Plaintiff") and files this *Response to Defendant Island Hospitality Management, Inc.'s Motion to Examine Plaintiff Jane Doe* ("Motion") and would respectfully show this Court the following:

**I.**
**SUMMARY OF RESPONSE**

1.     Defendant IHM seeks to have the Court issue an order requiring Plaintiff to submit to an unspecified "psychological" examination with its untimely designated expert, Dr. Lisa Clayton.  Defendant IHM's Motion must be denied because it does not comply with multiple provisions set forth in Texas Rule of Civil Procedure 204.1.  Defendant IHM's Motion

---

was filed after the applicable discovery deadline and almost nine months after the deadline set forth under Rule 204.1.

2. More importantly, Defendant IHM's Motion fails to establish good cause as to why Plaintiff should be subjected to a second mental examination when Defendant IHM admittedly has the objective "raw data" it needs to provide to its untimely designated expert. This accomplishes nothing, other than to needlessly subject Plaintiff to reliving the nightmare that she encountered when she was raped at the age of eighteen.

3. Not only is Defendant IHM's Motion untimely, it fails to specify the scope of the requested "psychological" examination, how it is to be conducted, and how it would be any different from the objective data Defendant IHM already has in its possession from the first examination. By not even specifying the examination that Defendant IHM is requesting, the Court cannot enter an order compliant with Rule 204.1(d). For these reasons, Defendant IHM's Motion must be denied.

## II.
### BACKGROUND

4. On April 26, 2011, Plaintiff was raped by Defendant Deari at the Hyatt House Hotel and contracted the incurable sexually transmitted disease of herpes. The Hyatt House Hotel is operated and managed by Defendant IHM. Plaintiff was eighteen years old at the time.

5. Plaintiff brought this lawsuit against Defendant IHM, Defendant Deari, and others on April 24, 2013.[1] In her Original Petition, Plaintiff alleged that, as a result of being raped and given herpes, she suffered "extreme emotional distress, pain and suffering, and mental anguish as the sexual assault is constantly replayed in her mind and the aftermath displayed on her body."[2]

---

[1] Plaintiff's Original Petition, **Exhibit 1**.
[2] *Id.* ¶ 33.

---

Plaintiff sought in her Original Petition recovery for "mental anguish incurred in the past and future."[3] That claim has not changed since the day it was brought nearly two years ago.

6. On January 10, 2014 the Court entered its Standing Scheduling Order.[4] The Scheduling Order closed discovery on June 9, 2014 and required Defendant IHM to designate its experts by April 30, 2014. Defendant IHM's deadline to designate its experts was then extended to May 31, 2014 by agreement among the parties.[5]

7. On April 30, 2014, Plaintiff timely served its Rule 194.2(f) Expert Witness Designations to Defendant IHM.[6] In Plaintiff's Expert Designations, Plaintiff disclosed Dr. William E. Flynn, Ph.D.—a licensed forensic and clinical psychologist.[7] On May 20, 2014, Plaintiff informed Defendant IHM that Dr. Flynn was free to be deposed at a time that was convenient for Defendants.[8] Defendant IHM chose not to take Dr. Flynn's deposition until December 19, 2014—seven months after Plaintiff made Dr. Flynn available.

8. On September 30, 2014, the Court entered an order resetting the trial date to March 24, 2015 because of the automatic stay invoked by Defendant Deari's filing of bankruptcy.[9] This order did not extend the discovery deadline or any other deadlines in the case. On February 24, 2015, the Court issued its Notice of Trial Announcement for July 7, 2015.[10] The Notice explicitly states that the deadlines in the Court's Standing Scheduling Order remain in place and are not changed because the trial date has been extended. *Id.*

---

[3] *Id.* ¶ 84.
[4] Court's January 10, 2014 Standing Scheduling Order, **Exhibit 2**. This Scheduling Order superseded the Scheduling Order entered by the Court on May 20, 2013.
[5] Rule 11 Agreement Re: Expert Designations, **Exhibit 3**.
[6] Plaintiff's TEX. R. CIV. P. 194.2(f) Expert Witness Designations, **Exhibit 4.**
[7] *Id.* at pp. 11-12**.**
[8] *See* Correspondence from Trey Crawford (July 3, 2014), **Exhibit 5.**
[9] Order Resetting Trial Date, **Exhibit 6**.
[10] Notice of Trial Announcement, **Exhibit 7**.

9. Defendant IHM did not disclose any expert in this case until January 16, 2015—approximately 9 months after Dr. Flynn was designated and 8 months after the parties' agreed deadline. Even then, Defendant IHM did not file this Motion until February 6, 2015—nearly two years after Defendant IHM was made aware of Plaintiff's claim for mental anguish caused by the rape.

10. Now, less than 4 months before trial, Defendant IHM seeks to put Plaintiff through an unspecified "psychological" examination that undoubtedly will be highly-invasive and duplicative of the "raw data" that was collected from her first examination. Defendant IHM's Motion states nothing of substance that will be gained by putting Plaintiff through such a procedure. Defendant IHM's Motion is untimely and lacks a showing of "good cause," and thus must be denied as a matter of law.

### III.
### LEGAL ARGUMENT AND AUTHORITY

11. Texas Rule of Civil Procedure 204.1 does not grant Defendant IHM an automatic right to obtain a physical or mental examination of Plaintiff. In order to conduct a mental examination, a movant must establish a greater showing of need than to obtain other kinds of discovery.[11]

12. Rule 204.1, by its express language, places an affirmative burden on the movant to show the requested examination's relevance *and* the movant must demonstrate "good cause" for such an examination.[12] In the absence of the movant establishing both prongs, a trial court

---

[11] *See In re Ten Hagen Excavating, Inc.*, 435 S.W.3d 859 (Tex. App.—Dallas 2014, no pet.) (relying on *Schlagenhauf v. Holder*, 379 U.S. 104 (1964) (federal rule is substantially similar to the Rule 204.1)).
[12] *Coates v. Whittington*, 758 S.W.2d 749, 751 (Tex. 1988).

cannot order an examination pursuant to Rule 204.1.[13] The movant's request must also be timely made in order for a court to consider it.

### A. Defendant IHM's Motion is Untimely.

13. Texas Rule of Civil Procedure 204.1(a) requires a party seeking to compel a mental examination of another party to file its application "no later than thirty days before the end of the applicable discovery deadline." When determining the "applicable discovery deadline," the Dallas Court of Appeals has held that requests for mental examinations are a form of discovery under Rule 192.1.[14]

14. The Court's Standing Scheduling Order set the applicable discovery deadline as June 9, 2014. Pursuant to Rule 204.1(a), Defendant IHM was required to file its Motion no later than May 10, 2014.

15. Defendant IHM has been aware of Plaintiff's claim of mental anguish since the day she filed her Original Petition—approximately two years ago. Plaintiff's Original Petition put Defendant IHM on notice that she was seeking damages for the significant mental and emotional trauma caused by being raped and given herpes when she eighteen.

16. Moreover, Plaintiff designated Dr. William Flynn on April 30, 2014 to testify about the "psychological, medical, behavioral, educational, physiological, vocational, and social trauma" that a victim of a sexual assault can experience, including Plaintiff.[15]

17. Despite being on notice of Plaintiff's mental anguish claim since the inception of this lawsuit, Defendant IHM's first formal request to examine Plaintiff was not until February 6, 2015. This is nearly two years after being made aware of the claim; almost a year after Dr. Flynn

---

[13] *Id.*

[14] *See In re Ten Hagen Excavating, Inc.*, 435 S.W.3d at 866 (Tex. App. – Dallas *; see also In re Valero Energy Corp.*, 2011 WL 579154, at *1 (Tex. App.—Beaumont Feb. 18, 2011, no pet.) (court denied examination request one month after the discovery deadline); TEX. R. CIV. PRO. 192.1(g).

[15] *See* **Exhibit 4** at 11-12.

was designated; and almost 9 months after Defendant IHM's deadline to request an examination under Rule 204.1. Defendant IHM has no excuse for this delay. For this reason alone, Defendant IHM's Motion should be denied.

**B. Defendant IHM Has Not Satisfied its Burden to Prove Good Cause.**

18. Even if the Court finds that Defendant IHM's Motion was timely, Defendant IHM's Motion fails to establish good cause to obtain an order from the Court for a "psychological" examination of Plaintiff. Thus, Defendant IHM's Motion must be denied.[16]

19. The Texas Supreme Court acknowledges that mental medical examinations are subject to a more rigorous standard due to their sensitive nature.[17] Under Rule 204.1, it is the movant's burden to affirmatively show "good cause" to obtain a medical examination.[18] "Good cause" requires an affirmative showing of three things: (1) the examination is relevant to issues that are genuinely in controversy in the case; (2) a reasonable nexus exists between the condition in controversy and the examination sought; and (3) it is not possible to obtain the desired information through means that are less intrusive than a compelled examination.[19]

20. These requirements may not be met with "conclusory allegations" in the movant's pleading.[20] Moreover, "good cause" is not presumed merely because Plaintiff has retained a psychologist to testify as an expert regarding Plaintiff's mental condition.[21] Texas courts have repeatedly refused to permit medical examinations when good cause is not shown.[22] Here, Defendant IHM has failed to show good cause with any evidence to meet its burden.

---

[16] *Coates v. Whittington,* 758 S.W.2d 749, 751-52 (Tex. 1988) (a movant's showing of good cause is mandatory).

[17] *Id.* at 752 ("Plaintiffs should not be subjected to public revelations of the most personal aspects of their private lives just because they seek compensation for mental anguish associated with an injury.").

[18] Tex. R. Civ. P. 204.1(a).

[19] *Id.* at 506-07.

[20] *In re Click*, 442 S.W.3d 487, 491 (Tex. App. – Corpus Christi 2014, no pet.).

[21] *In re Transwestern Pub. Co., L.L.C.*, 96 S.W.3d 501, 506 (Tex. App. – Fort Worth 2002, orig. proceeding).

[22] *See In re Dallas Group of Am., Inc.*, 434 S.W.3d 647, 648 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *In re Bell Hot Shot Co.*, 2014 WL 260116, at *2 (Tex. App.—Houston [14th Dist.] Jan. 9, 2014, no pet.) (The trial court

---

### 1. *Defendant IHM already has the information that it seeks.*

21.     Defendant IHM cannot establish good cause because it has not shown that it cannot obtain the desired information through a less intrusive means.  Plaintiff has already undergone a thorough mental health examination focusing on the sexual assault and the impact on her overall well-being before and after the assault.

22.     Plaintiff's psychologist, Dr. William Flynn, administered four separate objective tests to Plaintiff: 1) the Clinically-Administered PTSD Scale for DSM-IV, the gold standard in PTSD assessment; 2) a Personality Assessment Inventory, an objective inventory of adult personality that assesses  psychopathological syndromes and provides information relevant for clinical diagnosis, treatment planning, and screening for psychopathology; 3) the Structured Clinical Interview for DSM-IV Axis I Disorders, a diagnostic exam used to determine DSM-IV Axis I disorders (mental disorders); and 4) the Beck Depression Inventory I-II, one of the most commonly used instruments for measuring severity of depression.

23.     The results of these tests generate "raw data" which is then reviewed and analyzed by the medical professional. All of the "raw data" from these standardized tests have been provided to Defendant IHM to conduct its own analysis.[23] *In re Transwestern* explicitly states that "'good cause' is not assumed merely because a psychologist has been appointed to testify as an expert regarding the subject's mental condition."[24]

24.     There is no added benefit of having Plaintiff fill out the examination booklets a second time when the raw data is already available by less intrusive means. Defendant IHM has the burden of showing the Court that "it is not possible to obtain the desired information through

---

did not abuse its discretion by determining that the relators have not shown good cause for an independent psychological evaluation); *In re Click*, 442 S.W.3d 487, 492 (Tex. App.—Corpus Christi 2014, no pet.) (no good cause).

[23] *See* Correspondence between David Denton and Trey Crawford, **Exhibit 8.**

[24] 96 S.W.3d at 506.

means that are less intrusive than a compelled exam."[25] Defendant IHM's conclusory assertion that there is good cause is legally irrelevant. They must provide evidence making a showing of "good cause." No such showing has been made. Thus, the Court must deny the Motion.[26]

### 2. Defendant IHM fails to establish the required nexus between the mental examination sought and the condition in controversy.

25. Defendant IHM's Motion lacks any specificity as to the mental examination it is asking the Court to Order. Defendant IHM's Motion fails to specify the scope of the requested examination of Plaintiff, how it is to be conducted, and how it would be any different from the objective raw data Defendant IHM already has from the first examination.

26. By not specifying the examination that Defendant IHM is requesting, the Court cannot enter an order that would be compliant with the specificity requirements set forth in Rule 204.1(d). Thus, Defendant IHM has failed to make a showing that there is "a reasonable nexus between the condition in controversy and the examination sought."[27] Without such a showing, "good cause" cannot be established as a matter of law.

27. Allowing Defendant IHM to conduct a second examination of Plaintiff would be duplicative and invasive. Given the traumatic event that took place and the understandable anxiety associated with discussing or "reliving" such an event, a mental examination would be overly intrusive to Plaintiff and provide no substantive benefit. In light of Defendant IHM's failure to assert and prove good cause sufficient for a Rule 204.1 motion to compel, Defendant IHM's Motion must be denied.

---

[25] *See In re Click*, 442 S.W.3d at 491.
[26] *In re Caballero*, 36 S.W.3d 143, 145 (Tex. App.—Corpus Christi 2000, no pet.) (trial court abused its discretion in ordering medical examination after good cause was not established).
[27] *See In re Click*, 442 S.W.3d at 491.

---

## IV.
### PRAYER

**WHEREFORE, PREMISES CONSIDERED** Plaintiff respectfully prays that this Court deny Defendant IHM's Motion to Examine Plaintiff Jane Doe in its entirety, and respectfully prays for all relief, in law and in equity, to which Plaintiff may prove herself to be justly entitled.

Respectfully submitted,

_____

**ROYCE WEST**
State Bar No. 21206800
royce.w@westllp.com
**VERETTA FRAZIER**
State Bar No. 00793264
veretta.f@westllp.com
**NIGEL REDMOND**
State Bar No. 24058852
nigel.r@westllp.com
**WEST & ASSOCIATES, L.L.P.**
P.O. Box 3960
Dallas, Texas 75208-1260
Ofc.: (214) 941-1881
Fax: (214) 941-1399

**G. MICHAEL GRUBER**
State Bar No. 08555400
mgruber@ghjhlaw.com
**TREY CRAWFORD**
State Bar No. 24059623
tcrawford@ghjhlaw.com
**BRIAN E. MASON**
State Bar No. 24079906
bmason@ghjhlaw.com
**GRUBER HURST JOHANSEN HAIL SHANK LLP**
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
214.855.6800 (main)
214.855.6808 (facsimile)

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served—in accordance with TEX. R. CIV. P. 21, 21a—on March 24, 2015 to all counsel of record.

_____
Trey Crawford



Cause Number: 13.04564

| | | |
|---|---|---|
| JANE DOE, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | L-193rd |
| | § | |
| v. | § | _____ JUDICIAL DISTRICT COURT |
| | § | |
| AJREDIN "DANNY" DEARI; DRITAN | § | |
| KREKA; PASTAZIOS PIZZA, INC.; | § | |
| ISLAND HOSPITALITY MANAGEMENT, | § | |
| INC.; HYATT HOTELS CORPORATION; | § | |
| and DOES 1-25, | § | |
| | § | |
| *Defendants.* | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION

Plaintiff JANE DOE[1] ("Plaintiff") file *Plaintiff's Original Petition* ("Petition") against Defendants AJREDIN "DANNY" DEARI; DRITAN KREKA; PASTAZIOS PIZZA, INC.; ISLAND HOSPITALITY MANAGEMENT, INC.; HYATT HOTELS CORPORATION; and DOES 1-25 (collectively referred to herein as "Defendants"), and for causes of action respectfully shows this Court as follows:

### I.
### DISCOVERY CONTROL PLAN

1.      Pursuant to TEX. R. CIV. P. 190.1, 190.3, Plaintiff intends to conduct discovery under a Level 2 Discovery Control Plan.

### II.
### PARTIES

2.      Plaintiff is a natural person who resides in Collin County, Texas.

---

[1] Due to the extremely personal and sensitive nature of this lawsuit, Plaintiff is proceeding under the pseudonym of "Jane Doe"; however, Defendants have full knowledge of Plaintiff's identity due to Defendants' involvement in the underlying acts and omissions that form the basis of this Petition. To the extent that Defendants or Defendants' counsel are genuinely unaware of Plaintiff's identity (which would likely be impossible due to criminal proceedings against at least one Defendant in Dallas County, Texas, Case No. F1111106), Plaintiff's counsel is happy to state Plaintiff's identity to this Court and Defendants' counsel in papers that are (1) filed under seal with this Court, and/or (2) not filed with this Court and, thus, not subject to public inspection.

MANDAMUS RECORD - TAB 5

3. Defendant AJREDIN "DANNY" DEARI (hereinafter, "Deari") is a natural person who resides—and may be served with service of process—at 15750 Spectrum #2211, Addison, Texas 75001.

4. Defendant DRITAN KREKA (hereinafter, "Kreka") is a natural person who resides—and may be served with service of process—at 5549 Big River Drive, The Colony, Texas 75056.

5. Defendant PASTAZIOS PIZZA, INC. (hereinafter, "Pastazios") is a Texas corporation that maintains its principal place of business in Dallas County, Texas. Pastazios may be served with service of process by serving its registered agent, Ajredin Deari, located at 1416 Tree Farm Drive, Plano, Texas 75093.

6. Defendant ISLAND HOSPITALITY MANAGEMENT, INC. (hereinafter, "Island Hospitality") is a Florida corporation with its principal place of business in Palm Beach, Florida. Island Hospitality may be served with service of process by serving its registered agent, C T Corporation System, located at 350 N. Paul Street, Suite 2900, Dallas, Texas 75201.

7. Defendant HYATT HOTELS CORPORATION (hereinafter, "Hyatt") is a Delaware corporation with its principal place of business in Chicago, Illinois. Hyatt may be served with service of process by serving its registered agent, United States Corporation Co., located at 211 East 7th Street, Suite 620, Austin, Texas 78701.

8. Upon information and belief, Plaintiff alleges that the true identities and residences of Defendants JOHN DOE 1-25, respectively, are currently unknown to Plaintiff at this time. Plaintiff shall proceed with due diligence to discover the identities of Defendants JOHN DOE 1-25, respectively and, after said Defendants' true identities have been discovered, will amend this Petition accordingly.

9.     Upon information and belief, Plaintiff alleges that, at all material times, all Defendants were the agents, servants, employees, partners, authorized agents and/or joint venturers of every other Defendant and the acts of each Defendant were within the course and scope of the agency, employment, partnership, and/or joint venture such that each Defendant is jointly and severally liable for the damages alleged by Plaintiff herein.

## III.
### JURISDICTION

10.     This Court has subject matter jurisdiction over this lawsuit because the amount in controversy exceeds the minimum jurisdictional requirements.

11.     In accordance with TEX. R. CIV. P. 47, Plaintiff seeks monetary relief in excess of $1,000,000.00 due to Defendants' tortious conduct.

12.     This Court has personal jurisdiction over Defendant Deari and Defendant Kreka because said Defendants (1) are individuals and residents of the State of Texas, (2) transact business within the State of Texas, (3) maintain continuous and systematic contacts with the State of Texas, (4) purposefully avails themselves to the laws of the State of Texas, and (5) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Texas and involved Defendant Deari and Defendant Kreka.

13.     This Court has personal jurisdiction over Defendant Pastazios because said Defendant (1) is a Texas corporation that maintains its principal place of business in Texas, (2) transacts business within the State of Texas, (3) maintains continuous and systematic contacts with the State of Texas, (4) purposefully avails itself to the laws of the State of Texas, and (5) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Texas and involved Defendant Pastazios.

14.     This Court has personal jurisdiction over Defendant Island Hospitality because (1)

MANDAMUS RECORD - TAB 5

it transacts business within the State of Texas, (2) it has continuous and systematic contacts with the State of Texas, (3) it maintains multiple offices in Texas, owns property in Texas, and maintains bank accounts (used for the purpose of transacting business within the State of Texas and elsewhere) within the State of Texas, (4) it purposefully avails itself to the laws of the State of Texas, and (5) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Texas and involved Defendant Island Hospitality.

15.     This Court has personal jurisdiction over Defendant Hyatt because (1) it transacts business within the State of Texas, (2) it has continuous and systematic contacts with the State of Texas, (3) it maintains multiple offices and bank accounts (used for the purpose of transacting business within the State of Texas and elsewhere) within the State of Texas, (4) it purposefully avails itself to the laws of the State of Texas, and (5) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Texas and involved Defendant Hyatt.

16.     Removal of this case to a federal court is inappropriate and statutorily unauthorized because (1) complete diversity of parties is lacking, (2) at least one Defendant is a forum-state defendant by virtue of its Texas incorporation and/or principal place of business being in Texas, and (3) Plaintiff has not alleged a federal question, federal cause of action, or alleged facts that would give rise to a federal question or federal cause of action; therefore, any attempt to remove this case to a federal court is frivolous and gives rise to sanctionable conduct.

## IV.
### VENUE

17.     Pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002(a), venue is proper in Dallas County, Texas because (1) all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Dallas County, Texas, and (2) some or all of the Defendants resided in Dallas County, Texas at the time Plaintiff's causes of action accrued.

18.     Pursuant to TEX. CIV. PRAC. & REM. CODE § 15.005, because venue is proper in Dallas County, Texas against at least one Defendant, venue is proper in Dallas County, Texas as to all Defendants.

## V.
### FACTUAL BACKGROUND

19.     In early 2011, Plaintiff was 18 years old and a recent graduate from high school. Plaintiff excelled in school academically, graduating as the valedictorian of her class.

20.     Like many young adults, Plaintiff was in search of an entry-level job at a local business in order to earn disposable income and garner working experience. During her search, Plaintiff was introduced to Defendant Deari and Defendant Kreka. Plaintiff was told that Deari and Kreka were the owners of two local bar/restaurants, and would be willing to meet with her to discuss potential employment opportunities.

21.     On or about April 26, 2011, Plaintiff met Deari and Kreka at a restaurant in Dallas, Texas. Deari asked Plaintiff how old she was and Plaintiff informed both men that she was 18 years old. At the time, Defendant Deari was approximately 49 years old and Defendant Kreka was approximately 33 years old. The two Defendants subsequently tried to order Plaintiff an alcoholic beverage; however, the restaurant's server refused to bring the beverage because Plaintiff was underage.

22.     Undeterred, the two Defendants decided that it would be easiest to order Plaintiff beverages at "Pastazios's Pizza" in Addison, Texas. On information and belief, Plaintiff alleges that "Pastazios's Pizza" is the assumed name of Defendant Pastazios and, additionally, the alter ego of Defendant Deari who holds himself out to the public and Texas Secretary of State as the registered agent, director, and president of Pastazios.

23.     As planned, Defendant Deari and Defendant Kreka convinced Plaintiff to drive to

MANDAMUS RECORD - TAB 5

Pastazios. Prior to their arrival, Defendants purchased hard liquor from a store with the intention of serving the alcohol to Plaintiff.

24.     Upon arrival at Pastazios, Defendants Kreka, Deari, and Pastazios (through its employees, director, and president) began serving, selling, retrieving, and otherwise giving Plaintiff multiple "shots" of hard liquor and servings of beer. Defendants repeatedly and aggressively pressured Plaintiff into consuming—and Plaintiff, indeed, consumed—these beverages despite Defendants' knowledge that Plaintiff was not of the legal age to drink. Just as Defendants Deari, Kreka, and Pastazios planned, Plaintiff became intoxicated and she was, in fact, obviously intoxicated.

25.     After Plaintiff had consumed multiple shots of hard liquor and servings of beer that Defendants served, sold, retrieved, and otherwise gave to Plaintiff, Deari and Kreka decided that their next stop should be a local adult entertainment dance club. Deari retrieved his vehicle from Pastazios's parking lot and told Kreka and Plaintiff to get into the vehicle. Kreka moved into the driver's seat and Plaintiff, who was highly intoxicated, sat in the back of the vehicle. Plaintiff then lost consciousness.

26.     Plaintiff's next memory is vomiting in a gas station parking lot before losing consciousness again. Shortly thereafter, Plaintiff awoke in a hotel room located 4900 Edwin Lewis Drive, Addison, Texas 75001—a premise that is owned, operated, and otherwise possessed by Island Hospitality and Hyatt (hereinafter, "the Premises Defendants")—wherein she had been involuntarily disrobed and was actively being raped by Defendant Deari.

27.     Plaintiff repeatedly insisted that Defendant Deari stop the attack, but he did not. It was only after Plaintiff made multiple demands for Defendant Deari to stop did the sexual assault eventually end. Fearful of another attack, Plaintiff locked herself in the bathroom.

MANDAMUS RECORD - TAB 5

28.    While still in the hotel room, Defendant Deari called Defendant Kreka on the telephone and told him that Plaintiff was "really freaking out, dude", and asked for Kreka to retrieve him from the Premises Defendants' property. With the knowledge that a sexual assault had just occurred (one in which Defendant Kreka conspired to commit, facilitated, aided, and abetted), Kreka retrieved Deari from the crime scene (unimpeded by the Premises Defendants) thereby assisting Deari's evasion of law enforcement.

29.    Plaintiff alleges that the Premises Defendants knew, or reasonably should have known, of the reasonably foreseeable, unreasonable risks of harm from criminal activity at its premises to Plaintiff taking into account the history, frequency, proximity, regularity, publicity, and similarity of criminal conduct on or near the Premises Defendants' property. The Premises Defendants allowed Defendant Deari and Defendant Kreka to reserve a room at its hotel, enter it with an unconscious 18 year-old woman, rape her, and come and go from its property in an unimpeded fashion such that Defendants could evade a police investigation without resistance.

30.    After the attack on Plaintiff ceased and Deari and Kreka left the Premises Defendants' property, a friend of Plaintiff's arrived at the hotel to help. After learning what happened, the friend immediately notified the Addison Police Department. While investigating the crime scene, Defendant Deari came back to the hotel (presumably to retrieve the underwear he left, which was taken into evidence by the police department), and Deari was arrested, charged with the crime of sexual assault, indicted, and has a criminal trial pending. At this point in time, Defendant Kreka has not been charged for the crimes he aided, abetted, facilitated, and conspired to commit.

31.    Plaintiff was immediately transmitted to the hospital and underwent a series of examinations, tests, and administered massive quantities of treatments for the injuries she

incurred during the rape.

32.     Within a matter of days following the sexual assault, Plaintiff went back to the hospital after she experienced severe pain in her pubic region. Upon information and belief, the doctors informed Plaintiff that she had contracted herpes, an incurable sexually-transmitted disease, during the rape. The doctors conducted a blood test on Plaintiff wherein the specific strand of herpes was identified. It has recently been discovered that the results of a mandatory blood/sexually-transmitted disease test ordered by the Court in "The State of Texas v. Danny Deari" has confirmed that Plaintiff's attacker (who did not utilize latex contraception during the attack), Defendant Deari, is infected with the same derivation of the herpes virus.

33.     As a proximate result of the criminal, despicable, extreme, outrageous, and tortious acts of Defendants alleged herein, Plaintiff has foreseeably suffered through, and will continue to suffer through, extreme emotional distress, pain and suffering, and mental anguish as the sexual assault is constantly replayed in her mind and the aftermath displayed on her body. Plaintiff is forced to shoulder the burden of Defendants' criminal and tortious acts for the rest of her life which, according to the federal government's "National Vital Statistics Reports", is expected to be another 61.6 years.[2] Plaintiff has incurred, and will continue to incur, substantial damages proximately caused by Defendants.

## VI.
### CAUSES OF ACTION

#### COUNT 1: ASSAULT – THREAT OF BODILY INJURY

34.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 33 of Plaintiff's Petition.

35.     On or about April 26, 2011, Defendants intentionally or knowingly threatened

---

[2] *See* U.S. Department of Health and Human Service, NATIONAL VITAL STATISTICS REPORTS Vol. 61, No.3, September 24, 2012 at 20.

MANDAMUS RECORD - TAB 5

Plaintiff with imminent bodily injury. Defendants' threat of imminent bodily injury caused Plaintiff to be apprehensive, which was a foreseeable result of Defendants' actions.

36. Each and every Defendant is liable for the threat of bodily injury committed against Plaintiff because each and every Defendant participated in the tortious act themselves or, alternatively, assisted the tortious act against Plaintiff in furtherance of the civil conspiracy to do so or, alternatively, aided and abetted each other to allow the ultimate threat of bodily injury against Plaintiff to take place.

37. Defendants' threat of imminent bodily injury to Plaintiff was a cause of the damages alleged herein.

## COUNT 2: ASSAULT (BATTERY) –BODILY INJURY AND OFFENSIVE CONTACT

38. Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 37 of Plaintiff's Petition.

39. Plaintiff incorporates by reference, as if fully set forth herein, the statutory language of TEX. PENAL CODE § 22.011 describing the felony of "Sexual Assault". Plaintiff alleges that Plaintiff was the victim of the crime, Sexual Assault, which Defendants committed against Plaintiff (as described in TEX. PENAL CODE § 22.011(a),(b),(f)) on or about April 26, 2011, and that the sexual assault has caused Plaintiff's damages alleged herein.

40. Defendants intentionally, knowingly, and/or recklessly made physical contact with Plaintiff's person causing bodily injury—that is, physical pain, illness, or impairments of Plaintiff's physical condition—and Plaintiff did not, and could not, consent to the harmful physical contact.

41. Alternatively, Defendants intentionally or knowingly caused to be made physical contact with Plaintiff when Defendants knew, or reasonably should have believed, that Plaintiff

MANDAMUS RECORD - TAB 5

would regard the contact as offensive or provocative. Indeed, said physical contact was offensive, provocative, and committed by Defendants despite never having consent from Plaintiff.

42. As a causal result of Defendants' battery of Plaintiff's person, Plaintiff suffered immediate, consequential, and subsequent injuries—including pain, illness, and physical impairment—that were foreseeable to Defendants. The assault committed by Defendants on Plaintiff's person was a cause of the damages alleged by Plaintiff herein.

43. Each and every Defendant is liable for the crimes, assault, battery, and sexual assault of which Plaintiff is a victim because each and every Defendant participated in the tortious and felonious acts themselves or, alternatively, assisted the crimes, assault, battery, and sexual assault against Plaintiff in furtherance of the civil conspiracy to do so or, alternatively, aided and abetted the crimes, assault, battery, and sexual assault by providing intoxicating substances to Plaintiff, a mode of transportation for the crimes, assault, battery, and sexual assault to occur, and/or a location—which was foreseeably unsafe and unreasonably dangerous—for the crimes, assault, battery, and sexual assault to take place.

44. In addition to committing, conspiring to commit, or aiding and abetting assault, battery, and/or sexual assault against Plaintiff, the investigation is still ongoing as to whether or not Defendants individually—or collectively in furtherance of a conspiracy and/or whilst aiding and abetting each other—should be charged with, criminally prosecuted for, and civilly held liable for the felony of "Aggravated Sexual Assault", as defined by TEX. PENAL CODE § 22.021 and fully incorporated by reference herein.

COUNT 3: SEXUAL ASSAULT—TEX. PENAL CODE § 22.01

45. Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19

MANDAMUS RECORD - TAB 5

through 44 of Plaintiff's Petition.

## COUNT 4: FALSE IMPRISONMENT

46. Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 45 of Plaintiff's Petition.

47. Without legal authority or justification, Defendants willfully detained or participated in the detainment of Plaintiff without Plaintiff's consent. Defendants accomplished the unlawful detainment of Plaintiff with violence, threats that were calculated to inspire—and, in fact, inspired—a reasonable fear of injury to Plaintiff, intoxicating substances, and/or other means that were intended to cause—and, in fact, caused—Plaintiff to be unable to exercise her will in going anywhere she was lawfully allowed to go. Said false imprisonment took place at the hotel owned and operated by the Premises Defendants.

48. The false imprisonment committed by Defendants against Plaintiff was a proximate cause of the damages alleged by Plaintiff herein.

## COUNT 5: NEGLIGENCE

49. Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 48 of Plaintiff's Original Petition.

50. Defendants owed Plaintiff legal duties that Defendants breached thereby proximately causing Plaintiff's damages.

51. For example, Defendants Pastazios and Deari—as the individual who holds himself out as the registered agent, director, and president of Pastazios—had a duty to control its employees, a duty to supervise its employee's activities, a duty to prevent an employee from causing an unreasonable risk of harm to Plaintiff, a duty to use ordinary care in hiring and retaining its employees, a duty to not place Plaintiff in harm's way of foreseeable criminal

MANDAMUS RECORD - TAB 5

activity, and a duty to treat Plaintiff in a manner that would not subject her to physical or mental injury. Said Defendants breached those duties it owed Plaintiff by, amongst other things, negligently providing intoxicating substances to Plaintiff and placing here in harm's way. Defendant Kreka, by way of example, owed Plaintiff a legal duty to protect Plaintiff from harm when the danger was caused, in part, by Kreka and the harm was apparent to Kreka such that he was in a position to protect Plaintiff from the harm, a duty to not place Plaintiff in harm's way of foreseeable criminal activity, a duty to not operate a vehicle when legally intoxicated thereby placing Plaintiff in danger and, ultimately, causing her to arrive at the location where she was sexually assaulted, and a duty to treat Plaintiff in a manner that would not subject her to physical or mental injury. Defendant Kreka breached each and every one of these duties as detailed in this Petition. The Premises Defendants, for example, owed Plaintiff a duty to use ordinary care in maintaining its premises in a safe condition and to inspect the premises to ensure the safety of its occupants, a duty to protect Plaintiff against unreasonable and foreseeable risks of harm from the criminal acts of third parties due to the Premises Defendants' status (as landowner) and ability to control the security and safety of the premises, a duty not to injure Plaintiff in a willful, wanton, or grossly negligent manner or allow another to do so on its premises when it knew, or reasonably should have known, such conduct would take place, a duty to make safe conditions on its property in order to protect Plaintiff, and a duty to treat Plaintiff in a manner that would not subject her to physical or mental injury. As the owner and operator of the location where Plaintiff was sexually assaulted, falsely imprisoned, and subjected to extreme and outrageous intentional infliction of emotional distress, there can be no dispute that the Premises Defendants breached each and every one of the duties it owed Plaintiff.

52.     Defendants breached the duties it owed to Plaintiff (as set forth in this Petition)

MANDAMUS RECORD - TAB 5

thereby proximately causing Plaintiff's injuries and the damages alleged herein.

COUNT 6: PREMISES LIABILITY

53.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 52 of Plaintiff's Petition.

54.     Plaintiff's cause of action for Premises Liability is alleged against the Premises Defendants, only. Plaintiff reserves the right to supplement and amend this cause of action.

55.     The Premises Defendants facilitated the assault and tortious conduct on Plaintiff through the use or misuse of the property—located at 4900 Edwin Lewis Drive, Addison, Texas 75001—owned, operated, controlled by, franchised by, licensed by, and/or otherwise possessed by the Premises Defendants.

56.     The Premises Defendants owed Plaintiff a duty to exercise ordinary care in protecting Plaintiff from unreasonable and reasonably foreseeable risks of harm (including criminal activity at its premises considering the history, frequency, proximity, regularity, publicity, and similarity of criminal conduct on or near the Premises Defendants' property) especially in light of the Premises Defendants' status as landowner and ability to control the security and safety of the premise. The Premises Defendants had a duty to inspect and make safe any dangerous conditions or situations on its property or give Plaintiff an adequate warning of the dangerous conditions or situations.

57.     The Premises Defendants breached the legal duties it owed Plaintiff thereby proximately causing Plaintiff's damages alleged herein.

COUNT 7: DRAM SHOP LIABILITY

58.     Plaintiff's cause of action for Dram Shop Liability is alleged against Defendant Deari—in his capacity as registered agent, director, and president of Pastazios—and Pastazios,

only. As used within Section VI(Count 8) of Plaintiff's Original Petition, said Defendants shall be referred to as the "Dram Shop Defendants." Plaintiff reserves the right to supplement and amend this cause of action.

59.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 58 of Plaintiff's Petition.

60.     On or about April 26, 2011, the Dram Shop Defendants held Texas Alcoholic Beverage Commission licenses for the sale or service of alcoholic beverages and did, in fact, sell or serve multiple alcoholic beverages to Plaintiff who, at the time, was an 18 year-old "adult recipient" of said beverages.

61.     To the extent that the Dram Shop Defendants did not hold Texas Alcoholic Beverage Commission licenses for the sale or service of alcoholic beverages on or about April 26, 2011, Plaintiff alternatively alleges that the Dram Shop Defendants did not have said licenses yet still sold Plaintiff, an 18 year-old "adult receipt", alcoholic beverages.

62.     After the Dram Shop Defendants provided the alcoholic beverages to Plaintiff, it was apparent, or readily became apparent, to the Dram Shop Defendants that Plaintiff was obviously intoxicated.

63.     Plaintiff's intoxication—as a result of Defendants' actions—was one of the proximate causes of the injuries incurred and the damages alleged by Plaintiff herein.

### COUNT 8: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS [ALTERNATIVE REMEDY]

64.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 63 of Plaintiff's Petition.

65.     As an alternative remedy to Plaintiff's claims detailed in this Petition at Section (VI)(Count 1-Count7 ), Plaintiff alleges that no alternative cause of action would provide

Plaintiff with a remedy for the severe emotional distress incurred by Plaintiff which was proximately caused by Defendants' tortious conduct.

66. Plaintiff—an individual—was and is a victim of Defendants' intentional or reckless actions that were calculated to cause severe emotional distress to Plaintiff.

67. Defendants' intentional or reckless actions towards Plaintiff were extreme and outrageous and, ultimately, proximately caused Plaintiff to suffer severe emotional distress.

## COUNT 9: PARTICIPATORY LIABILITY—AIDING AND ABETTING AND CONCERT OF ACTION

68. Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 67 of Plaintiff's Petition.

69. Among the Defendants was a primary actor/actors who committed an underlying tort, or torts, against Plaintiff. Defendants had knowledge that the primary actor's conduct constituted a tort and Defendants gave the primary actor assistance, substantial assistance, and/or encouragement to commit the tort against Plaintiff. Defendants' assistance, substantial assistance, and/or encouragement was a substantial factor in causing the tort to be completed and a substantial factor in the damages incurred by Plaintiff as alleged herein.

70. Alternatively, Defendants' own conduct—separate and apart from the primary actor—was a breach of duty to Plaintiff and a substantial factor in causing Plaintiff's injuries.

71. Due to Defendants' joint assistance, encouragement, aiding and abetting, and/or concert of action, Plaintiff alleges that Defendants should be held jointly and severally responsible for the whole of damages incurred by Plaintiff.

## COUNT 10: PARTICIPATORY LIABILITY—CONSPIRACY

72. Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 71 of Plaintiff's Petition.

MANDAMUS RECORD - TAB 5

73. As fully described in this Petition, Defendants are, and were, individuals or individual entities that acted together as a combination of two or more individuals or entities.

74. Throughout Defendants' interactions with Plaintiff on or about April 26, 2011, the object of Defendants' combination was to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.

75. Defendants had a meeting of the minds on the object or course of action of its conspiracy, and at least one Defendant committed an unlawful, overt act in furtherance of Defendants' object or course of action.

76. Plaintiff suffered the damages alleged herein as a proximate result of Defendants' wrongful act or acts.

**COUNT 11: EXEMPLARY DAMAGES**

77. Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 76 of Plaintiff's Original Petition.

78. Defendants' tortious conduct was malicious, fraudulent, and/or grossly negligent.

79. Defendants' malicious, fraudulent, and/or grossly negligent was carried out by Defendants personally, through Defendants' authorized agents, managers, officers, directors, vice-principals, and/or principals of the Defendants who were acting within the course and scope of their agency, employment, partnership, and/or joint venture. Alternatively, Defendants' malicious, fraudulent, and/or grossly negligent conduct was subsequently approved by or ratified by Defendants.

80. Defendants intentionally breached the legal duties it owed Plaintiff such that it could take undue advantage of Plaintiff and/or otherwise maliciously treat Plaintiff. The acts or omissions of Defendants, when viewed objectively from the Defendants' standpoint, involved an

MANDAMUS RECORD - TAB 5

extreme degree of risk when considering the probability and magnitude of the potential harm to Plaintiff and others.

81.    Additionally, Defendants had actual, subjective awareness of the risk to Plaintiff and others but proceeded anyway with a conscience indifference to the rights, safety, or welfare of Plaintiff and others.

82.    Defendants' conduct was performed and/or designed with a specific intent to cause substantial injury or harm to Plaintiff. As alleged fully herein, Defendants' conduct is an example of why punitive damages exist, and Plaintiff alleges that Defendants' conduct rises to the level warranting the imposition of exemplary damages against Defendants at trial of this matter.

## VII.
### DAMAGES

83.    Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 82 of Plaintiff's Petition.

84.    Plaintiff has incurred significant damages due to Defendants' criminal, tortious, and outrageous conduct. Plaintiff seeks all losses sustained as a natural, probable, foreseeable, and/or proximate result of Defendants' wrongful conduct, including:

   a.   General damages;

   b.   Actual damages;

   c.   Physical pain and suffering incurred in the past and future;

   d.   Mental anguish incurred in the past and future;

   e.   Disfigurement incurred in the past and future;

   f.   Physical impairment incurred in the past and future;

   g.   Medical expenses incurred in the past and future;

MANDAMUS RECORD - TAB 5

h.  Loss of earning capacity incurred in the past and future;

i.  Lost wages incurred in the past and future;

j.  All reasonable and necessary attorneys' fees that Plaintiff is forced to incur pursuant to Texas common law and equity;

k.  Exemplary damages;

l.  Costs of court;

m.  Pre-judgment interest;

n.  Post-judgment interest; and

o.  All other relief, in law and in equity, to which Plaintiff may be justly entitled.

## VIII.
### DEMAND FOR JURY

85.  Plaintiff demands a jury trial and tenders the appropriate fee.

## IX.
### REQUEST FOR DISCLOSURE

86.  Under TEX. R. CIV. P. 194, Plaintiff hereby makes the demand that Defendants disclose, within the timeframe provided by the TEXAS RULES OF CIVIL PROCEDURE, the information and material described in TEX. R. CIV. P. 194.2(a)-(l).

## X.
### PRAYER

87.  WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer herein. Plaintiff further prays that, upon trial by jury, she have judgment against Defendants for the damages enumerated herein, as well as all other relief, in law and in equity, to which Plaintiff may show herself to be justly entitled.

Respectfully submitted,

G. MICHAEL GRUBER
State Bar No. 08555400
mgruber@ghjhlaw.com
ERIC POLICASTRO
State Bar No. 24068809
epolicastro@ghjhlaw.com
TREY H. CRAWFORD
State Bar No. 24059623
tcrawford@ghjhlaw.com

GRUBER HURST JOHANSEN HAIL SHANK LLP
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
214.855.6800 (main)
214.855.6808 (facsimile)

ATTORNEYS FOR PLAINTIFF

MANDAMUS RECORD - TAB 5

CAUSE NO. DC-13-04564-L

| | | |
|---|---|---|
| JANE DOE | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | |
| | § | |
| AJREDIN "DANNY" DEARI; DRITAN | § | |
| KREKA; PASTAZIOS PIZZA, INC.; | § | |
| ISLAND HOSPITALITY MANAGE- | § | |
| MENT, INC.; HYATT HOTELS | § | |
| CORPORATION; HYATT HOUSE | § | |
| FRANCHISING, LLC; GRAND PRIX | § | DALLAS COUNTY, TEXAS |
| FLOATING LESSEE, LLC; INK | § | |
| ACQUISITION, LLC; INK | § | |
| ACQUISITION II, LLC; INK | § | |
| ACQUISITION III, LLC; INK LESSEE, | § | |
| LLC; INK LESSEE HOLDING, LLC; | § | |
| CHATHAM TRS HOLDING, INC.; | § | |
| CHATHAM LODGING, LP; JEFFREY | § | |
| H. FISHER, Individually; POST | § | |
| PROPERTIES, INC.; and DOES 1-25 | § | 193RD JUDICIAL DISTRICT |

## 193rd JUDICIAL DISTRICT COURT'S STANDING SCHEDULING ORDER

In accordance with Rules 166, 190 and 192, of the Texas Rules of Civil Procedure (TRCP), the Court issues the following Order to control the scheduling of this cause.

### TRIAL SETTING, AMENDMENT OF DATES & DISMISSAL FOR WANT OF PROSECUTION

This case will be ready and is set for jury trial on **July 29, 2014 at 9:30 a.m:** the "Trial Setting." Any reset or continuance of the Trial Setting will not alter any deadline in this Order or established by the Texas Rules of Civil Procedure unless otherwise provided by Order, or by the agreement of the parties, in accordance with TRCP 11. When no announcement is made for Plaintiff(s) or the Plaintiff(s) fail to appear, the Court may dismiss this case for want of prosecution, pursuant to: (i) Rule 165a TRCP; (ii) the Dallas County Local Civil Rules; and/or (iii) the Court's inherent power to dismiss cases not diligently prosecuted, with a hearing on dismissal for want of prosecution to be held at the time of trial.

### DEADLINES & TIMELINES

The following pre-trial matters will be completed by the following dates (in the event that one of these dates falls on a weekend or holiday, the date will be the first preceding date, which is not a weekend or a holiday):

1. **Deadline for filing Amended Pleadings Asserting New Claims or Defenses.** – **120 days** before the Trial Setting, which is **March 31, 2014.** (Amended pleadings responsive to

MANDAMUS RECORD - TAB 5

timely filed pleadings under this scheduling order may be filed after the deadline for amended pleadings, if filed within two (2) weeks after the pleading to which they respond.)

2. **Deadline to Designate Responsible Third Parties.** – **120 days** before the Trial Setting, which is **March 31, 2014.** Defendants shall file any motions for leave to designate responsible third parties, under Civ. Prac. & Rem. Code §33.004 by this date.

3. **Deadline to Join Additional Parties.** – **120 days** before the Trial Setting, which is **March 31, 2014.** No additional parties may be joined after this date, except on motion for leave showing good cause. This paragraph does not otherwise alter the requirements of Rule 38. This paragraph does not limit a claimant's ability to join a person designated as a responsible third parties, as provided for under Civ. Prac. & Rem. Code §33.004(e). The party joining an additional party shall serve a copy of this Order on the new party concurrently with the pleading joining that party.

4. **Deadline for any Party seeking affirmative relief to designate experts as per Tex. R. Civ. P. 1942(f)** – **120 days** before the Trial Setting, which is **March 31, 2014.**

5. **Deadline for any Party opposing affirmative relief to designate experts as per Tex. R. Civ. P. 1942(f)** – **90 days** before the Trial Setting, which is **April 30, 2014.**

6. **Deadline for Designation of Rebuttal Experts and Provide Reports as per Tex. R. Civ. P. 1942(f)** – **85 days** before the Trial Setting, which is **May 5, 2014.** The Parties shall designate rebuttal experts from whom they intend to elicit expert opinion testimony regarding matters not reasonably anticipated prior to that Party's original expert designation deadline.

7. **Deadline to File Dispositive Motions:** – **60 days** before the Trial Setting, which is **May 30, 2014.** All dispositive motions shall be filed no later than this date.

8. **Deadline to File No-Evidence Motions.** – **60 days** before the Trial Setting, which is **May 30, 2014.** All no-evidence motions, as provided for by Rule 166a(i), shall be filed by this date. No such Motion shall be heard before the close of the discovery period.

9. **Discovery Closes.** – **50 days** before the Trial Setting, which is **June 9, 2014.** All depositions shall be completed by this date and all written discovery request shall be served so that responses are due no later than this date. Rule 193.5 governs amended or supplemental responses; however, it is presumed that an amended or supplemental response made after this date was not made reasonably promptly.

10. **Deadline to File Motion to Compel.** – **46 days** before the Trial Setting, which is **June 13, 2014.** Any motion to compel responses to discovery (other than relating to factual matters arising after the end of fact discovery) must be filed no later than this date, except for motions for sanctions as provided for by Rule 193.6.

11. **Deadline to File *Daubert/Robinson* Motions Challenging Opinion Testimony.** – **21 days** after said expert is deposed, or if the expert is not deposed, **14 days** after the end of the

MANDAMUS RECORD - TAB 5

discovery period, which is **June 23, 2014.** (These deadlines may be extended upon good cause shown).

The parties may alter these deadlines by agreement, pursuant to TRCP 11. Except by agreement of the parties, leave of Court, or where expressly authorized by the TRCP, no party may obtain discovery of information subject to TRCP 194 Disclosures by other forms of discovery (*e.g.* a request for production for testifying expert reports, witness statements, *etc.*). Repeated attempts of this type may be treated as an abuse of the discovery process and subject to Court sanctions.

### MEDIATION

The parties shall mediate this case no later than fifty (50) days before the Trial Setting, which is **June 9, 2014,** in accordance with this Court's Standing Mediation Order or any amendment thereto by the Court or the parties. If a Mediation Order is not issued in the case by the Court, the Parties are **ORDERED** to obtain a copy of the Order from the Court Coordinator.

### PRE-TRIAL MATTERS, EXHIBITS, JURY CHARGE, *ETC.*

**Fourteen (14) days before the Trial Setting**, which is **July 15, 2014,** the parties shall exchange: (i) designations of deposition testimony (by page and line) to be offered in direct examination; (ii) a witness list; (iii) a jury questionnaire, if any; (iv) any Motions in Limine (please note the Court has a Standing Motion in Limine); (v) a proposed jury charge; and (vi) a list of exhibits, including any demonstrative aids and affidavits. The Parties shall exchange copies of any exhibits not previously produced in discovery; over-designation of witness and/or exhibits is strongly discouraged and may be sanctioned. Except for records to be offered by way of business record affidavits, each exhibit must be identified separately and not by category or group designation. Please do not file these documents with the Court, just exchange them among the Parties.

**Eleven (11) days before the Trial Setting**, which is **July 18, 2014,** the parties shall exchange, in writing, objections to the opposing party's proposed exhibits, including objections under rule 193.7 TRCP, as well as objections to any deposition testimony. The attorneys in charge for each party shall confer on stipulations regarding the materials to be submitted to the Court under this paragraph and each shall attempt to maximize agreement with each opposing attorney on such matters. Please do not file these documents with the Court, just exchange them among the Parties.

**For Discovery Level II or III Cases *Only*: By 4:00 p.m., on the Thursday before the Trial Setting,** which is **July 24, 2014** each Party shall file with the Court a copy of its most recent Disclosures.

**On the Trial Date**, the parties shall bring to Court the documents required to have been exchanged in the preceding three paragraphs, along with a proposed Jury Charge for jury trials (a hard copy and on disk or CD in a Word Perfect or Word format) and any Motions in Limine (please note that the Court has its own Standing Motion in Limine). Counsel should be prepared

to discuss with the Court an estimate of the length of trial and witnesses to be called (number, identity and anticipated length of testimony).

Unless otherwise notified by the Court Coordinator, all Counsel must appear on the morning of the Trial Date, with witnesses on one-hour standby. Counsel should be advised that, if their case is not reached on the morning of the trial date, they are subject to being held-over on standby for the rest of the week. The Court will not entertain continuances on the day of trial on the ground that a Party did not expect that it would not be reached, absent exigent circumstances.

### PROCEDURES GOVERNING DAUBERT/ROBINSON HEARINGS

A challenge to an expert's opinion must be in writing and specify every ground for such challenge. A failure to specify a ground for a challenge is a waiver of that ground. The challenge, along with all supporting affidavits, deposition excerpts and any other evidence in support thereof, must be filed and served pursuant to the deadlines set forth in this Order. Direct testimony and all other evidence in support of the challenged expert must be reduced to affidavits and/or deposition excerpts of each and all witnesses to be used and such material filed with the Court's clerk no later than 4:00 p.m., four (4) days before the hearing. Such sponsoring evidence must be exchanged so as to be received in opposing counsel's office by 4:00 p.m., four (4) days before the hearing.

At the hearing, affiants, including challenged expert witnesses, may be present in the courtroom, but may not be presented for direct testimony in addition to their affidavits or deposition excerpts. The objecting party may cross examine affiants including challenged expert witnesses, if present in the Courtroom, only after which will the sponsoring party be permitted re-direct examination.

Please be advised that a challenge to the opinion of an expert, which is contained as evidence in the response to a Summary Judgment Motion, will likely result in the continuance of the Summary Judgment hearing so as not to work prejudice to the Summary Judgment Respondent, who, in effect, would otherwise be required to defend an expert at a <u>Daubert/ Robinson</u> hearing upon limited notice.

### MISCELLANEOUS

**Telephone Hearings  (For parties out of town).** — Participation in hearings by telephone for parties out of town is encouraged. Arrangements should be made with the Court Administrator.

**Default and Minor Prove-Ups.** — Unless instructed otherwise by the Court, default judgments should be presented by submission through affidavits; minor prove-ups shall be set for a hearing through the Court Administrator (which are to be held on Mondays).

**Continuances.** — Despite Dallas County Local Civil Rule 3.01(b), The Court does *not* require that continuances be signed by the Parties in addition to the Counsel (unless *pro se*, of course). However, be advised that an Agreed Motion for Continuance will not always be granted, especially those filed within two weeks before trial.

**Judgments** -- Pursuant to Tex. R. Civ. P. 299a, do **not** include findings of fact in any proposed Judgment for the Court. The Court will **not** sign any such Judgments. After a trial, the prevailing party shall tender a judgment to the Court within 30 days or the case is subject to being dismissed without prejudice. Concerning the procedure of tendering Judgments to the Court, the Parties are **ORDERED** to comply with Dallas County Local Civil Rule 2.08, as if this Rule applied to judgments in addition to orders, and as if the Court requested such judgment to be presented after trial.

All parties in receipt of this Scheduling Order are **ORDERED** to serve a copy of this Order on any Parties making an appearance after the date of this Order.

SIGNED this _10th_ day of _January, 2014_.

The Honorable Carl Ginsberg
193rd Judicial District Court

MANDAMUS RECORD - TAB 5

## MISCELLANEOUS

**Telephone Hearings (For parties out of town).** — Participation in hearings by telephone for parties out of town is encouraged. Arrangements should be made with the Court Administrator.

**Default and Minor Prove-Ups.** — Unless instructed otherwise by the Court, default judgments should be presented by submission through affidavits; minor prove-ups shall be set for a hearing through the Court Administrator (which are to be held on Mondays).

**Continuances.** — Despite Dallas County Local Civil Rule 3.01(b), The Court does *not* require that continuances be signed by the Parties in addition to the Counsel (unless *pro se*, of course). However, be advised that an Agreed Motion for Continuance will not always be granted, especially those filed within two weeks before trial.

**Judgments** — Pursuant to Tex. R. Civ. P. 299a, do *not* include findings of fact in any proposed Judgment for the Court. The Court will *not* sign any such Judgments. After a trial, the prevailing party shall tender a judgment to the Court within 30 days or the case is subject to being dismissed without prejudice. Concerning the procedure of tendering Judgments to the Court, the Parties are **ORDERED** to comply with Dallas County Local Civil Rule 2.08, as if this Rule applied to judgments in addition to orders, and as if the Court requested such judgment to be presented after trial.

All parties in receipt of this Scheduling Order are **ORDERED** to serve a copy of this Order on any Parties making an appearance after the date of this Order.

SIGNED this _____ day of _____, _____.


_____

The Honorable Carl Ginsberg
193rd Judicial District Court

| AGREED: | |
|---|---|
| Eric Policastro | Samuel H. Johnson |
| Gruber Hurst Johansen Hail Shank | Johnson-Broome, PC |
| 1445 Ross Avenue, Suite 2500 | 2591 Dallas Parkway, Suite 300 |
| Dallas, TX 75202-2711 | Frisco, TX 75034 |
| Royce West | *Attorney for Defendants Deari and* |
| West & Associates | *Pastazios Pizza* |
| P.O. Box 3960 | |
| Dallas, TX 75208-1260 | |
| *Attorneys for Plaintiff* | Ramona Martinez |
| | Matthew P. Last |
| | Cobb Martinez Woodward |
| | 1700 Pacific Avenue, Suite 3100 |
| Randy A. Nelson | Dallas, Texas 75201 |
| Thompson, Coe, Cousins & Irons, L.L.P. | *Attorneys for Island Hospitality Management,* |
| 700 N. Pearl, 25th Floor | *Hyatt House Franchising, LLC,* |
| Dallas, Texas 75201 | *Hyatt Hotels Corporation* |
| *Attorney for Post Properties, Inc. and* | *Grand Prix Floating Lessee, LLC,* |
| *Post Addison Circle LP* | *Ink Acquisition, LLC,* |
| | *Ink Acquisition II, LLC,* |
| | *Ink Acquisition III, LLC,* |
| Dritan Kreka | *Ink Lessee, LLC,* |
| 5549 Big River Drive | *Ink Lessee Holding, LLC,* |
| The Colony, TX 75056 | *Chatham TRS Holding, Inc.,* |
| *Pro Se Defendant Dritan Kreka* | *Chatham Lodging, LP, and* |
| | *Jeffrey H. Fisher* |

AGREED:

_____

Eric Policastro

Gruber Hurst Johansen Hail Shank

1445 Ross Avenue, Suite 2500

Dallas, TX 75202-2711

Royce West

West & Associates

P.O. Box 3960

Dallas, TX 75208-1260

*Attorneys for Plaintiff*


_____

Randy A. Nelson

Thompson, Coe, Cousins & Irons, L.L.P.

700 N. Pearl, 25th Floor

Dallas, Texas 75201

*Attorney for Post Properties, Inc. and*

*Post Addison Circle LP*


_____

Dritan Kreka

5549 Big River Drive

The Colony, TX 75056

*Pro Se Defendant Dritan Kreka*


_____

Samuel H. Johnson

Johnson Broome, PC

2591 Dallas Parkway, Suite 300

Frisco, TX 75034

*Attorney for Defendants Deari and*

*Pastazios Pizza*

*Matthew E. Last*

_____

Ramona Martinez

Matthew E. Last

Cobb Martinez Woodward

1700 Pacific Avenue, Suite 3100

Dallas, Texas 75201

*Attorneys for Island Hospitality Management,*

*Hyatt House Franchising, LLC,*

*Hyatt Hotels Corporation*

*Grand Prix Floating Lessee, LLC,*

*Ink Acquisition, LLC,*

*Ink Acquisition II, LLC,*

*Ink Acquisition III, LLC,*

*Ink Lessee, LLC,*

*Ink Lessee Holding, LLC,*

*Chatham TRS Holding, Inc.,*

*Chatham Lodging, LP, and*

*Jeffrey H. Fisher*

MANDAMUS RECORD - TAB 5

AGREED:

_____

Eric Policastro

Gruber Hurst Johansen Hail Shank

1445 Ross Avenue, Suite 2500

Dallas, TX 75202-2711

Royce West

West & Associates

P.O. Box 3960

Dallas, TX 75208-1260

*Attorneys for Plaintiff*

_____

Randy A. Nelson

Thompson, Coe, Cousins & Irons, L.L.P.

700 N. Pearl, 25th Floor

Dallas, Texas 75201

*Attorney for Post Properties, Inc. and*

*Post Addison Circle LP*

_____

Dritan Kreka

5549 Big River Drive

The Colony, TX 75056

*Pro Se Defendant Dritan Kreka*

_____

Samuel H. Johnson

Johnson Broome, PC

2591 Dallas Parkway, Suite 300

Frisco, TX 75034

*Attorney for Defendants Deari and*

*Pastazios Pizza*

_____

Ramona Martinez

Matthew E. Last

Cobb Martinez Woodward

1700 Pacific Avenue, Suite 3100

Dallas, Texas 75201

*Attorneys for Island Hospitality Management,*

*Hyatt House Franchising, LLC,*

*Hyatt Hotels Corporation*

*Grand Prix Floating Lessee, LLC,*

*Ink Acquisition, LLC,*

*Ink Acquisition II, LLC,*

*Ink Acquisition III, LLC,*

*Ink Lessee, LLC,*

*Ink Lessee Holding, LLC,*

*Chatham TRS Holding, Inc.,*

*Chatham Lodging, LP, and*

*Jeffrey H. Fisher*

MANDAMUS RECORD - TAB 5

## CERTIFICATE OF CONFERENCE

Counsel for the Mr. Deari has caused to be delivered to Defendant Kreka, pro se, and Mr. Kreka has received a copy of the proposed agreed scheduling order. Counsel for Mr. Deari has made at least one attempt to contact Mr. Kreka followed the receipt by Mr. Kreka of the proposed agreed scheduling order. Mr. Kreka has failed to respond.

Certified to the 9th day of January 2014.

*Matthew E. Last*

Matthew E. Last

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document has been forwarded to the following counsel of record either by telefax, electronic mail, certified mail, return receipt requested, and/or regular U.S. mail on this 9th day of January, 2014:

Eric Policastro
Gruber Hurst Johansen Hail Shank
1445 Ross Avenue, Suite 2500
Dallas, TX 75202-2711
fax: 214.855.6808
*Attorney for Plaintiff*

Royce West
West & Associates
P.O. Box 3960
Dallas, TX 75208-1260
fax: 214.941.1399
*Attorney for Plaintiff*

Samuel H. Johnson
Johnson Broome, PC
2591 Dallas Parkway, Suite 300
Frisco, TX 75034
fax: 972.584.6054
*Attorney for Defendants Deari &
Pastazios Pizza*

Randy A. Nelson
Thompson Coe Cousins & Irons
700 North Pearl Street
25th Floor – Plaza of the Americas
Dallas, TX 75201
*Attorney for Post Properties*

Dritan Kreka
5549 Big River Drive
The Colony, TX 75056
*Defendant Kreka*

*Matthew E. Last*

**RAMONA MARTINEZ**
**MATTHEW E. LAST**

MANDAMUS RECORD - TAB 5

**GRUBER | HURST | JOHANSEN | HAIL | SHANK**

Attorneys | Counselors
A Limited Liability Partnership
1445 Ross Avenue | Suite 2500
Dallas Texas 75202-2711
214.855.6800 main
214.855.6808 fax

Eric Policastro
epolicastro@ghjhlaw.com
(214) 855-6848

March 21, 2014

**VIA E-MAIL**
Ramona Martinez
Matthew Last
**Cobb Martinez Woodward PLLC**
rmartinez@cobbmartinez.com
mlast@cobbmartinez.com

**VIA E-MAIL**
Randy Nelson
**Thompson Coe Cousins & Irons, LLP**
rnelson@thompsoncoe.com

**VIA E-MAIL**
Samuel H. Johnson
**Johnson Broome, P.C.**
sjohnson@johnsonbroome.com

> Re: *Jane Doe v. Ajredin "Danny" Deari, et al.* Rule 11 Agreement re: Expert Designations

Dear Counsel,

This letter agreement, made pursuant to TEX. R. CIV. P. 11, memorializes the agreement reached between Plaintiff and Defendants in the above-captioned case. The agreement is:

1.      The parties to this agreement have agreed to alter the time period listed in paragraph 4 of the 193rd Judicial District Court's Standing Scheduling Order from "March 31, 2014…" to "April 30, 2014…." and

2.      The parties to this agreement have agreed to alter the time period listed in paragraph 5 of the 193rd Judicial District Court's Standing Scheduling Order from "April 30, 2014…" to "May 31, 2014…."; and

3.      The parties to this agreement have agreed to alter the time period listed in paragraph 6 of the 193rd Judicial District Court's Standing Scheduling Order from "May 5, 2014…" to "June 6, 2014…."

As always, this agreement may be modified upon the mutual assent, in writing, of all parties to this agreement.

Please sign this letter in the space indicated below and return a copy of the same to me. Plaintiff will file the executed version with the Court after receiving duly executed counterparts of the letter from you. Please do not hesitate to contact me directly if this letter misstates our agreement in anyway, or if you have any questions.

Respectfully,

**GRUBER HURST JOHANSEN HAIL SHANK LLP** AND
**WEST & ASSOCIATES, L.L.P.**

Eric Policastro
ATTORNEYS FOR PLAINTIFF

**AGREED AND WITH AUTHORITY**:

_____

ATTORNEYS FOR DEFENDANT AJREDIN "DANNY" DEARI
AND PASTAZIOS PIZZA, INC.

**AGREED AND WITH AUTHORITY**:

_____

ATTORNEYS FOR DEFENDANTS POST PROPERTIES, INC.
AND POST ADDISON CIRCLE LIMITED PARTNERSHIP

**AGREED AND WITH AUTHORITY**:

_____

ATTORNEYS FOR DEFENDANTS HYATT HOTELS CORP.;
HYATT HOUSE FRANCHISING, LLC; ISLAND HOSPITALITY
MANAGEMENT, INC.; INK ACQUISITION, LLC, GRAND
PRIX FLOATING LESSEE, LLC; INK ACQUISITION II, LLC;
INK ACQUISITION III, LLC; INK LESSEE, LLC; INK LESSEE
HOLDING, LLC; CHATHAM TRS HOLDING, INC.; CHATHAM
LODGING, L.P.; AND JEFFREY H. FISHER

March 21, 2014
Page 2 of 2

Respectfully,

**GRUBER HURST JOHANSEN HAIL SHANK LLP AND
WEST & ASSOCIATES, L.L.P.**

Eric Policastro
ATTORNEYS FOR PLAINTIFF

**AGREED AND WITH AUTHORITY**:

_____
ATTORNEYS FOR DEFENDANT AJREDIN "DANNY" DEARI
AND PASTAZIOS PIZZA, INC.

**AGREED AND WITH AUTHORITY**:

_____
ATTORNEYS FOR DEFENDANTS POST PROPERTIES, INC.
AND POST ADDISON CIRCLE LIMITED PARTNERSHIP

**AGREED AND WITH AUTHORITY**:

_____
ATTORNEYS FOR DEFENDANTS HYATT HOTELS CORP.;
HYATT HOUSE FRANCHISING, LLC; ISLAND HOSPITALITY
MANAGEMENT, INC.; INK ACQUISITION, LLC, GRAND
PRIX FLOATING LESSEE, LLC; INK ACQUISITION II, LLC;
INK ACQUISITION III, LLC; INK LESSEE, LLC; INK LESSEE
HOLDING, LLC; CHATHAM TRS HOLDING, INC.; CHATHAM
LODGING, L.P.; AND JEFFREY H. FISHER

Respectfully,

**GRUBER HURST JOHANSEN HAIL SHANK LLP** AND
**WEST & ASSOCIATES, L.L.P.**

Eric Policastro
ATTORNEYS FOR PLAINTIFF


**AGREED AND WITH AUTHORITY:**


_____

ATTORNEYS FOR DEFENDANT AJREDIN "DANNY" DEARI
AND PASTAZIOS PIZZA, INC.


**AGREED AND WITH AUTHORITY:**

_____

ATTORNEYS FOR DEFENDANTS POST PROPERTIES, INC.
AND POST ADDISON CIRCLE LIMITED PARTNERSHIP


**AGREED AND WITH AUTHORITY:**


_____

ATTORNEYS FOR DEFENDANTS HYATT HOTELS CORP.;
HYATT HOUSE FRANCHISING, LLC; ISLAND HOSPITALITY
MANAGEMENT, INC.; INK ACQUISITION, LLC, GRAND
PRIX FLOATING LESSEE, LLC; INK ACQUISITION II, LLC;
INK ACQUISITION III, LLC; INK LESSEE, LLC; INK LESSEE
HOLDING, LLC; CHATHAM TRS HOLDING, INC.; CHATHAM
LODGING, L.P.; AND JEFFREY H. FISHER

Respectfully,

**GRUBER HURST JOHANSEN HAIL SHANK LLP** AND
**WEST & ASSOCIATES, L.L.P.**

Eric Policastro
ATTORNEYS FOR PLAINTIFF

**AGREED AND WITH AUTHORITY:**

_____

ATTORNEYS FOR DEFENDANT AJREDIN "DANNY" DEARI
AND PASTAZIOS PIZZA, INC.

**AGREED AND WITH AUTHORITY:**

_____

ATTORNEYS FOR DEFENDANTS POST PROPERTIES, INC.
AND POST ADDISON CIRCLE LIMITED PARTNERSHIP

**AGREED AND WITH AUTHORITY:**

_____

ATTORNEYS FOR DEFENDANTS HYATT HOTELS CORP.;
HYATT HOUSE FRANCHISING, LLC; ISLAND HOSPITALITY
MANAGEMENT, INC.; INK ACQUISITION, LLC, GRAND
PRIX FLOATING LESSEE, LLC; INK ACQUISITION II, LLC;
INK ACQUISITION III, LLC; INK LESSEE, LLC; INK LESSEE
HOLDING, LLC; CHATHAM TRS HOLDING, INC.; CHATHAM
LODGING, L.P.; AND JEFFREY H. FISHER

| | | |
|---|---|---|
| JANE DOE, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | 193rd JUDICIAL DISTRICT COURT |
| | § | |
| ISLAND HOSPITALITY MANAGEMENT, | § | |
| INC.; HYATT HOTELS CORPORATION; | § | |
| HYATT HOUSE FRANCHISING, L.L.C.; | § | |
| GRAND PRIX FLOATING LESSEE, LLC; | § | |
| INK ACQUISITION, LLC; INK | § | |
| ACQUISITION II, LLC; INK | § | |
| ACQUISITION III, LLC; INK LESSEE, | § | |
| LLC; INK LESSEE HOLDING, LLC; | § | |
| CHATHAM TRS HOLDING, INC.; | § | |
| CHATHAM LODGING, L.P.; JEFFREY | § | |
| H. FISHER, Individually; POST | § | |
| PROPERTIES, INC.; POST ADDISION | § | |
| CIRCLE LIMITED PARTNERSHIP; | § | |
| PASTAZIOS PIZZA, INC.; AJREDIN | § | |
| "DANNY" DEARI; DRITAN KREKA; and | § | |
| DOES 1-25, | § | |
| | § | |
| *Defendants.* | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S TEX. R. CIV. P. 194.2(F) EXPERT WITNESS DESIGNATIONS

Pursuant to the 193rd Judicial District Court's Standing Scheduling Order and TEX. R. CIV. P. 194.2(f), Plaintiff Jane Doe ("Plaintiff") hereby makes and serves *Plaintiff's TEX. R. CIV. P. 194.2(f) Expert Witness Designations*. Plaintiff reserves the right to designate rebuttal expert witnesses, designate expert witnesses identified by Defendants, and supplement and/or amend these expert witness designations as discovery continues and additional facts and evidence have been learned and produced.

MANDAMUS RECORD - TAB 5

Respectfully submitted,

**ROYCE WEST**
State Bar No. 21206800
royce.w@westllp.com
**VERETTA FRAZIER**
State Bar No. 00793264
veretta.f@westllp.com
**NIGEL REDMOND**
State Bar No. 24058852
nigel.r@westllp.com
**WEST & ASSOCIATES, L.L.P.**
P.O. Box 3960
Dallas, Texas 75208-1260
Ofc.:   (214) 941-1881
Fax:    (214) 941-1399

**G. MICHAEL GRUBER**
State Bar No. 08555400
mgruber@ghjhlaw.com
**ERIC POLICASTRO**
State Bar No. 24068809
epolicastro@ghjhlaw.com
**TREY CRAWFORD**
State Bar No. 24059623
tcrawford@ghjhlaw.com
**GRUBER HURST JOHANSEN HAIL SHANK LLP**
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
214.855.6800 (main)
214.855.6808 (facsimile)

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of *Plaintiff's TEX. R. CIV. P. 194.2(f) Expert Witness Designations* were served—in accordance with TEX. R. CIV. P. 21, 21a—on April 30, 2014 via certified mail, return receipt requested to all counsel of record.

Eric Policastro

MANDAMUS RECORD - TAB 5

(f)     For any testifying expert:

(1) the expert's name, address, and telephone number;

(2) the subject matter on which the expert will testify;

(3) the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information;

(4) if the expert is retained by, employed by, or otherwise subject to the control of the responding party:

(A) all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony; and

(B) the expert's current resume and bibliography;

**RESPONSE:**

The following individuals have been retained by Plaintiff in this case to help the jury and Court better understand various medical, scientific, professional, technical, and/or scientific aspects of the claims brought by Plaintiff due to the damages she incurred that were caused by Defendants' tortious conduct:

I.      **RETAINED TESTIFYING EXPERTS**

**Dr. Claire E. Brenner, M.D.**

Dr. Claire E. Brenner, M.D.—(972) 494-1155, 2241 Peggy Lane Suite E, Garland, Texas 75042—is a medical doctor who holds board certifications in infectious disease and internal

medicine. Please see the attached **Exhibit A** for a copy of Dr. Brenner's resume and/or bibliography. In this case, Dr. Brenner may testify concerning the clinical course of infectious diseases, including the herpes virus, generally, as well as in Plaintiff's case. Dr. Brenner may testify about the general nature, incubation, presentment, recurrence, and effects of the herpes virus related to an individual who is infected with the disease, including Plaintiff. Dr. Brenner may testify concerning the clinical course, progression, treatment, effects (physical, emotional, financial, etc.), and prognosis of an individual diagnosed with the herpes virus, and the fact that there is no cure for the herpes virus, generally, as well as the same categories of testimony regarding Plaintiff. Additionally, Dr. Brenner may testify generally as to the human anatomy, the effect of the herpes virus on an infected individual's body, mind, and quality of life, as well as the irreversible effects of the herpes virus, complications caused by the herpes virus throughout an individual's life including during pregnancy/labor and the effects it may have on a newborn child. Dr. Brenner may testify about the effect the herpes virus has on an infected individual's immune system throughout said individual's life. Dr. Brenner may testify about the progression of the disease in Plaintiff, and the mental, physical, psychological, financial, and physiological obstacles Plaintiff will encounter throughout her life as a result of the rape and the disease. She may also testify concerning the scientific literature on the biological, physical, physiological, social, and mental effects of infectious diseases—including the herpes virus—authored by Dr. Brenner and others. Dr. Brenner may testify as to Plaintiff's and Defendant Deari's medical history, respectively. She may testify concerning the transmission of the herpes virus from one individual to another, including the same for Plaintiff. Dr. Brenner may testify as to the procedures, protocols, tests, and science behind the same that a medical staff could and would observe and/or perform for an individual who is suspected to have been the victim of a sexual

assault, including what was done for Plaintiff on April 26, 2011. Dr. Brenner may testify as to the results of the rape kit performed on Plaintiff on April 26, 2011, as well as the results of the State of Texas's sexually transmitted disease test of Defendant Deari. Dr. Brenner may testify that the herpes virus that Plaintiff presented to Parkland hospital in May 2011 was consistent with an initial outbreak of herpes that took place during and/or immediately after the generally accepted incubation time for the disease after an individual's first exposure. Dr. Brenner may testify that Plaintiff may require medical monitoring, treatment, and/or hospitalization as a result of the disease. Dr. Brenner may also testify that Plaintiff has incurred in the past, and will incur in the future, medical expenses as a result of the herpes virus she contracted from the sexual assault that took place at the Hyatt House hotel. Dr. Brenner may also testify that said past and future medical expenses are reasonable and necessary, especially in light of the incurable nature of the disease for which Plaintiff has been diagnosed. Dr. Brenner may further testify as to facts and circumstances regarding the nature of the injuries and damages that are the subject of this action. Dr. Brenner's testimony will be based upon her skill, knowledge, education, experience, and training, as well as her review of Plaintiff's medical records and diagnoses, scientific literature and studies, and the evidence, pleadings, and discovery served, produced, and/or elicited in this case and based upon a reasonable degree of medical and scientific probability and/or certainty. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

### Mr. John A. Harris, CPA, CPP, PSP

Mr. John A. Harris, CPP, PSP, CPA—(404) 888-0060, 1170 Peachtree Street, Suite 1200, Atlanta, Georgia 30309—is a premises liability and forensic security expert. Please see the

attached **Exhibit B** for a copy of Mr. Harris's resume and/or bibliography. Mr. Harris is board certified in security management (CPP) and Physical Security (PSP) by the professional certification board of ASIS International, an ANSI accredited standards development organization with worldwide membership of over 37,000 security professionals. Mr. Harris's CPP certification is the preeminent designation awarded to individuals whose primary responsibilities are in security management and who have demonstrated advanced knowledge in security solutions and best business practices. Mr. Harris's experience in physical security began over 40 years ago when he was undergoing training to become a commissioned officer in the United States Marine Corps, and he has conducted over 1,200 security risk assessments of various types of commercial properties including apartments, hotels, office buildings, parking lots, and malls located in 43 states as well as in Puerto Rico, the Virgin Islands, and Colombia, South America. In this case, Mr. Harris may testify that the sexual assault of Plaintiff on April 26, 2011, while the guest of an invitee and/or invitee at the Hyatt House located at 4900 Edwin Lewis Drive in Addison, Texas, was reasonably foreseeable and should have been anticipated by the "Hotel Defendants"[1] based on the crimes committed on the premises and the surrounding area in the five years preceding April 26, 2011. Mr. Harris may testify that, prior to April 26, 2011, there had been sufficient crime committed at the Hyatt Hotel—including an armed robbery of an employee of the Hotel Defendants' just months before Plaintiff was raped on the same premises—and in the immediate vicinity to put the Hotel Defendants on notice that reasonable security measures were needed for the security, safety and well-being of their guests, invitees, and other people legally on their property. Mr. Harris may testify that in the five years preceding

---

[1] As used herein, "Hotel Defendants" refers to Island Hospitality Management, Inc., Grand Prix Floating Lessee, LLC, Hyatt Hotels Corporation, Hyatt House Franchising, LLC, Jeffrey H. Fisher, Chatham Lodging, L.P., Chatham TRS Holding, LLC, Ink Acquisition, LLC, Ink Acquisition II, LLC, Ink Acquisition III, LLC, Ink Lessee Holding, LLC, and Ink Lessee LLC.

the attack on Plaintiff at the hotel, that there had been a significant number of criminal incidents reported to the Addison Police Department (including multiple crimes at the Hyatt House hotel and other hotels immediately in the vicinity of the Hyatt House hotel) such that the real potential of a violent crime taking place at the hotel was reasonably foreseeable. Mr. Harris may testify that these reported offenses included violent crime that the Hotel Defendants either knew or reasonably should have known about and should have taken proactive steps to ensure the security of its premises but did not. Mr. Harris may testify that the Hotel Defendants negligently failed to analyze the level of crime at or near the Hyatt House hotel provided by the Addison Police Department and the Texas Department of Public Safety and to utilize those analyses in determining the security needs of the property, and that the Hotel Defendants negligently failed to request any information from the Addison Police Department regarding past or current criminal incidents on the premises and in the immediate vicinity as a reasonably prudent hotel operator would and should have done. Mr. Harris may testify that the Hotel Defendants failed to conduct either component of a security risk assessment, including the failure to conduct a threat assessment (based upon historical information of past criminal events, actual threats, inherent threats, and potential threats by virtue of the vulnerabilities around the hotel or weaknesses in the security program which produce opportunities for crime to occur) and the negligent failure to conduct a vulnerability assessment to analyze the weaknesses of the Hotel Defendants' security program or, alternatively, that the Hotel Defendants negligently failed to engage a professional security consultant to conduct the analysis. Mr. Harris may testify that the Hotel Defendants' negligent failure to conduct a security risk assessment made it impossible for the Hotel Defendants to assess the likelihood that criminals could and would exploit vulnerabilities or compromise security countermeasures at the hotel. Mr. Harris may testify that, based upon the

Hotel Defendants' experience in the lodging industry, the Hotel Defendants knew or should have known that their guests, invitees, and other people legally on their property were at risk to criminal activities if reasonable security measures were not undertaken, and that the Hotel Defendants knew or should have known that in the absence of reasonable security measures, the multiple property crimes (e.g., theft, vehicle break-ins, etc.) that were reported at the Hyatt House hotel can lead to violent crimes against persons. Mr. Harris may testify that it is generally accepted that most crimes are not random events, but planned events in environments which provide the opportunity to commit a crime with the least likelihood of detection, intervention and apprehension and, further, that these conditions existed at the Hyatt House hotel on, and prior to, the April 26, 2011 attack on Plaintiff yet the Hotel Defendants did nothing. Mr. Harris may testify that the Hotel Defendants negligently failed to have security and/or adequate security at the Hyatt House hotel and that the Hotel Defendants knew or should have known that they did not have security and/or adequate security and that the inadequate security was unreasonably safe. Mr. Harris may testify that, at all pertinent times, the Hotel Defendants owned, operated, and/or controlled the Hyatt House hotel, and that the Hotel Defendants owed a duty to Plaintiff to exercise reasonable care (at a minimum) to protect Plaintiff from criminal attacks and other reasonably foreseeable injuries. Mr. Harris may testify that the Hotel Defendants breached its duties by committing the following non-exhaustive list of acts or omissions: (1) the Hotel Defendants negligently failed to exercise reasonable care in providing security guard services (the same services that were once provided but eliminated due to an attempted cost savings measure by the Hotel Defendants); (2) the Hotel Defendants' failure to implement sufficient security measures and conduct any type of threat assessment or security assessment for the Hyatt House hotel at any point in time (including to this day); (3) the Hotel Defendants' negligent

failure to properly train any of its employees on adequate security measures for the safe operation of a hotel; (4) the Hotel Defendants' negligent failure to have more than one employee working during the hours of 7:00 p.m. and 11:00 p.m. when Plaintiff was being sexually assaulted at the hotel; (5) the Hotel Defendants' negligent failure to implement security policies and procedures that adhere to industry best practices of identifying, addressing, and mitigating security vulnerabilities at the hotel; (6) the Hotel Defendants' negligent failure to adhere to its own security policies and procedures (despite the fact that said policies and procedures fall far below the industry standard of care); (7) the Hotel Defendants' negligent failure to provide any security personnel at the hotel (which, naturally, caused the Hotel Defendants to fail to train said personnel properly); (8) the Hotel Defendants' negligent failure to properly or adequately train management personnel for oversight of security and safety issues; (9) the Hotel Defendants' negligent failure to provide appropriate and adequate physical security measures commensurate with the risk that existed on the premises—including, but not limited to, the lack of any patrols (i.e., off-duty police officers, private security guards, etc.); (10) the Hotel Defendants' negligent failure to have any system, procedure, or policy in place to detect, monitor, and control access to the hotel; (11) the Hotel Defendants' negligent failure to enforce procedures regarding suspicious guests and suspicious prospective guests during the check-in process; (12) the Hotel Defendants' negligent failure to have operable closed circuit television (CCTV) cameras installed in any area of the hotel that would be conducive to guest safety and security and, further, conducive to deterring, detecting, monitoring, or preventing crime; (13) the Hotel Defendants' negligent failure to even know about—let alone implement—the generally accepted industry standards for premises security and premises security at a lodging facility found in NFPA 370 and 371; (14) the Hotel Defendants' negligent failure to adhere to industry best practices by failing to identify

MANDAMUS RECORD - TAB 5

and address measures to mitigate security vulnerabilities at the hotel; (15) the Hotel Defendants' negligent failure to exercise reasonable care in providing adequate security and failing to implement sufficient security measures; (16) the Hotel Defendants' negligent failure to conduct periodic reviews and recapitulations of security incident reports at the Hyatt House hotel and remedy the security deficiencies that it knew or should have known about; and (17) the Hotel Defendants' negligent failure to remedy the glaring security concerns noted on its own internal audits for years prior to the attack on Plaintiff. Mr. Harris may testify that the negligent acts and omissions by the Hotel Defendants to discharge the duties of a reasonably prudent property owner/manager/operator to provide reasonable security and property management measures at the Hyatt Hotel was a substantial factor and/or proximate cause of the attack on Plaintiff and damages she incurred. Mr. Harris may testify that had the Hotel Defendants acted as a reasonably prudent property owner/manager/operator would have acted in the same or similar circumstances (given the amount, similarity, proximity, frequency, and publicity of crime at or in the immediate vicinity of the Hyatt House Hotel) to provide reasonable security and property management measures at the Hyatt House hotel, it is more probable than not that the sexual assault of Plaintiff would not have occurred. Mr. Harris may testify that due to the violent criminal atmosphere that existed at the Hyatt House hotel and in its immediate vicinity, that the Hotel Defendants' failure to provide security guards, operable closed-circuit televisions, and other reasonable security measures was in gross breach of minimum standards of care for an innkeeper. Mr. Harris may testify that the Hotel Defendants' acts or omissions, when viewed objectively from the standpoint of the Hotel Defendants at the time of its occurrence involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and that the Hotel Defendants had actual, subjective awareness of the risk involved, but

nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others, including Plaintiff. With respect to Pastazios Pizza, Inc., Post Addison Circle Limited Partnership, and Post Properties, Inc., Plaintiff expects that Mr. Harris may testify in a similar fashion as he may testify as to the Hotel Defendants (but, naturally, with respect to a restaurant/restaurant common area that is open to the public such that the owners of said premises know that alcohol is consumed on said premises by the public on a daily basis). Mr. Harris may testify that the Post entities were negligent and grossly negligent for failing to terminate its lease with Pastazios Pizza, Inc. after Pastazios violated the Texas Alcohol and Beverage Code on multiple occasions, including a publicly known sale of alcohol to an 18 year old female in 2002 during a law enforcement sting operation. Mr. Harris may further testify as to facts and circumstances regarding the nature of the injuries and damages that are the subject of this action. Mr. Harris's testimony will be based upon his skill, knowledge, education, experience, and training, as well as his review of the pertinent authoritative publications written by him and others, and the evidence, pleadings, and discovery served, produced, and/or elicited in this case and based upon a reasonable degree of professional probability and/or certainty. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

### Dr. William E. Flynn, Ph.D.

Dr. William E. Flynn, Ph.D.—(214) 202-7344, 100 Highland Park Village, Suite 200, Dallas, Texas 75205—is a forensic and clinical psychologist. Please see the attached **Exhibit C** for a copy of Dr. Flynn's resume and/or bibliography. In this case, Dr. Flynn may testify, generally, about the psychological, medical, behavioral, educational, physiological, vocational, and social trauma that a victim of a sexual assault—including a sexual assault that ultimately

**PLAINTIFF'S TEX. R. CIV. P. 194.2(F) EXPERT WITNESS DESIGNATIONS**          **PAGE 11 OF 20**

causes the transmission of an incurable disease—can experience, including Plaintiff. Dr. Flynn may testify about Post-Traumatic Stress Disorder ("PTSD") in general and as applied to victims of rape, including Plaintiff. Dr. Flynn may testify about other medical and psychological conditions—including, but not limited to, depression, PTSD, sleep disorders, eating disorders, substance abuse, self-harm/self-injury, flashbacks, personality disorders, suicide, etc.—that are reasonably likely to arise in victims of rape, including Plaintiff. Dr. Flynn may testify regarding the need for medical and/or psychological treatment throughout the course of a rape victim's life—generally, as well as with respect to Plaintiff—and he may also testify as to the reasonable and necessary future psychiatric expenses that Plaintiff is, in all reasonable probability, likely to incur in the future as a result of Defendants' tortious conduct and the permanent and incurable nature of the herpes virus. Dr. Flynn may testify as to the permanent and incurable nature of Plaintiff's injuries and disease—as well as the impact of said injuries and disease on Plaintiff's life, education, future earning capacity, mental state, etc.—from a forensic and clinical psychology perspective. Dr. Flynn may further testify as to facts and circumstances regarding the nature of the injuries and damages that are the subject of this action. Dr. Flynn's testimony will be based upon his skill, knowledge, education, experience, and training, as well as his review of the pertinent authoritative publications written by him and others, and the evidence, pleadings, and discovery served, produced, and/or elicited in this case and based upon a reasonable degree of professional, medical, and scientific probability and/or certainty. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

### Dr. Joe G. Gonzales, M.D., FAAPMR, CLCP

Dr. Joe G. Gonzales—(210) 501-0995, 11550 IH 10 West, Suite 375, San Antonio, Texas

78230—is a Physical Medicine & Rehabilitation specialist (board certified), Pain Management specialist (board certified), Occupational & Environmental Medicine specialist (board certified), and certified life care planner who has practiced Medicine in Texas since 1985 and is certified by the American Academy of Physical Medicine & Rehabilitation, the American Board of Pain Medicine, and the American College of Occupational & Environmental Medicine. Dr. Gonzales is a Diplomat of the American Academy of Pain Management, a Designated Physician of the Texas Workers' Compensation Commission, and a Certified Life Care Planner as designated by the Commission on Health Care Certification. Dr. Gonzales is the President of the Texas Physical Medicine & Rehabilitation Institute, and the Founder and Medical Director of Physician Life Care Planning, LLC. Dr. Gonzales is a licensed physician in the State of Texas. Please see the attached **Exhibit D** for a copy of Dr. Gonzales's resume and/or bibliography. Dr. Gonzales may testify about vocational feasibility or disabled related needs of injured people and/or individuals with disabilities or life-altering and permanent diseases (such as Plaintiff), determine the need for medical, psychological and vocational services, identify functional limitations and need for assistive devices for Plaintiff, conduct job and task analyses as well as labor market surveys. Dr. Gonzales may be called to testify with regard to life care planning for Plaintiff, and the value of such assistance and/or care, for those—such as Plaintiff—who are injured or those with disabilities. Dr. Gonzales may testify as to the permanent and incurable nature of Plaintiff's injuries and disease—as well as the impact of said injuries and disease on Plaintiff's life, education, future earning capacity, mental state, etc.—from a physical, psychological, and/or social perspective, and he may testify as to what Plaintiff would have been capable of earning— as well as Plaintiff's other economic losses—had she never been subject to the injuries caused by Defendants' tortious conduct. Dr. Gonzales may testify as to the reasonable and necessary future

medical expenses that Plaintiff is, in all reasonable probability, likely to incur in the future as a result of Defendants' tortious conduct and the permanent and incurable nature of the herpes virus. Dr. Gonzales may testify as to the economic loss incurred by Plaintiff in the past to treat the injuries she sustained that were caused by Defendants, as well as Plaintiff's future loss of earning capacity based upon Plaintiff's earnings, medical condition, stamina, efficiency, ability to work in light of the injuries sustained, the weaknesses and changes that will naturally result from Plaintiff's injuries, and Plaintiff's work-life expectancy. Dr. Gonzales may testify as to a life care plan for Plaintiff's lifetime that determines her lifetime needs and costs of care (e.g., Plaintiff's medical, psychiatric, psychological, behavioral, educational, vocational and social needs, etc.) for her chronic disease and psychological trauma caused by Defendants' tortious conduct. Dr. Gonzales may further testify as to facts and circumstances regarding the nature of the injuries and damages that are the subject of this action. Dr. Gonzales's testimony will be based upon his skill, knowledge, education, experience, and training, as well as his review of the pertinent authoritative publications written by him and others, and the evidence, pleadings, and discovery served, produced, and/or elicited in this case and based upon a reasonable degree of professional, medical, and scientific probability and/or certainty. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

### Dr. John A. Swiger, Ph.D.

Dr. John A. Swiger, Ph.D.—(210) 434-6711, 411 S.W. 24th Street, San Antonio, Texas 78207—is a Doctor of Finance and is an economist. Please see the attached **Exhibit E** for a copy of Dr. Swiger's resume and/or bibliography. As an expert economist, Dr. Swiger may testify as to the economic loss, discounted to present value, which Plaintiff has incurred due to the tortious

conduct of Defendants. Dr. Swiger may also testify generally regarding the concept of present value and its application to economic losses, particularly loss of earning capacity, past and future medical expenses, lost wages, loss and future medical costs. Dr. Swiger may testify as to the reasonable and necessary future medical expenses that Plaintiff is, in all reasonable probability, likely to incur in the future as a result of Defendants' tortious conduct and the permanent and incurable nature of the herpes virus. Dr. Swiger may testify as to the economic loss incurred by Plaintiff in the past to treat the injuries she sustained that were caused by Defendants, as well as Plaintiff's future loss of earning capacity based upon Plaintiff's earnings, medical condition, stamina, efficiency, ability to work in light of the injuries sustained, the weaknesses and changes that will naturally result from Plaintiff's injuries, and Plaintiff's work-life expectancy. Dr. Swiger may testify as to Plaintiff's past lost wages, the economic value of the loss of enjoyment of life, and other economic losses incurred by Plaintiff as a result of Defendants' tortious conduct. Dr. Swiger may also testify about Defendants' financial conditions, the net worth and profits of Defendants, and/or Defendants' current fiscal policies and/or practices for purposes of establishing Defendants' wealth during the punitive damages phase of trial. Dr. Swiger may further testify as to facts and circumstances regarding the nature of the injuries and damages that are the subject of this action. Dr. Swiger's testimony will be based upon his skill, knowledge, education, experience, and training, as well as his review of the pertinent authoritative publications written by him and others in the field of economics, and the evidence, pleadings, and discovery served, produced, and/or elicited in this case and based upon a reasonable degree of professional and scientific probability and/or certainty. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

## II.  UNRETAINED TESTIFYING EXPERTS

Plaintiff hereby designates the following individuals as "unretained testifying experts" as these individuals are not retained by, employed by, or otherwise subject to the control of Plaintiff. *See* TEX. R. CIV. P. 194.2(f)(3).

### Detective Katie Spencer

Detective Katie Spencer—(972) 450-7100, c/o Addison Police Department, 4799 Airport Parkway, Addison, Texas 75001—is a detective with the Addison Police Department. Detective Spencer investigated the rape of Plaintiff such that, in addition to testifying with respect to her expertise in criminal investigations and criminal conduct in Addison, Texas (of this case and other criminal cases in Addison, Texas from 2005 to the present)—Detective Spencer is also a percipient witness of the circumstances surrounding the sexual assault on Plaintiff and the lack of security and safety measures in place at the Hyatt House hotel on April 26, 2011. Documents reflecting Detective Spencer's investigation of the sexual assault of Plaintiff have previously been produced to Defendants. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

### Officer Isaac Gloger

Officer Isaac Gloger—(972) 450-7100, c/o Addison Police Department, 4799 Airport Parkway, Addison, Texas 75001—is a police officer with the Addison Police Department. Officer Gloger was the arresting officer of Defendant Deari on April 26, 2011 and interviewed Defendant Deari at the crime scene where Plaintiff was raped such that, in addition to testifying with respect to his expertise in criminal investigations and criminal conduct in Addison, Texas (of this case and other criminal cases in Addison, Texas from 2005 to the present)— Officer

Gloger is also a percipient witness of the evidence and circumstances surrounding the sexual assault on Plaintiff and the lack of security and safety measures in place at the Hyatt House hotel on April 26, 2011. Documents reflecting Officer Gloger's investigation of the sexual assault of Plaintiff have previously been produced to Defendants. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

### Mr. Kenneth Sherman

Mr. Kenneth Sherman—(817) 652-5912, c/o Arlington Regional Office of Texas Alcoholic Beverage Commission, 2225 East Randol Mill Road, Suite 200, Arlington, Texas 76011—is a licensed peace officer in the State of Texas and is employed by the Texas Alcoholic Beverage Commission as an Enforcement Agent. Mr. Sherman investigated the violations of the Texas Alcoholic and Beverage Code committed by Pastazios Pizza, Inc., as well as photographed the "common area" shared between Post and Pastazios Pizza on which Plaintiff became obviously intoxicated, as well as interviewed Plaintiff, Defendant Deari, and Defendant Kreka. Mr. Sherman may testify as to his personal knowledge of the facts of this case (including his investigation), as well as based upon his skill, knowledge, education, experience, and training as to criminal and administrative investigations and violations of the Texas Alcoholic Beverage Code (in this case and other cases in Addison, Texas from 2005 to the present), the standard of care required of a business that knowingly and intentionally leaves its property open for the public to consume alcoholic beverages on, the Texas Alcoholic Beverage Code (in general and as applied to this case), and the incidence of intoxicated minors in general, and those subject to a criminal attack, in the Addison, Texas area from 2005 to the present (including the resulting damages that arise therefrom). Documents reflecting Mr. Sherman's investigation related to this

case have previously been produced to Defendants. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

### Dr. Allison Jeanne Brooks-Heinzman, M.D.

Dr. Allison Jeanne Brooks-Heinzman, M.D.—(512) 324-9650, 313 E. 12th Street #101, Austin, Texas 78701—is a medical doctor who is board certified in obstetrics and gynecology. Dr. Brooks-Heinzman was Plaintiff's treating physician on the night of April 26, 2011 after Plaintiff was sexually assaulted at the Hyatt House hotel and subsequently transferred to Parkland Hospital for testing, treatment, and evaluation. Dr. Brooks-Heinzman may testify—based upon her perceptions and skill, knowledge, education, experience, and training—about her treatment of Plaintiff (including the results of any tests conducted during, or as a result of, said treatment), Plaintiff's physical, mental, physiological, and psychological condition of the night of April 26, 2011, obstetrics and gynecology in general, and the physical, emotional, mental, social, and biological effects and trauma associated with rape victims and rape victims who are infected with an incurable sexually transmitted disease during the course of the rape. Documents (as well as an executed HIPAA authorization) reflecting Dr. Brooks-Heinzman's treatment of Plaintiff in this case have previously been produced to Defendants. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

### Dr. Dustin B. Manders, M.D.

Dr. Dustin B. Manders, M.D.—(214) 648-3639, c/o University of Texas Southwestern, 5323 Harry Hines Boulevard, Dallas, Texas 75390—is a medical doctor who is board certified in obstetrics and gynecology. Dr. Manders was Plaintiff's treating physician on May 6, 2011 when

Plaintiff returned to Parkland Hospital with a "chief complaint" that "it feels like someone hit me in the crotch with a hammer covered in razors." Dr. Manders diagnosed subsequently diagnosed Plaintiff with a "primary outbreak" of herpes. Dr. Manders may testify—based upon his perceptions and skill, knowledge, education, experience, and training—about his treatment of Plaintiff (including the results of any tests conducted during, or as a result of, said treatment), Plaintiff's physical, mental, physiological, and psychological condition on May 6, 2011, obstetrics and gynecology in general, the generally accepted incubation period from exposure to outbreak of the herpes virus, and the physical, emotional, mental, social, and biological effects and trauma associated with rape victims and rape victims who are infected with an incurable sexually transmitted disease during the course of the rape. Documents (as well as an executed HIPAA authorization) reflecting Dr. Manders's treatment of Plaintiff in this case have previously been produced to Defendants. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

## III.    ATTORNEYS' FEES EXPERTS

Eric Policastro and Tom H. Crawford III—(214) 855-6800, c/o Gruber Hurst Johansen Hail Shank LLP, 1445 Ross Avenue, Suite 2500, Dallas, Texas 75202—are the attorneys for Plaintiff and expect to testify to the reasonable and necessary attorneys' fees for the prosecution of Plaintiff's claims against Defendants. Plaintiff's attorneys expect to testify that the attorneys' fees incurred by Plaintiff in this litigation were reasonable and necessary for the prosecution of her claims against Defendants. They will testify that the total fees as well as the hourly rates charged by Plaintiff's counsel were reasonable in the State of Texas as well as in Dallas County, specifically. They will testify based on their education, skill, knowledge, training, and experience

in the practice of law as licensed attorneys in the State of Texas, their knowledge about this case, and upon a review of the fee statements reflecting the fees incurred by Plaintiff. Plaintiff's attorneys will further testify as to the reasonable and necessary attorneys' fees likely to be incurred by Plaintiff in the event that a jury verdict is appealed to the Court of Appeals and/or the Texas Supreme Court, as well as the total number of hours worked in this matter and will offer an opinion as to the total reasonable fee for said necessary work. Plaintiff's attorneys are familiar with all of the pleadings and discovery transmitted by the parties in this case Plaintiff's attorneys' resumes can be found at http://www.ghjhlaw.com/. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

# EXHIBIT A

# CLAIRE E. BRENNER, M.D.

2241 Peggy Lane, Suite E.
Garland, Texas 75042
972-494-1155 (W)    972-494-6572 (F)    214-507-8339 (M)

**PRESENT POSITION**

INFECTIOUS DISEASE PHYSICIAN
FOUNDING PHYSICIAN OF CLAIRE BRENNER, M.D., P.A. – 2004
MEDICAL DIRECTOR OF INFECTION CONTROL - BAYLOR GARLAND HOSPITAL – 2003
BAYLOR GARLAND WOUND CARE CLINIC – 2006

**PREVIOUS POSITION**

NORTH TEXAS INFECTIOUS DISEASE CONSULTANTS - 8/1/2001 – 1/20/2004

**HOSPITAL PRIVILEGES**

Baylor of Garland Medical Center, Garland, TX 2001-present
Lake Pointe Medical Center, Rowlett, TX 2008-present
Presbyterian Hospital of Rockwall, Rockwall, TX 2008-present
Forest Park Medical Center, Dallas, TX 2010-present
Kindred Hospital of Dallas, Dallas, TX 2013-present
Methodist Hospital for Surgery, Addison, TX 2012-present
Methodist Richardson Medical Center, Richardson, TX 2013-present

**EDUCATION**

| | |
|---|---|
| 1996 M.D. | University of Texas Southwestern Medical School - Dallas, Texas |
| 1991 B.S. | University of Texas at San Antonio, Major:  Biology |

**POSTGRADUATE TRAINING**

| | |
|---|---|
| 1999-2001 | Infectious Diseases Fellowship, Barnes Jewish Hospital, Washington University School of Medicine, St. Louis, Missouri |
| 1997-1999 | Residency, Depart. of Internal Medicine, Barnes Jewish Hospital, Washington University School of Medicine, St. Louis, Missouri |
| 1996-1997 | Internship, Depart. of Internal Medicine, Barnes Jewish Hospital, Washington University School of Medicine, St. Louis, Missouri |

**MEDICAL LICENSURE AND BOARD CERTIFICATION**

Board Certified, Infectious Disease – October 2001; Recertification, Infectious Disease – 2012
Board Certified, Internal Medicine – August 1999 – Certificate # 1945635; Recertification, Internal Medicine – 1999
Certification of Attendance Principles of Wound Healing and Hyperbaric Medicine – 2006
Texas Medical License - #L1533
United States Medical Licensing Exam – July 1998

**HONORS AND AWARDS**

Medical School Class Rank:  Top 20%
Southwestern Medical Foundation Scholarship, 1992

**PROFESSIONAL SOCIETIES AND ORGANIZATIONS**

Infectious Diseases Society of America – 2000
Society of Hospital Epidemiology – 2003

**TEACHING EXPERIENCE**

Histology Course Teaching Assistant, University of Texas Southwestern Medical School – 1995
Baylor Garland Family Practice Residence/Infectious Disease Rotation – 2004-present
Podiatric Residency Program/Infectious Disease Rotation – 2007-present

## ABSTRACTS

1) Warren RQ, Brenner CE, Holf H., Kanda P., Boswell RN, Kennedy RC. Characterization of longitudinal sera samples from HIV-1 infected individuals for antibodies reactive to gp160 synthetic peptides *International Conference on Advances in AIDS Vaccine Development: Third Annual Meeting of the National Cooperative Vaccine Development Groups for AIDS,* Clearwater, Florida. 1990.

2) Warren RQ, Holf H., Nkya WM, Brenner CE, Anderson SA, Boswell RN, Kanda P., Kennedy RC. Comparison of antibody specificities to HIV-1 gp160 epitopes defined by synthetic peptides in sera from infected individuals from Tanzania and the United States. *International Conference on Advances in AIDS Vaccine Development: Third Annual Meeting of the National Cooperative Vaccine Development Groups for AIDS.* Clearwater, Florida. 1990.

3) Shao JF, Holf H., Warren RQ, Brenner CE, Kennedy RC. Reactivity of HIV-1 Infected Individuals from Tanzania with an Immunodominant B-Cell Epitope on gp41. *International Conference on Advances in AIDS Vaccine Development: Thirds Annual Meeting of the National Cooperative Vaccine Development Groups for AIDS.* Clearwater, Florida. 1990.

4) Nkya WM, Warren RQ, Holf H., Brenner CE, Tesha J., Kanda P., Kennedy RC. Fine Specificity of the Humeral Immune Response to HIV-1 gp160 in HIV-1 infected individuals from Tanzania. *Fifth International Conference on AIDS in Africa.* Kinshasha, Zaire. 1990.

5) Warren RQ, Holf H., Brenner CE, Kanda P., Boswell RN, Kennedy RC. Decline in Antibody Reactivity to specific HIV-1 gp160 epitopes in associated with CD4+ cell levels below 200/mm in infected individuals. *Conference of the Federation of American Societies for Experimental Biology.* 1991.

6) Hollingsworth RE, Brenner CE, Zhu X-L, Lee WH. Regulation of the RB Protein by the CDC2 cell cycle kinase. *The Symposium on Cancer Research.* San Antonio, Texas. 1992.


## RESEARCH EXPERIENCE

1) Mapping the Antibody Reactivity to Human Immunodeficiency Virus Envelope Antigens in Infected Individuals, University of Texas at San Antonio, 1990

2) Preparation of Boc-threonine-4-oxymethyD-phenylacetic acid for use as a linker in solid phase peptide synthesis, University of Texas at San Antonio, 1991

3) Institute of Biotechnology, worked on DNA sequencing of tumor suppressor genes as a full-time research assistant with Dr. Wen-Hwa Lee, San Antonio, Texas 1989-1991

4) Southwest Foundation for Biomedical Research, studied the Humeral Immune Response to HIV with Dr. Ronald Kennedy, San Antonio, Texas 1991

5) BMS Protocol AI455-135 ZEST QDAY-Phase IIIB, Open Label, Randomized, Multicenter Study Switching HIV-1 Infected Subjects with a Viral Load of <50 copies/ml on a BID Regimen or More Frequent Initial HAART Regimen to a Once Daily Regimen Including Stavudine XR, Lamivudine and Efavirenz. 2002

# EXHIBIT B

CURRICULUM VITA
# JOHN A. HARRIS, CPP, PSP
## THG PREMISES LIABILITY CONSULTANTS, LLC
1170 PEACHTREE STREET NE
SUITE 1200
ATLANTA, GA 30309
404.888.0060
www.thgconsult.com

John Harris' multi-disciplined background is the basis of his comprehensive approach to premises liability consulting. Mr. Harris is board certified in security management (CPP) and physical security (PSP) and is also a retired Certified Public Accountant (CPA). He holds an M.S. degree in real estate and a B.S. degree in accounting.

Mr. Harris received his first experience in physical security when he was training to become a commissioned officer in the United States Marine Corps.

He has conducted over 1,200 security risk assessments of premises including multi-family, lodging, resorts, casinos, retail, office, medical and industrial properties located in 43 states and in Puerto Rico, the Virgin Islands, and Colombia, South America.

Mr. Harris is experienced in developing, implementing, managing and maintaining physical security programs with personally-owned properties as well as fiduciary responsibility as a general partner in real estate investments and as consultant to developers, owners, managers, and insurers of properties.

Mr. Harris' body of knowledge and experience in premises security, real estate, and accounting combined with his forensic work in multi-state jurisdictions involving varied types of premises, each with its own set of facts and circumstances, is the basis of his specialized expertise in premises security risk identification and liability mitigation.

A court-qualified forensic security expert, John Harris consults with defense and plaintiff counsel in the civil dispute resolution process regarding premises liability related to negligence and third party criminal acts such as assault, homicide, kidnapping, rape and robbery.

## AREAS OF EXPERTISE
Adequacy of security
Negligent hiring, retention and supervision
Workplace violence

MANDAMUS RECORD - TAB 5

## EDUCATION
M.S., Real Estate
B.S., Accounting

## CERTIFICATIONS

### Certified Protection Professional (CPP)
Board Certified in Security Management by the Professional Certification Board (PCB) of ASIS International, an ANSI accredited standards development organization with worldwide membership of over 38,000 security professionals. This designation is acknowledged as the security profession's highest recognition of practitioners who have demonstrated competency in the areas of security solutions and best business practices. Requirements for certification: passage of a written exam, bachelor's degree from an accredited university and seven years of security experience. Continuing education required for recertification. Certified through 2014.

### Physical Security Professional (PSP)
Board Certified in Physical Security by the Professional Certification Board (PCB) of ASIS International. This technical designation is awarded to those individuals whose primary responsibilities are to conduct physical security surveys, design integrated security systems and who have demonstrated in-depth operations knowledge and competence in this area. Requirements for certification: passage of a written exam and five years' experience in physical security. Continuing education required for recertification. Certified through 2015.

### Certified Public Accountant (CPA)
Retired – Georgia CPA008884
Requirements for certification: pass uniform CPA examination, hold baccalaureate degree from an accredited university with a concentration in accounting of at least 30 quarter or 20 semester hours, and a two year or 4000 hours of continuous experience in public accounting. Continuing education required for maintaining license.

## PUBLICATIONS & PRESENTATIONS
"Finding a Remedy for Renters", *TRIAL* magazine published by the Association of Trial Lawyers of America (ATLA). The article addressed premises liability issues in multi-family residential properties. (December 2002)

Appeared on the NBC's *Today* show segment on hotel thefts (2007)

Presentation "Using Experts in Sexual Assault Cases" ATLA annual convention Inadequate Security Litigation Group and Schools: Violence, Misconduct, and Safety Litigation Group, Seattle, WA (July 2006)

MANDAMUS RECORD - TAB 5

Speaker "Unique Issues in Apartment Security Cases", The National Crime Victim Bar Association national conference on Civil Actions for Criminal Acts, Washington, DC (May 2006)

Instructor on premises liability at an ASIS security seminar in Los Angeles, CA (2004)

Designated instructor for the premises liability section of the ASIS International Physical Security Council professional development program, "Managing Your Physical Security", Toronto, Canada (2003)

Guest lecturer on premises liability at the Georgia State University Department of Criminal Justice, Atlanta, GA. (2003)

Security consultant for a *Dateline NBC* segment on hotel security (2003)

Interviews:
Security issues in lodging facilities for *20/20 ABC* (2002)

Parking lot crimes at "big-box retailers" for *ABC's Good Morning America and 20/20* (2000)

Security at hotels/motels have been published in several issues of the *Hotel Security Report*

## PROFESSIONAL MEMBERSHIPS
American Institute of Certified Public Accountants (AICPA)

ASIS International (formerly the American Society for Industrial Security International)

## PREVIOUS PROFESSIONAL MEMBERSHIPS
Commercial Real Estate Council, ASIS International

Physical Security Council, Education Committee, ASIS International

Editorial Advisory Board of the Hotel/Casino/Resort Security Report and the School Security Report, published by Rusting Publications, Westbury, NY

American Hotel and Lodging Association

Atlanta Apartment Association

National Apartment Association

MANDAMUS RECORD - TAB 5

## CURRENT POSITION

### THG PREMISES LIABILITY CONSULTANTS, LLC (2000–Present)
(LLC formation January 2014. Previously sole proprietor, The Harris Group)

Consults on premises liability issues related to risk identification and liability mitigation

Audits premises security programs for compliance with security industry standards, guidelines and best business practices

Conducts security risk assessments

Determines appropriate countermeasures to be utilized in integrated security plans

Performs forensic evaluations to draw conclusions regarding adequacy of premises security

Opines on findings of forensic evaluations regarding threat and vulnerabilities, reasonable care, and causation

Testifies as a forensic security expert in civil litigation

## PREVIOUS EXPERIENCE

### LARRY TALLEY & ASSOCIATES, INC., ASSOCIATE (1994–2000)
Conducted premises security risk assessments

Determined appropriate countermeasures

Analyzed crime to made determinations regarding foreseeability and produced demonstrative exhibits for testimony and for exhibits to the record

Produced working papers for testimony and for exhibits to the record in support of conclusions regarding standard of care and causation

Developed crime analysis model

### REITRAC, PRINCIPAL AND DIRECTOR OF ANALYTICS (1991–1994)
Real estate investment trust (REIT) data and analyses for Wall Street investment banking firms.

Performance indices developed for real estate investment trusts (REITS) in conjunction with the Wharton Econometric Forecasting Associates (WEFA),

MANDAMUS RECORD - TAB 5

**BDO SEIDMAN, DIRECTOR OF REAL ESTATE CONSULTING (1990–1991)**
Portfolios of real estate valued in excess of $2.5 billion

**AKINS SECURITY, OPERATIONS TROUBLESHOOTER (1989–1990)**
Security services including security guards

**DIVISION ROCKEFELLER GROUP, REAL ESTATE CONSULTANT (1986–1989)**
Portfolios of office buildings, apartments, industrial facilities, malls, shopping centers, and lodging facilities throughout the United States

**EQUITY OWNER OF APARTMENTS (1979–1986)**
**FIRST PROPERTIES, SHAREHOLDER (1979–1983)**
Real estate investments in apartments

**UNITED STATES MARINE CORPS (1969-1975)**
Active duty — 1969 –1973
Attained the rank of Captain
Awarded Certificate of Commendation

## RELATED TRAINING

**U.S. Army Physical Security Field Manual, FM 19-30,** published February 1965. United States Marine Corps officer training. Implemented, supervised, maintained and monitored physical security plans developed from this training. Areas of instruction and training included physical protection, perimeter barriers, protective lighting, alarms, lock and key systems, guard force selection, and organization, training and supervision of guard force, vulnerability assessment, physical security surveys, and investigation of breaches of physical security. The principles of this military training form the foundation for physical security in the public and private sectors.

**Crime Prevention through Environmental Design (CPTED)** course at the National Crime Prevention Institute, University of Louisville. The security concept taught here is expressed as: "The proper design and effective use of the built environment can lead to a reduction in the fear and incidence of predatory stranger to stranger crime, as well as an improvement of the quality of life". Law enforcement officers worldwide are sent to this program for security training.

**Crime Free Multi-Housing** program at the Albuquerque Police Department, Albuquerque, NM. This nationally recognized program is the model for communities developing systems to reduce illegal activity in rental property. It administers a three phase program for certification of APD Certified Crime Free Multi-Housing Designation for property owners. This program requires the owners to implement a security training program, receive CPTED training, and establish a neighborhood watch training program. In addition, owners must meet

MANDAMUS RECORD - TAB 5

the following requirements: crime free lease addendums, tenant screening, and criminal background checks.

SPECIALIZED SECURITY COURSES

**Assets Protection Course I, II and III, a series of security management programs (2011, 2005)**

**Assets Protection Course I**, Concepts and Methods: Security Vulnerability, Barriers, Locking Concepts, Intrusion Detection, Ethics, Security Lighting, Emergency Planning, Security Management, Security and the Law, Workplace Violence, Investigations, Deception Detection, CPTED, Access Control.

**Assets Protection Course II**, Practical Applications: Financial Forensic Investigations for Asset Recovery, Violence Risk Assessment and Intervention, Interrogation Techniques, Executive Communication, Internal Controls, Organizational Development for Security Professionals, Critical Success Strategies for New Leaders, Employment Law for the Security Professional, Information Security.

**Assets Protection Course III**, Functional Management: How to Become a Trusted Strategic Advisor, Strategy in Action, Business Continuity, Standards, Crisis Management, Unleashing your Leadership Potential, Unity and Leadership.

**Security Officer Management (2007)**

Contract Security: Developing a Decision-making Process, Workplace Violence Planning and Response: Lessons Learned from Virginia Tech, Contract Security: What's Fair and Balanced-Liability and Insurance, Private Security Industry: Trends and Perspective, Contract Security Standards and Guidelines: Application and Compliance , Comparing Apples to Apples: Understanding the Pros and Cons of Outsourcing, Contract Measurement, Performance-based Contracts, and Other Quality Measurements, Contracts: Sharing Risk and Protecting Your Business, RFPs: Developing Practical Business Tools that Work , A Legal Prospective: How To Manage a Contract Security Relationship With a Customer

**CCTV: From Contractors to Courtrooms (2005)**

Using CCTV to mitigate threats and vulnerabilities at facilities. Working knowledge of the latest equipment, systems, and application technologies for CCTV. Assessing digital video applications and the selection of appropriate systems.

**Physical Security: Advanced Applications & Technology (2002)**

Understanding of emerging trends and latest technology in control systems. Integrating physical components, staff, and procedures for cost effective systems. Planning for perimeter barrier systems. Screening processes for

MANDAMUS RECORD - TAB 5

people, vehicles, and materials at sites. Operating systems, database management and enhancements to security control systems.

**Facility Security Design (2002)**

Instruction in design of fully-integrated physical security programs. Integration of multiple security systems in layered effect including environmental security, infrastructure protection, building designs, interior/exterior layout, detections systems, structural barriers, access controls, communications and CCTV assessment.

**Physical Security: Technology Applications (2001)**

Security Risk and Vulnerability Assessment, Conducting a Site Survey, Intrusion Alarms, Fire Alarms, Access Control, CCTV, Physical Barriers and Perimeter Protection, Security Personnel, CPTED, Security Lighting, Security Litigation, Security Engineering

MANDAMUS RECORD - TAB 5

# EXHIBIT C

**Personal Information:**
Name: William E. Flynn
Address: 100 Highland Park Village
Suite 200
Dallas, Texas 75205
Mobile: 214-202-7344
Fax: 214-902-1766
E-mail: weflynn@legalpsychologist.com

**Academic History:**
Internship: 1977-1978, Bureau of Prisons, Federal Correctional Institute, Seagoville, Texas.
PhD: 1970; University of South Carolina, Columbia, South Carolina. Psychology.
B.A: 1965; Wayne State University, Detroit, Michigan. Psychology.

**Professional Experience:**
1978-2012: Independent Practice of Forensic and Clinical Psychology; Dallas, Texas.
1976-2012: Licensed Psychologist, Texas license #21400.
1999-2009: Consultant, Texas Department of Criminal justice, State Council for Offenders, Huntsville, Texas.
1996-2002: Clinical Committee, Survivors of Torture, Dallas, Texas.
1978-1980: Clinical Director of Psychology, Metroplex Clinics; Richardson, Texas.
1977-1978: Clinical and Research Psychologist, Bureau of Prisons, Federal Correctional Institute, Seagoville, Texas.
1970-1978: Assistant Professor of Psychology, Department of Psychology, Southern Methodist University, Dallas, Texas; Director of Graduate Studies in Psychology.
1969-1970: Instructor, School of Nursing, University of South Carolina, and Columbia, South Carolina.
1968-1970: Research Fellow, V.A. Hospital; Columbia, South Carolina.
1966-1967: Alcohol abuse counselor/research assistant, Georgia Department of Mental Health; Atlanta, Georgia.
1963-1965: Research Associate, Department of Otology, Henry Ford Hospital; Detroit, Michigan.

**Memberships:**
American Psychological Association
National Academy of Neuropsychology
American Association of Correctional Psychology

# EXHIBIT D

## Joe G. Gonzales
### MD, FAAPMR, CLCP

## BIOGRAPHY

**Dr. Joe G. Gonzales** is a Physical Medicine & Rehabilitation, Pain Medicine, and Occupational & Environmental Medicine specialist who has practiced Medicine in Texas since 1985.

He is the President of the Texas Physical Medicine & Rehabilitation Institute, and the Founder and Medical Director of Physician Life Care Planning, LLC.

Dr. Gonzales is a licensed physician in the State of Texas; he is certified by the American Academy of Physical Medicine & Rehabilitation, the American Board of Pain Medicine, and the American College of Occupational & Environmental Medicine.

Dr. Gonzales is a Diplomat of the American Academy of Pain Management, a Designated Physician of the Texas Workers' Compensation Commission, and a Certified Life Care Planner as designated by the Commission on Health Care Certification.

His professional affiliations include the American Medical Association, the Texas Medical Association, the Texas Physical Medicine & Rehabilitation Society, the American Academy of Physical Medicine & Rehabilitation, the American Congress of Rehabilitation Medicine, the American College of Occupational & Environmental Medicine, the Mexican American Physician's Association, the International Academy of Life Care Planners, and the International Association of Rehabilitation.

Dr. Gonzales earned his M.D. from Texas Tech University's Health Science Center, and his Bachelors of Health Science degree from Baylor College of Medicine.

⊕ **Physician Life Care Planning**
America's Leading Life Care Planner

11550 IH 10 West
Suite 375
San Antonio, Texas 78230
Phone: (210) 501-0995
email: jgomd@physicianLCP.com

MANDAMUS RECORD - TAB 5

## Joe G. Gonzales
### MD, FAAPMR, CLCP

# CURRICULUM VITAE

**Physician Life Care Planning**
America's Leading Life Care Planner

11550 IH 10 West
Suite 375
San Antonio, Texas 78230
Phone: (210) 501-0995
email: jgomd@physicianLCP.com

## SPECIALTIES

Physical Medicine & Rehabilitation (Board Certified)
Pain Management (Board Certified)
Occupational & Environmental Medicine (Board Certified)
Certified Life Care Planner

## EDUCATIONAL BACKGROUND

Texas Tech University Health Science Center
Degree: Doctor Of Medicine
Lubbock, Texas
1980-1984

Baylor College of Medicine, Texas Medical Center
Degree: Bachelor of Health Science Degree,
Physician Assistant Certification
Awards: Henry D. McIntosh Award for Clinical Excellence
Houston, Texas
1975-1977

Angelo State University
Department of Nursing
Degree: Associate of Science & Nursing (R.N.)
San Angelo, Texas
1971-1973

San Angelo School of Vocational Nursing
Degree: Diploma & Certification (Licensed)
San Angelo, Texas
1970-1971

## POST GRADUATE TRAINING

Department of Physical Medicine & Rehabilitation
University of TexasHealth Science Center
Residency, Physical Medicine & Rehabilitation
San Antonio, Texas
1985 - 1988

Department of Family Practice
Texas Tech University Health Science Center
Internship, Family Medicine
Lubbock, Texas
1984 – 1985

## Joe G. Gonzales
### MD, FAAPMR, CLCP

## CURRICULUM VITAE

## LICENSES & CERTIFICATIONS

Texas Medical License – Physician Permit
License Number: G8135
Issued: August 1985

American Board Physical Medicine & Rehabilitation
Board Certification
Certificate Number: 3039
Issued: May 1989

American Board of Pain Medicine
Board Certification
Issued: 1994

American College of Occupational & Environmental Medicine
Board Certification
Status: Active Member
Issued: 1992

American Academy of Pain Management
Diplomate
1992

Texas Workers' Compensation Commission
Approved Doctor List Certification
Issued: 2003 (Re-certified, 2009)

Texas Workers' Compensation Commission
Certificate, Maximum Medical Improvement & Assignment of Impairment
Ratings
Issued: 2003 (Re-certified, 2009)

Texas Workers' Compensation Commission
Designated Doctor List Certification
Issued: 2003 (Re-certified, 2009)

Commission on Health Care Certification
Certified Life Care Planner
Issued: 2006 (Re-certified, 2009)

The University of Florida & MediPro Seminars, LLC
Post Graduate Course Study in Life Care Planning
Certificate of Completion
Issued: 2006

## PROFESSIONAL ASSOCIATIONS

American Medical Association
Texas Medical Association

MANDAMUS RECORD - TAB 5

## Joe G. Gonzales
### MD, FAAPMR, CLCP

## CURRICULUM VITAE

Bexar County Medical Society
Texas Physical Medicine & Rehabilitation Society
American Academy of Physical Medicine & Rehabilitation
American Congress of Rehabilitation Medicine
American College of Occupational & Environmental Medicine
American Academy of Pain Management – Diplomate
Mexican American Hispanic Physician's Association
International Academy of Life Care Planners
The International Academy of Life Care Planners
The International Association of Rehabilitation Professionals

## PROFESSIONAL EXPERIENCE

Physician Life Care Panning , LLC
Founder & Medical Director
San Antonio, Texas
2011 - Present

Texas Physical Medicine & Rehabilitation Institute
President
San Antonio, Texas
1998 - Present

Hyperbaric & Wound Care Associates, P.A.
President
San Antonio, Texas
2003 - 2006

Christus Santa Rosa Wound Care and Hyperbaric Center
Medical Director
San Antonio, Texas
2004 - 2006

South Texas PM&R Group
Founder & Past President
San Antonio, Texas
1987 - 1998

Hyperbaric Oxygen, Inc. Total Wound Treatment Centers
Corporate Medical Director
San Antonio, Texas
1995 - 2000

Warm Springs &  Baptist Rehabilitation Network
Hyperbaric Medicine & Wound Care Center
Medical Director
San Antonio, Texas
1995 - 2000

MANDAMUS RECORD - TAB 5

## Joe G. Gonzales
### MD, FAAPMR, CLCP

**CURRICULUM VITAE**

Warm Springs Rehabilitation Center
NW Clinic & System Outpatient Medical Director
San Antonio, Texas
1994 - 1998

South Texas Rehabilitation Center
(San Antonio's first Comprehensive Outpatient Physical Medicine & Rehabilitation Center)
Development & Medical Director
San Antonio, Texas
1987 - 1993

Rehabilitation Institute of San Antonio (RIOSA)
Medical Director, Physical Medicine & Rehabilitation
Medical Director, Spinal Cord Injury Rehabilitation Program
Medical Director, Orthopedic Rehabilitation Program
San Antonio, Texas
1988 - 1993

South Plains Rehabilitation Center
(Lubbock's first Comprehensive Outpatient Physical Medicine & Rehabilitation Center)
Associate & Active Developer
Lubbock, Texas

(This Space Left Intentionally Blank)

MANDAMUS RECORD - TAB 5

# EXHIBIT E

# JOHN A SWIGER, PH.D.
411 S.W. 24th Street, San Antonio, Texas 78207
(210) 434-6711 ex2499  FAX: (210) 434-0821
cell: (210) 861-2772 home office 210-694-9111
jaswiger@ollusa.edu

## CAREER HISTORY/ACADEMIC

2003 - Present      Our Lady of the Lake University, San Antonio, Texas
                    <u>Professor of Finance</u>

1999 - 2006         Our Lady of the Lake University, San Antonio, Texas
                    <u>Chairman of Accounting, Economics and Finance Department</u>

1991 - 2003         Our Lady of the Lake University, San Antonio, Texas
                    <u>Associate Professor of Finance</u>
                    Taught graduate and undergraduate courses in Finance, Investments,
                    International Finance, Economics, Modern Banking and International
                    Business.
                    Received Tenure-1998

Summer 1991         University of Texas at Austin
Summer 1992         <u>Senior Lecturer of Finance</u>
                    Taught Investments in the MBA Program. Courses concentrated on
                    investment valuation and included a section on the economic valuation of
                    human life.

1976-1980           University of Texas, San Antonio, Texas
                    <u>Assistant Professor of Finance</u>
                    Taught courses in Capital Budgeting, Financial Management,
                    Investment Analysis and Portfolio Management.

## PUBLICATIONS:

Swiger, J., Hammons, R., Robinett, S., and Winney, K., "Management of
Technological Change and Sustainable Economic Growth: Economic Factors
(2011) Management of Technological Changes: Proceedings of the 7th
International  Conference on Management of Technolocial Changes,
September 1-3, Alexandroupolis, Greece.

Swiger, J., Hammons, R., Robinett, S., and Winney, K., "Management of
Technological Change and Sustainable Economic Growth: Economic Recovery
(2011) Management of Technological Changes: Proceedings of the 7th
International  Conference on Management of Technolocial Changes,
September 1-3, Alexandroupolis, Greece.

1

Swiger, J., Winney, K., and Bender, B.," IFRS Convergence: A Crossroads For Post Secondary Accounting Education Programs" (2010) *Quality Management in Higher Education: Proceedings of the 6th International Seminar on the Quality Management in Higher Education* (pp.). Tulcea, Romania.

Swiger, J. & Mudge, S. (2008). The Effect of Higher Education on Human Capital Formation: A Multinational study. *The International Journal of Learning, 15*(9), 227-236.

Swiger, J., Mudge, S., & Wise, S. (2008). U.S. and European Trends that Impact Human Capital Formation through Higher Education, Part 1: Rising Enrollment and Rising Costs of Higher Education. *Quality Management in Higher Education: Proceedings of the 5th International Seminar on the Quality Management in Higher Education* (pp.). Tulcea, Romania.

Swiger, J., Mudge, S., & Wise, S. (2008). U.S. and European Trends that Impact Human Capital Formation through Higher Education, Part 2: Human capital Formation Through Higher Education. *Quality Management in Higher Education: Proceedings of the 5th International Seminar on the Quality Management in Higher Education* (pp.). Tulcea, Romania.

Swiger, J., Mudge, S., & Pennington, A. (2007). Combating Capital Flight Facilitated by Illegal Money Laundering – Challenges and Strategies: Part I: Rising Incidence and Excessive Costs. In N. Badea and C. Rusu (Eds.), *Management of Technological Changes: Proceedings of the 5th International Conference on the Management of Technological Changes – Volume 1* (pp. 145-150). Alexandroupolis, Greece: Democritus University of Thrace.

Swiger, J., Pennington, A., & Mudge, S. (2007). Combating Capital Flight Facilitated by Illegal Money Laundering – Challenges and Strategies: Part II: Legislative and Technological Responses. *Management of Technological changes: Proceedings of the 5th International Conference on the Management of Technological Changes – Volume 1* (pp. 139-144). Alexandroupolis, Greece: Democritus University of Thrace.

Swiger, John & Mudge, Susan, "Managing Trends That Impact Human Capital Formation Through Higher Education, Part I: Rising Enrollment and Rising Costs of Higher Education" Proceedings of the 4th International Seminar on the Quality Management in Higher Education, held in Sinaia, Romania, June 9-10, 2006.

Swiger, John & Mudge, Susan, "Managing Trends That Impact Human Capital Formation Through Higher Education, Part II: Preserving the Benefits of Human Capital Formation" Proceedings of the 4th International Seminar on the Quality Management in Higher Education, held in Sinaia, Romania, June 9-10, 2006.

Swiger, John & Maloney, Tim, "A Reexamination of the Value of a Homemaker Necessitated by Legal, Demographic and Business Changes and Trends—Part I" Proceedings at the 4th Management of Technological Changes Conference in Chaina, Crete, Greece, August 2005.

2

Swiger, John & Maloney, Tim, "A Reexamination of the Value of a Homemaker Necessitated by Legal, Demographic and Business Changes and Trends—Part II" Proceedings at the 4th Management of Technological Changes Conference in Chaina, Crete, Greece, August 2005.

Swiger, John, & Krause, Kent C., "Analysis of the Department of Justice Regulations for the September 11th Victim Compensation Fund." *Journal of Air Law and Commerce*, 67(1). (Winter 2002). Southern Methodist University School of Law.

Swiger, John, & Krause, Kent C., "Analysis of the Department of Justice Regulations for the September 11th Victim Compensation Fund." *Lawyer Pilots Bar Association Journal, XXIV No. 1,* Spring. 2002.

Swiger, John, & Krause, Charles F. "Proving Damages for Foreign Litigants." *New York Bar Journal,* July, 1997.

Swiger, John & Klaus, Allen. "Capital Budgeting Guidelines for the Small Private University." *Business Officer,* March 1996.

Swiger, John. Study Guide: The Basics of Investing. John Wiley & Sons, New York, 1979.

Swiger, John, and Scott Jones. Simplified Forecasting Techniques for Finance and Industry. U.T.S.A. Continuing Education Department, 1979.

Numerous reviews of finance and investment texts written on an honorarium basis for the editors of McGraw-Hill, Wiley/Hamilton, and West Educational Publishing.


**WORKING PAPERS**

"Determining Economic Damages for the High Income Executive"


**PRESENTATIONS AND SEMINARS**

"Successful Handling of Wrongful Death Cases in Texas" a presentation conducted for attorneys and sponsored by Lorman Education Service. Dallas, Texas, July 27, 2004.

"An Economic Analysis of the Department of Justice Victim Compensation Fund." Presented to the Aviation Law Section of the State Bar of Texas, 2002 Annual meeting, June 14, 2002.

"The Airline Industry: A Time for Maximum Pessimism?" Presented to the Aviation Law Section of the State Bar of Texas, 2002 Annual meeting, June 14, 2002.

"What Every Trial Attorney Should Know About Proving Economic Damages." A presentation to the Bexar County Women's Bar Association. October 20, 2000.

3

"Financial Analysis and Credit Evaluation." Prepared expressly for and presented to the senior marketing staff of Fairchild Aviation, San Antonio, Texas on March 17, 1995.

"Proving Economic Damages for Litigants of Mexican Citizenry." A research paper presented at the Western Economic Association International Conference, San Diego, California, on July 6, 1995.

"Is a Minimum Wage Increase Justified?" A seminar at the First Friday Forum, KLRN Studio, San Antonio, Texas, February 3, 1995.

"Proving Damages for Foreign Litigants." Presented to the Aviation Law Section of the State Bar of Texas, 1993 Annual meeting, June 18, 1993.

Conducted seminars in Financial Forecasting for U.T.S.A. Continuing Education Department.

Conducted seminars in Financial Statement Analysis for the Small Business Administration.


**MEDIA INTERVIEWS**

Interview with KENS TV regarding the impact of the Toyota recall on the San Antonio Toyota Tundra Manufacturing Plant, February 2010.

Numerous interviews with business reporters from the San Antonio Express-News radio talk shows and television news programs regarding issues ranging from minimum wage legislation to stock market activity to the closing of Kelly Air Force Base.


**EDUCATION**

University of North Carolina at Chapel Hill, Ph.D. 1976
    Major: Finance
    Minor: Management
    Thesis Title:  Commercial Strategy and Performance and Financial Policy


University of Richmond, B.S. in Business Administration
    Major: Marketing
    Minor: Economics


**CAREER HISTORY/BUSINESS**


**1990 - Present**       **Business and Economic Consultant**
       Provide economic and financial analysis to law firms, business firms and government agencies. Consulting activities include the determination of economic damages and losses in the following types of cases:

4

- Wrongful death and serious injury
- Business Valuation
- Business interruption and the abrogation of contracts
- Sexual harassment, discrimination and wrongful termination
- Tortious interference of business relationships and contracts

**Other consulting activities include:**
- Feasibility studies for manufacturing operations
- Valuation analysis for closely held corporations

**Sample Clients:**
- Engstrom, Lipscomb & Lack
- Podhurst Orseck
- Craddock Davis and Crouse
- USAA
- Mission City Management
- Estate and Gift Division of the Internal Revenue Service

**1977-1990**  TNL Financial Inc., San Antonio, Texas
President and Founder

Organized the firm in May 1977. By 1990, TNL comprised 34 vendors, 8,000 accounts, 18 employees, and $40,000,000 in assets. Administered day-to-day operations with emphasis in the areas of marketing, financial planning and control, and banking relations.

**1968-1969**  First & Merchants National Bank. Richmond, VA (now Bank of America)
Credit Analyst

5

GRUBER | HURST | JOHANSEN | HAIL | SHANK

Gruber Hurst Johansen Hail Shank LLP
Attorneys | Counselors
1445 Ross Avenue | Suite 2500
Dallas Texas 75202-2711
214.855.6800 main
214.855.6808 fax

Trey Crawford
214.855-6866 (direct)
214.855.6808 (facsimile)
tcrawford@ghjhlaw.com

July 3, 2014

<u>*Via Email and Facsimile: 214-871-8209*</u>
Randy Nelson
**Thompson Coe Cousins & Irons, LLP**
Plaza of Americas
700 N. Pearl Street, 25th Floor
Dallas, TX 75201-2832

<u>*Via Email and Facsimile: 214-220-5252*</u>
Ramona Martinez
**Cobb Martinez Woodward, PLLC**
1700 Pacific Avenue, Suite 3100
Dallas, TX 75201

<u>*Via Email and Facsimile: 972-584-6054*</u>
Samuel H. Johnson
**Johnson Broome, P.C**.
2591 Dallas Parkway, Suite 300
Frisco, TX 75074

  Re: Cause No. DC-13-04564-L; *Jane Doe v. Ajredin "Danny" Deari; Dritan Kreka; Pastazios Pizza, Inc.; Island Hospitality Management, Inc.; Hyatt Hotels Corporation; and DOES 1-25;* 193rd Judicial District Court, Dallas County, Texas

Dear Counsel,

  As I advised you all at the conclusion of the deposition of Post Properties' Corporate Representative on June 18, 2014 (i.e. – the last fact witness deposition in this matter), all of Plaintiff's experts are available to be deposed at a date and time that is convenient for the parties and the witness. Since that date, I have not receive a single request for dates to take Plaintiff's experts' depositions.

  This is in addition to the invitation I extended at the May 20, 2014 hearing on Plaintiff's Motion to Compel the Deposition of Jeffrey Fisher (while conferring in the jury room) for Defendants to begin taking the depositions of those experts whose opinions are not directly related to fact witness testimony of deponents not yet made available by Defendants. Once again, we did not receive a single request for dates since that time.

  Instead, you have elected to file (or join in the filing) of motions to continue the trial setting – citing, as a basis, your inability to take the depositions of Plaintiff's experts. Not only is this basis false, it is an excuse that has been intentionally manufactured by Defendants' own conduct and discovery abuse that has been pervasive throughout this litigation. These issues will



**EXHIBIT 9**

July 3, 2014
Page 2


be addressed at upcoming hearings with the Court but, in the interim, I once again invite you to provide us with proposed dates and times that you would like to take the depositions of Plaintiff's designated experts.

  Should you have any questions or concerns please feel free to contact me.



     Sincerely,

     Trey H. Crawford


THC:ddt



## DC-13-04564

| | | |
|---|---|---|
| JANE DOE, | | In the District Court |
| | *Plaintiff(s),* | of Dallas County |
| v. | | 193rd Judicial |
| AJREDIN "DANNY" DEARI ET. AL., | | District |
| | *Defendant(s).* | |

### ORDER RESETTING TRIAL DATE

ON THIS DAY the Court notes that it was unaware of a vacation letter on file when it reset the trial date in this cause for May 26, 2015. Therefore, the Court hereby resets the trial of this cause for March, 24, 2015 at 9:30 a.m. The remainder of the Court's September 24, 2014 Order concerning the abatement remains in effect.

SO ORDERED this Tuesday, September 30, 2014.

_____
CARL GINSBERG, *District Judge*
193rd Judicial District Court

**ORIGINAL SIGNED BY JUDGE**



IN THE DISTRICT COURT
OF DALLAS COUNTY
193RD JUDICIAL DISTRICT

February 24, 2015

ERIC POLICASTRO
1445 ROSS AVE
SUITE 2500
DALLAS TX 75202

**In Re: Cause No. DC-13-04564**
    **JANE DOE vs. AJREDIN DEARI, et al**

**ALL COUNSEL OF RECORD:**     Counsel for Plaintiff is required to notify all parties of new trial setting.

Please take note of the following settings:     *[The trial date in this notice supersedes all others. However, the deadlines in the previous Scheduling Order control, i.e. just because the trial date may have changed, this fact alone does not change deadlines, as per the Court's Initial Scheduling Order.]*

**\*ALL PARTIES CALLED TO TRIAL MUST APPEAR, UNLESS OTHERWISE INSTRUCTED BY THE COURT ADMINISTRATOR.** Also parties are instructed to mark, exchange and discuss any exhibits to be admitted

        Trial:     **July 07, 2015   @ 9:30 a.m.**

Trial announcements must be made in accordance with Rule 3.02, Dallas Civil Court Rules.

When no announcement is made for **Plaintiff,**or the Plaintiff fails to appear, the Court intends to dismiss this case for want of prosecution, under T.R.C.P. 165a and IN THE EXERCISE OF THE COURTS DISCRETION PURSUANT TO ITS INHERENT POWER TO DISMISS CASES NOT DILIGENTLY PROSECUTED, and will hold a hearing at the time of trial on dismissing this case for want of prosecution .

Completion of discovery, presentation of pretrial motions and other matters relating to preparation for trial are governed by the Dallas Civil Court Rules. Copies may be obtained through the Dallas County District Clerks Office.

    *Parties are to announce the Thursday and Friday until 10:00 a.m. the week prior to trial, ready/not ready for trial, length of time for trial, and the number of witnesses you anticipate calling.*

For those cases with a Modified Uniform Scheduling Order in place, please note that nothing is affected by this notice except the date of trial. The Court still expects counsel to follow the schedule set forth in the scheduling order. To announce for trial call (214) 653-6998

                    Sincerely,

                    CARL GINSBERG, Judge
                    193rd Judicial District Court

# Trey Crawford

| | |
|---|---|
| **From:** | Trey Crawford |
| **Sent:** | Friday, February 06, 2015 10:33 AM |
| **To:** | David S. Denton |
| **Cc:** | Kymberlee Wright |
| **Subject:** | RE: Doe v. Deari, et al/msj hearings and raw data |
| **Attachments:** | PLTF003532 - 003534.pdf |

David,

Please see the attached letter to me from Dr. Flynn. I have confirmed that all of Dr. Flynn's "raw data" was produced to you in advance of his deposition. In fact, you questioned Dr. Flynn on most of it during the deposition. By way of reference, I refer you to the portions of Dr. Flynn's file at PLTF001731-002311 which contains the "raw data" and scaled scores for Dr. Flynn's evaluations of Ms. Doe. If there is something specific that you are looking for that you believe you do not have, please identify it with enough specificity for me to address the issue.

I am once again asking you for dates in which I can take Dr. Clayton's deposition. This is my third request. If I do not hear from you by the end of business today, I will notice the deposition to take place at your office at a date and time that is convenient for us.

Regards.


Trey Crawford
Partner

**GRUBER | HURST | JOHANSEN | HAIL | SHANK**
1445 Ross Avenue | Suite 2500
Dallas, Texas 75202-2711
214.855.6866 Voice
214.855.6808 Fax
Email: **tcrawford@ghjhlaw.com**
**www.ghjhlaw.com**

Gruber Hurst Johansen Hail Shank is a Limited Liability Partnership formed under the laws of the State of Texas. This message (and any attached files) is intended only for the use of the addressee(s). This electronic transmission (and the documents accompanying it) may contain trade secrets, copyrighted materials, and confidential information belonging to the sender that is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510 and 2521 and may be legally privileged. If you are not the intended recipient, any dissemination, copying or distribution of this message or files attached with it is strictly prohibited. If you have received this communication in error, please notify Gruber Hurst Johansen Hail Shank LLP immediately by telephone (214-855-6800) and destroy the original message.

**From:** David S. Denton [mailto:DDenton@cobbmartinez.com]
**Sent:** Tuesday, February 03, 2015 11:53 AM
**To:** Trey Crawford
**Subject:** Doe v. Deari, et al/msj hearings and raw data

Trey,

My calendar shows the msjs are set for hearing as follows:

Feb. 9 – Hyatt Franchising/Hyatt Hotels msj
Feb. 16 – Fisher and Ink/Chatham msj
Feb. 23 – Island/Grand Prix msj

Dr. Flynn generated "raw data" from his examination of Plaintiff, but I did not see it in his documents produced before his deposition.  Raw data is generally defined as the patient's specific answers, whether spoken or written, generated in drawings, or recorded by computers or other lab devices.  *See* American Psychological Association, Ethical Principles of Psychologists and Code of Conduct, Ethical Standard 9.04(a) (2002) (providing that the term *test data* refers to raw and scaled scores, client/patient responses to test questions or stimuli, and psychologists' notes and recordings concerning client/patient statements and behavior during an examination).  This raw data is contained directly in the tests materials, booklets and protocols that were administered to Plaintiff by Dr. Flynn.  Let me know when I can expect to have the raw data to provide it to Dr. Clayton.

David

**CMW**

**David S. Denton**
Cobb Martinez Woodward PLLC
1700 Pacific Avenue, Suite 3100
Dallas, Texas  75201
(214) 220-5219  direct
(214) 220-5269  fax
ddenton@cobbmartinez.com
www.cobbmartinez.com

| JANE DOE | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| VS. | § | |
| | § | |
| AJREDIN "DANNY" DEARI; DRITAN | § | |
| KREKA; PASTAZIOS PIZZA, INC.; | § | |
| ISLAND HOSPITALITY MANAGE- | § | |
| MENT, INC.; HYATT HOTELS | § | |
| CORPORATION; HYATT HOUSE | § | |
| FRANCHISING, LLC; GRAND PRIX | § | DALLAS COUNTY, TEXAS |
| FLOATING LESSEE, LLC; INK | § | |
| ACQUISITION, LLC; INK | § | |
| ACQUISITION II, LLC; INK | § | |
| ACQUISITION III, LLC; INK LESSEE, | § | |
| LLC; INK LESSEE HOLDING, LLC; | § | |
| CHATHAM TRS HOLDING, INC.; | § | |
| CHATHAM LODGING, LP; JEFFREY | § | |
| H. FISHER, Individually; POST | § | |
| PROPERTIES, INC.; and DOES 1-25 | § | 193RD JUDICIAL DISTRICT |

---

**DEFENDANT ISLAND HOSPITALITY MANAGEMENT, INC.'S REPLY TO
PLAINTIFF'S RESPONSE TO ISLAND'S MOTION TO EXAMINE PLAINTIFF JANE DOE**

---

Defendant Island Hospitality Management, Inc. ("Defendant") files this Reply to Plaintiff's Response to Island's Motion to Examine Plaintiff Jane Doe, as follows:

## I.   Background

Plaintiff filed her Response to Island's Motion to Examine Plaintiff on March 24 at 9:03 p.m.  In her Response, Plaintiff asserts two arguments:  (1) Defendant's motion is untimely; and (2) Defendant has not satisfied its burden to prove good cause.  As discussed herein, The Response is unavailing because:  (1) Defendant's expert designation was timely, as was the request for an independent examination; and (2) good cause exists for Defendant's expert to

DEFENDANT ISLAND HOSPITALITY MANAGEMENT, INC.'S
REPLY TO PLAINTIFF'S RESPONSE TO ISLAND'S MOTION TO EXAMINE PLAINTIFF JANE DOE       PAGE 1
Document #135153

MANDAMUS RECORD - TAB 6

conduct an independent examination, and fundamental fairness requires that Defendant's psychiatric expert be allowed to examine Plaintiff when her expert has conducted an examination.

Importantly, as an initial matter, Defendants' counsel spoke with Plaintiff's counsel about the scope of the independent examination before filing the motion. Namely, the scope of the independent evaluation would be limited to:

(1) a four hour clinical interview where Plaintiff's history and personality disorders would be discussed; and

(2) a Minnesota Multiphasic Personality Inventory -2 ("MMP-2").[1]

The scope of the proposed independent examination is far less intrusive than the examination performed by Plaintiff's expert.[2]

## II. Arguments and Authorities

### 1. Defendant's Expert Designation was timely, as was the request for an independent examination.

Defendants' expert was timely designated pursuant to the Court's December 30, 2014 order. Namely, the Court's order states:

> FURTHERMORE, IT IS THEREFORE ORDERED that within 30 days after the deposition of an expert designated by Plaintiff, the Defendants may designate experts testifying in response to opinions disclosed at the deposition.

Dr. Flynn produced his expert file on December 16, 2014. Defendant deposed Dr. Flynn three days later on December 19, 2014, and Defendants designated their expert, Dr. Clayton, on January 16, 2015. Shortly after Dr. Clayton was designated, Defendants requested that Plaintiff

---

[1] The MMPI-2 is the most widely used and researched standardized psychometric test of adult personality and psychopathology. *See* *http://psychology.about.com/od/psychologicaltesting/a/mmpi.htm*
[2] *Exhibit A, Dr. Flynn Deposition Transcript, page/line. 45:14-16; Exhibit B, Dr. Flynn's Invoice.*

DEFENDANT ISLAND HOSPITALITY MANAGEMENT, INC.'S
REPLY TO PLAINTIFF'S RESPONSE TO ISLAND'S MOTION TO EXAMINE PLAINTIFF JANE DOE                PAGE 2
Document #135153

MANDAMUS RECORD - TAB 6

submit to examination by Dr. Clayton trying to work something out without the need for the Court's intervention. Ultimately, negotiations about the independent examination broke down – which required Defendants to file their motion for an independent examination on February 6, 2015.

Defendants' request for an independent examination was timely. Plaintiff now contends that Defendant should have known it would need an independent examination since Plaintiff designated Dr. Flynn in May 2014. However, Plaintiff ignores that her expert designation does not state that Dr. Flynn examined Plaintiff, hence Defendants did not have notice that they would need to examine Plaintiff. In fact, Plaintiff's expert designation states only that:

> Dr. Flynn's testimony will be based upon his skill, knowledge, education, experience, and training, as well as his review of the pertinent authoritative publications written by him and others, and the evidence, pleadings, and discovery served, produced, and/or elicited in this case and based upon a reasonable degree of professional, medical, and scientific probability and/or certainty.

Given the language of Plaintiff's expert designation, Defendants were not put on notice that their expert would conduct an examination on Plaintiff. To the contrary, Defendants did not know Plaintiff's expert conducted an independent examination until three days before Dr. Flynn's deposition when his expert file was produced. Of note, Plaintiff's examinations did not take place until August 2014 and September 2014, well after Plaintiff's expert designation and after Plaintiff alleges discovery was cut-off.

Defendants' expert realized that an independent examination was necessary only after Defendants deposed Plaintiff's expert on his independent examination of Plaintiff. And Defendants moved quickly for an independent examination after Plaintiff rejected their request. Accordingly, Defendants' request for an independent examination is timely.

DEFENDANT ISLAND HOSPITALITY MANAGEMENT, INC.'S
REPLY TO PLAINTIFF'S RESPONSE TO ISLAND'S MOTION TO EXAMINE PLAINTIFF JANE DOE          PAGE 3
Document #135153

MANDAMUS RECORD - TAB 6

**2. Good Cause exists for this Court to order an independent examination and fundamental fairness requires that Defendant's expert be allowed to examine Plaintiff.**

First, Plaintiff's expert testified that his raw data was based on his subjective interpretation of Plaintiff's responses to his questions. Specifically, Dr. Flynn testified as follows:

Q. (BY MR. DENTON) Similarly, I'm looking at this very first sentence on that paragraph, and it says, Ultimately, the clinician must make a clinical judgment as to whether a diagnostic criterion is met. Now, would that also mean that you have the judgment, the discretion to find or not find whether a diagnostic criterion is met?

Page 160

A. It does.[3]

Dr. Flynn further testified that some of his opinions are based on his subjective or clinical judgment. Namely, Dr. Flynn testified:

Q. Is it objective -- or is it objective data from which you used in arriving at your opinions?
    A. It is mostly objective and some clinical judgment or subjective.[4]

Because Plaintiff's expert's opinions are partially based on his subjective interpretation of Plaintiff's response during his examination, the raw data produced from Dr. Flynn's examination warrants an independent examination by Defendant's psychiatric expert.

Second, Defendants established the requisite nexus between the independent examination and the condition in controversy. The Fort Worth Court of Appeals recognized in *In re Transwestern Publ'g Relators Co.,* that "A mental examination by Defendants' expert

---

[3] *Exhibit A, Dr. Flynn Deposition Transcript, page/line. 159:20-160:1.*
[4] *Exhibit A, Dr. Flynn Deposition Transcript, page/line. 214:10-13.*

DEFENDANT ISLAND HOSPITALITY MANAGEMENT, INC.'S
REPLY TO PLAINTIFF'S RESPONSE TO ISLAND'S MOTION TO EXAMINE PLAINTIFF JANE DOE          PAGE 4
Document #135153

MANDAMUS RECORD - TAB 6

[psychiatrist] is likely to lead to the discovery of relevant evidence regarding the nature and extent of her mental anguish damages, the bases for her injuries and the likelihood of her suffering future mental anguish." 96 S.W.3d 501, 507 (Tex. App. – Fort Worth, 2002). Just like *In re Transwestern*, a reasonable nexus exits in this case between Plaintiff's mental condition and the examination sought because Defendants' expert psychiatrist's mental examination is intended to explore Plaintiff's allegations of mental anguish as they relate to her inability to go to college, explore other career paths, and otherwise live a normal life.[5]

Finally, the raw data provided by Plaintiff's expert does not contain all the information which Defendant's expert seeks. *In re Transwestern* recognized that the information Defendants will obtain from conducting their own mental examination is not likely to be acquired by other means.[6] Reviewing Dr. Flynn's raw data and Dr. Flynn's deposition transcript only allows Defendants' expert to base her opinions on the information obtained by Plaintiff's expert. In order for Defendants to make their own analysis of the nature of Plaintiff's mental anguish and effectively challenge the opinions of Dr. Flynn, Defendants' expert psychiatrist needs to be able to conduct an independent evaluation of Plaintiff. The reasoning of the court of appeals in *Sherwood Lane Assocs. v. O'Neill* is directly on point:

> The minor has already been examined by her expert witnesses. Unless relators are allowed the requested relief, their expert's analysis will be limited to a review of the minor's records and the testimony of the minor's psychologists. Relators' expert would be precluded from examining matters not covered by the minor's psychologists' examinations and would be precluded from making his own observations. The trial court's actions severely restricts relators' opportunity to discover facts that may contradict the opinions of the minor's

---

[5] *In re Transwestern,* 96 S.W.3d at 507 (stating "Because the mental examination is intended to explore [Plaintiff's] allegations of mental anguish as they relate to her termination, a reasonable nexus exists between her metnal condition and the examination sought.").

[6] *Id.* at 507.

DEFENDANT ISLAND HOSPITALITY MANAGEMENT, INC.'S
REPLY TO PLAINTIFF'S RESPONSE TO ISLAND'S MOTION TO EXAMINE PLAINTIFF JANE DOE          PAGE 5
Document #135153

MANDAMUS RECORD - TAB 6

expert witnesses. In turn, such restriction severely limits relators' ability to contest the minor's claim for mental injury damages.

The ultimate purpose of discovery is to seek the truth, so that disputes may be decided by what the facts reveal, bot by what facts are concealed. Fundamental fairness dictates that relators' psychiatrist be allowed to examine the minor; otherwise, relators will be at a severe disadvantage in the "battle of experts."[7]

It is impossible to obtain the desired information through means that are less obtrusive than the independent examination sought by Defendants.

For the reasons discussed above, good cause exists for this Court to order an independent examination.

### III. Conclusion

WHEREFORE, PREMISES CONSIDERED Defendant requests that the Court grant their Motion to Examine Plaintiff, order Plaintiff to be produced for a psychological examination conducted by Dr. Lisa Clayton, and grant such further and additional relief to which Defendant may be entitled.

---

[7] 782 S.W.2d 942, 945 (Tex. App. – Houston [1st Dist.] 1990, orig. proceeding) (citations omitted).

DEFENDANT ISLAND HOSPITALITY MANAGEMENT, INC.'S
REPLY TO PLAINTIFF'S RESPONSE TO ISLAND'S MOTION TO EXAMINE PLAINTIFF JANE DOE          PAGE 6
Document #135153

MANDAMUS RECORD - TAB 6

Respectfully submitted,

**COBB MARTINEZ WOODWARD PLLC**
1700 Pacific Avenue, Suite 3100
Dallas, TX  75201
(214) 220-5202 (direct phone)
(214) 220-5252 (direct fax)

By: _____
        **RAMONA MARTINEZ**
        Texas Bar No. 13144010
        email: rmartinez@cobbmartinez.com
        **DAVID S. DENTON**
        Texas Bar No. 24036471
        email: ddenton@cobbmartinez.com
        **MATTHEW E. LAST**
        Texas Bar No. 24054910
        email: mlast@cobbmartinez.com

**ATTORNEYS FOR DEFENDANT ISLAND
HOSPITALITY MANAGEMENT, INC.**

DEFENDANT ISLAND HOSPITALITY MANAGEMENT, INC.'S
REPLY TO PLAINTIFF'S RESPONSE TO ISLAND'S MOTION TO EXAMINE PLAINTIFF JANE DOE      PAGE 7
Document #135153

MANDAMUS RECORD - TAB 6

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of this document has been forwarded to the following counsel of record by e-service, email, certified mail, return receipt requested, and/or regular U.S. mail on this 26th day of March, 2015:

Trey Crawford
Gruber Hurst Johansen Hail Shank
1445 Ross Avenue, Suite 2500
Dallas, TX  75202-2711
fax: 214.855.6808
*Attorney for Plaintiff*

Dritan Kreka
5549 Big River Drive
The Colony, TX  75056
*Defendant Kreka*

Samuel H. Johnson
Johnson Broome, PC
2591 Dallas Parkway, Suite 300
Frisco, TX  75034
fax: 972.584.6054
*Attorney for Defendants Deari &*
*Pastazios Pizza*

Randy A. Nelson
Thompson Coe Cousins & Irons
700 North Pearl Street
25th Floor – Plaza of the Americas
Dallas, TX  75201
*Attorney for Post Properties*

**RAMONA MARTINEZ**
**MATTHEW E. LAST**

DEFENDANT ISLAND HOSPITALITY MANAGEMENT, INC.'S
REPLY TO PLAINTIFF'S RESPONSE TO ISLAND'S MOTION TO EXAMINE PLAINTIFF JANE DOE          PAGE 8
Document #135153

MANDAMUS RECORD - TAB 6

| | | |
|---|---|---|
| JANE DOE, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | 193rd JUDICIAL DISTRICT COURT |
| | § | |
| ISLAND HOSPITALITY MANAGEMENT, | § | |
| INC.; HYATT HOTELS CORPORATION; | § | |
| HYATT HOUSE FRANCHISING, L.L.C.; | § | |
| GRAND PRIX FLOATING LESSEE, LLC; | § | |
| INK ACQUISITION, LLC; INK | § | |
| ACQUISITION II, LLC; INK | § | |
| ACQUISITION III, LLC; INK LESSEE, | § | |
| LLC; INK LESSEE HOLDING, LLC; | § | |
| CHATHAM TRS HOLDING, INC.; | § | |
| CHATHAM LODGING, L.P.; JEFFREY | § | |
| H. FISHER, Individually; POST | § | |
| PROPERTIES, INC.; POST ADDISON | § | |
| CIRCLE LIMITED PARTNERSHIP; | § | |
| PASTAZIOS PIZZA, INC.; AJREDIN | § | |
| "DANNY" DEARI; DRITAN KREKA; and | § | |
| DOES 1-25, | § | |
| | § | |
| *Defendants.* | § | DALLAS COUNTY, TEXAS |

## ORDER DENYING DEFENDANT ISLAND HOSPITALITY MANAGEMENT, INC.'S MOTION TO EXAMINE PLAINTIFF JANE DOE

CAME TO BE HEARD

The Court, after having Considered Defendant Island Hospitality Management, Inc.'s Motion to Examine Plaintiff Jane Doe, Plaintiff's Response thereto, the pleadings on file in this case, and the argument of counsel, hereby finds that Defendant Island Hospitality Management, Inc.'s Motion to Examine Plaintiff Jane Doe, should be, and is hereby, DENIED in its entirety.

IT IS SO ORDERED.

Signed this 27th day of ___MARCH___, 2015.

_Carl Ginsberg_

_____
PRESIDING JUDGE

ORDER DENYING MOTION TO EXAMINE PLAINTIFF                    PAGE 1 OF 1

CAUSE NO. DC-13-04564-L

| | | |
|---|---|---|
| JANE DOE | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | |
| | § | |
| AJREDIN "DANNY" DEARI; DRITAN | § | |
| KREKA; PASTAZIOS PIZZA, INC.; | § | |
| ISLAND HOSPITALITY MANAGE- | § | |
| MENT, INC.; HYATT HOTELS | § | |
| CORPORATION; HYATT HOUSE | § | |
| FRANCHISING, LLC; GRAND PRIX | § | DALLAS COUNTY, TEXAS |
| FLOATING LESSEE, LLC; INK | § | |
| ACQUISITION, LLC; INK | § | |
| ACQUISITION II, LLC; INK | § | |
| ACQUISITION III, LLC; INK LESSEE, | § | |
| LLC; INK LESSEE HOLDING, LLC; | § | |
| CHATHAM TRS HOLDING, INC.; | § | |
| CHATHAM LODGING, LP; JEFFREY | § | |
| H. FISHER, Individually; POST | § | |
| PROPERTIES, INC.; and DOES 1-25 | § | 193RD JUDICIAL DISTRICT |

## DEFENDANTS ISLAND HOSPITALITY MANAGEMENT, INC.'S, POST PROPERTIES, INC.'S, AND POST ADDISON CIRCLE LIMITED PARTNERSHIP'S JOINT MOTION FOR RECONSIDERATION TO EXAMINE PLAINTIFF JANE DOE

TO THE HONORABLE COURT:

NOW COMES Defendants Island Hospitality Management, Inc., Post Properties, Inc., and Post Addison Circle Limited Partnership and file this Joint Motion for Reconsideration to Examine Plaintiff Jane Doe. Defendants also request that Dr. Lisa Clayton's deposition be postponed until the Court can rule upon this Motion for Reconsideration.

## I.    Background

1.      On March 27, 2015, the Court denied Island's Motion to Examine Plaintiff Jane Doe.  Island and Post file this motion for reconsideration based on the affidavit provided by Dr. Lisa Clayton.

2.      By way of background, Plaintiff sued Defendants for, among other things, mental anguish and psychological-related damages as a result of an alleged sexual assault.

3.      On April 30, 2014, Plaintiff designated a psychologist as a testifying expert, Dr. William Flynn. In the designation, Plaintiff did not state or give any indication that Dr. Flynn would conduct an examination of Plaintiff.

4.      On December 16, 2014, Dr. Flynn's file was produced, and it was learned for the first time that he conducted a psychological examination on Plaintiff.[1]  The tests Dr. Flynn administered to Plaintiff were the CAPS-DX, the Personality Assessment Inventory ("PAI"), the Structured Clinical Interview for DSM Disorders ("SCID-1"), the Beck Depression Inventory ("BDI"), and the Structured Interview of Reported Symptoms, Second Edition ("SIRS II"), and he interviewed Plaintiff for a total of six and a half hours.[2]

5.      On December 19, 2014, Dr. Flynn gave his testimony at a deposition, and testified that his opinions were based upon and in reliance upon the examination.

6.      On January 16, 2015, Defendant designated Dr. Lisa Clayton as a testifying expert, to testify in response to Dr. Flynn.  Dr. Clayton has requested that she, like Dr. Flynn, be able to examine Plaintiff to develop her expert opinions to further challenge Dr. Flynn's opinions.

---

[1] *See Exhibit 1,* Email from Kymberlee Wright producing Dr. Flynn's file.
[2] *Exhibit 2,* Dr. Flynn's Invoice No. 13047; *Exhibit 3,* Dr. Flynn's Deposition Transcript Excerpts, Page:Line:  45:11-16.

7.     The scope of the independent examination be would be limited to:

(1) a four hour clinical interview where Plaintiff's history and personality disorders would be discussed; and

(2) a Minnesota Multiphasic Personality Inventory -2 ("MMP-2").

8.     The interview and MMPI-2 are intended to explore Plaintiff's alleged PTSD, and other mental issues, as the alleged issues relate to the sexual assault that is the subject of this lawsuit.[3]

9.     The clinical interview will be no more than four hours.[4] The topics covered during the interview include identification of Plaintiff's symptoms, the history of Plaintiff's present mental disorders, psychiatric history, medical history, family history, social history, sexual history, substance use and abuse, and mental status examination (*i.e.,* behavior, speech, mood, insight and judgment).[5] The interview will be held at Dr. Clayton's Southlake Office between Plaintiff and Dr. Clayton. Dr. Clayton will take notes of the interview, and the notes will be made available to Plaintiff's counsel and Dr. Flynn.[6]

10.    The clinical interview allows Dr. Clayton to obtain information that is not available from any other source than Plaintiff.[7] In order for Dr. Clayton to have all the information to challenge Dr. Flynn's opinions, Dr. Clayton needs to be able to conduct an independent evaluation of Plaintiff. Unless Dr. Clayton is allowed to examine Plaintiff, her analysis will be limited to a review of Plaintiff's records and Dr. Flynn's testimony and data.[8] Without an

---

[3] *See Exhibit 4,* Affidavit of Lisa K. Clayton, M.D.
[4] *See Exhibit 4,* Affidavit of Lisa K. Clayton, M.D.
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*

independent examination, Dr. Clayton would be precluded from examining matters not covered by Dr. Flynn, and Dr. Clayton would be precluded from making her own observations of Plaintiff. Furthermore, without an independent examination, the Defendants would be restricted from the opportunity to discover facts that may contradict Dr. Flynn's opinions.   The scope of the proposed independent examination is far less intrusive than the examination performed by Plaintiff's expert.[9]

11.    The MMPI-2 is commonly used and relied upon for clinical treatment, as well as in the area of forensic psychiatry.[10]   Further, it is the most widely recognized tool to diagnose genuine verses malingered or feigned PTSD within the forensic psychiatric community.[11]  The MMPI-2 consists of 567 questions and takes approximately 60 to 120 minutes to complete.[12]  Dr. Clayton will administer, score, and interpret Plaintiff's responses to the questions.[13]  This test will be used in collaboration with the clinical interview.[14]   The clinical interview is necessary to interpret the results to the MMPI-2.[15]

12.    The requested clinical interview and MMPI-2 would both provide additional information relating to Plaintiff's historical, current, and future mental health symptoms, diagnoses, problems, and treatments.[16]  For example, the requested examination would provide information regarding the impact of the sexual assault that is the subject of this lawsuit on Plaintiff's past and future mental health, events in Plaintiff's life other than the sexual assault

---

[9] *Exhibit 3* Dr. Flynn Deposition Transcript, page/line. 45:14-16; *Exhibit 2* Dr. Flynn's Invoice.
[10] *Exhibit 4,* Affidavit of Dr. Lisa K. Clayton, M.D.
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*

that impact her mental health, Plaintiffs' mental health issues existing prior to or unrelated to the sexual assault, and whether - and the extent to which - future mental health treatment is needed.[17] Such information directly bears on the alleged past and future mental anguish injuries and damages that are at issue in this lawsuit. The requested examination is intended to explore Plaintiff's allegations of mental anguish as they relate to her ability (or inability) to go to college, explore certain career paths, and otherwise live a normal life.[18]

## II.    Arguments and Authorities

13.     The court may order the mental examination of a party or person under the party's control if the movant shows good cause and either: (a) the party's mental condition is in controversy;[19] or (b) the party responding to the motion designated a psychologist as a testifying expert or disclosed a psychologist's records for possible use at trial.[20]

14.     Rule 204(c) provides there must be good cause for the examination. "Good Cause" requires a showing of each of the following components: (a) the examination is relevant to the genuine issues; (b) there is a reasonable connection between the condition in controversy and the examination sought; and (c) it is not possible to obtain the information sought though some other, less intrusive means.[21]

---

[17] *Id.*
[18] *Id.*
[19] Tex. R. Civ. P. 204.1(c)(1).
[20] Tex. R. Civ. P. 204.1(c)(2)
[21] *Coates v. Whittington,* 758 S.W.2d 749, 753 (Tex. 1988).

**1. Good Cause exists for this Court to order an independent examination and fundamental fairness requires that Defendant's expert be allowed to examine Plaintiff.**

15.     As an initial matter, Plaintiff's expert testified that his raw data was based on his subjective interpretation of Plaintiff's responses to his questions. Specifically, Dr. Flynn testified as follows:

> Q. (BY MR. DENTON) Similarly, I'm looking at this
> very first sentence on that paragraph, and it says,
> Ultimately, the clinician must make a clinical judgment as
> to whether a diagnostic criterion is met. Now, would that
> also mean that you have the judgment, the discretion to
> find or not find whether a diagnostic criterion is met?
>
> Page 160
> A. It does.[22]

Dr. Flynn further testified that some of his opinions are based on his subjective or clinical judgment. Namely, Dr. Flynn testified:

> Q. Is it objective -- or is it objective data from
> which you used in arriving at your opinions?
> A. It is mostly objective and some clinical judgment
> or subjective.[23]

Because Plaintiff's expert's opinions are partially based on his subjective interpretation of Plaintiff's response during his examination, the raw data produced from Dr. Flynn's examination warrants an independent examination by Defendant's psychiatric expert.

16.     Dr. Flynn continues to evaluate Plaintiff "**as new information comes in**", and formulate opinions for trial. During his deposition, Dr. Flynn testified that he has had subsequent

---

[22] *Exhibit 3,* Dr. Flynn Deposition Transcript, page/line. 159:20-160:1.
[23] *Exhibit 3,* Dr. Flynn Deposition Transcript, page/line. 214:10-13.

telephone follow-up with Plaintiff and formed additional opinions about her prognosis on new information that he received. Specifically, Dr. Flynn testified:

Q. (BY MR. DENTON) As you sit here today, the opinions that you've told us about a few minutes ago, are those all of the opinions that you have about Ms. Shields in relation to the work that you're doing on this file?

MR. CRAWFORD: Objection, form.

A. I'd like to be able to give something rather than a yes or no. Is that okay or not?

Q. (BY MR. DENTON) Yes, sir. You answer --

A. Okay.

Q. All that I -- the only deal that I have is --

A. Just asking.

Q. -- that you answer the question, and then you can say whatever you want to, okay?

A. Great.

Q. So just answer the question --

0088

A. So -- so to the question you've just asked, and the reason why I have said "at this time" is I've done follow-up with Ms. Shields, and as new information comes in -- like, for example, she has said that things are getting worse, not better -- it depends on what questions I'm asked in the future as to whether I'll provide something in addition to what I've already said.

For example, you didn't ask me -- you asked me what my opinion was, and my opinion -- I gave opinion. But you really didn't ask about is it getting worse, is it getting better, how old is she, does she -- so depending upon what questions are asked of me, I'll simply give honest answers to whatever I'm asked. Does that make sense?[24]

### a. The examination is relevant to the genuine issues in this case.

17. Plaintiff alleges in her lawsuit that she suffered and will suffer past and future mental as a result of the alleged sexual assault.[25] She is seeking punitive damage for these

---

[24] *Exhibit 3,* Dr. Flynn Deposition Transcript, page/line. 87:11-88:14.
[25] *Plaintiff's Third Amended Petition.*

injuries.[26] In response to discovery, Plaintiff designed Dr. Flynn as her testifying expert and he will testify about Plaintiff's mental anguish.[27] Moreover, Plaintiff alleges a loss of earning capacity since she was unable to attend college due to her mental anguish.

18.      Through Plaintiff's pleadings, discovery responses, and designation of a psychologist to testify about her mental anguish, she has made her mental anguish a central issue in this case.  As such, the evidence supports a determination that she has placed her mental condition in controversy.[28]

### b. There is a reasonable connection between Plaintiff's mental anguish and the examination sought.

19.      The Fort Worth Court of Appeals recognized in *In re Transwestern Publ'g Relators Co.,* that "A mental examination by relators' expert psychologist is likely to lead to the discovery of relevant evidence regarding the nature and extent of her mental anguish damages, the bases for her injuries and the likelihood of her suffering future mental anguish."[29]  Just like *In re Transwestern*, a reasonable nexus exits in this case between Plaintiff's mental condition and the examination sought because Defendants' expert psychiatrist's mental examination is intended to explore Plaintiff's allegations of mental anguish as they relate to her inability to go to college, explore other career paths, and otherwise live a normal life.[30]

---

[26] *Id.*
[27] *Exhibit 5,* Plaintiff's Expert Witness Designations.
[28] *In re Transwestern,* 96 S.W.3d at 507.
[29] 96 S.W.3d 501, 507 (Tex. App. – Fort Worth, 2002).
[30] *In re Transwestern,* 96 S.W.3d at 507; *Exhibit 4,* Affidavit of Lisa K. Clayton, M.D.

**c. It is not possible to obtain the information sought through some other, less intrusive means.**

20.     The Fort Worth Court of Appeals recognized that the information obtained from conducting an independent examination is not likely to be acquired by other means.[31] This is true in this case.   Reviewing Dr. Flynn's raw data and his deposition transcript only allows Defendants' expert to base her opinions on the information obtained by Plaintiff's expert.  In order for Defendants to make their own analysis of the nature of Plaintiff's mental anguish and effectively challenge the opinions of Dr. Flynn, Defendants' expert psychiatrist needs to be able to conduct an independent evaluation of Plaintiff.[32]  The reasoning of the court of appeals in *Sherwood Lane Assocs. v. O'Neill* is directly on point:

> The minor has already been examined by her expert witnesses.  Unless relators are allowed the requested relief, their expert's analysis will be limited to a review of the minor's records and the testimony of the minor's psychologists.  Relators' expert would be precluded from examining matters not covered by the minor's psychologists' examinations and would be precluded from making his own observations.  The trial court's actions severely restricts relators' opportunity to discover facts that may contradict the opinions of the minor's expert witnesses. In turn, such restriction severely limits relators' ability to contest the minor's claim for mental injury damages.
>
> The ultimate purpose of discovery is to seek the truth, so that disputes may be decided by what the facts reveal, not by what facts are concealed.  Fundamental fairness dictates that relators' psychiatrist be allowed to examine the minor; otherwise, relators will be at a severe disadvantage in the "battle of experts."[33]

It is not possible to obtain the desired information through means that are less obtrusive than the independent examination sought by Defendants.  Namely, Dr. Clayton is unable to observe Plaintiff's reactions to the tests administered by Dr. Flynn and this data is not available through

---

[31] *Id.* at 507.
[32] *Id.*
[33] 782 S.W.2d 942, 945 (Tex. App. – Houston [1st Dist.] 1990, orig. proceeding) (citations omitted).

less intrusive means than conducting (a) a clinical interview lasting no more than four hours where Plaintiff's history and personality disorders would be discussed, and (b) a MMPI-2.[34] This is because the raw data and examination records from Dr. Flynn were based on, at least in part, his subjective interpretation of Plaintiff's responses to his questions. His data and records were also based, in part, on his subjective or clinical judgment, including which subject matters and events to cover or not cover. As a result, Dr. Clayton does not have all the data and records regarding Plaintiff.[35] For example, reviewing Dr. Flynn's raw data and Dr. Flynn's deposition transcript only allows Dr. Clayton to form opinions based upon the subjective and selective information obtained by Dr. Flynn.[36] The requested examination would enable Dr. Clayton to explore the opinions of Dr. Flynn and potentially discover additional facts that may contradict or bear upon his opinions.[37] For these reasons, good cause exists for this Court to order an independent examination.

2. **Plaintiff designated a psychologist as a testifying expert and disclosed his records for possible use at trial.**

21. As discussed above, Plaintiff designed Dr. Flynn (a forensic psychologist) as her testifying expert to testify about the psychological, medical, behavioral, educational, physiological, vocational, and social trauma that Plaintiff allegedly suffered as a result of the sexual assault that is the subject of this case.[38] As such, Defendants have satisfied Rule 204(c)'s requirements for obtaining an order to obtain an independent examination.

---

[34] *Exhibit 4, Affidavit of Lisa K. Clayton, M.D.*
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Exhibit 5,* Plaintiff's Designation of Expert Witnesses.

**3. Dr. Clayton's deposition should be postponed until the Court rules upon this joint motion for reconsideration.**

22.     Dr. Clayton's deposition is currently set for April 17, 2015. In the event the Court grants this motion, then Dr. Clayton will formulate additional opinions about Plaintiff after the examination. In that case, Plaintiff will want to take Dr. Clayton's deposition again to obtain Dr. Clayton's additional opinions. Rather than incurring the cost of two depositions, Defendants request the Court postpone Dr. Clayton's April 17, 2015 deposition until this motion can be decided.

### III.     Conclusion & Prayer

WHEREFORE, PREMISES CONSIDERED Defendants requests that the Court grant this Motion for Reconsideration to Examine Plaintiff, order Plaintiff to be produced for a psychological examination conducted by Dr. Lisa Clayton, postpone Dr. Lisa Clayton's deposition until after the examination, and grant such further and additional relief to which Defendants may be entitled.

Respectfully submitted,

COBB MARTINEZ WOODWARD PLLC
1700 Pacific Avenue, Suite 3100
Dallas, TX  75201
(214) 220-5202 (direct phone)
(214) 220-5252 (direct fax)

By: _____

    **RAMONA MARTINEZ**
    Texas Bar No. 13144010
    email: rmartinez@cobbmartinez.com
    **DAVID S. DENTON**
    Texas Bar No. 24036471
    email: ddenton@cobbmartinez.com
    **MATTHEW E. LAST**
    Texas Bar No. 24054910
    email: mlast@cobbmartinez.com

**ATTORNEYS FOR DEFENDANT ISLAND
HOSPITALITY MANAGEMENT, INC.**

and

**THOMPSON, COE, COUSINGS, & IRONS, L.L.P.**
700 N. Pearl, 25th Floor
Dallas, Texas 75201
(214) 871-8228 (direct phone)
(214) 871-8209

By: _____ N/PERMISSION

    **RANDY A. NELSON**
    Texas Bar No. 14904800
    email: rnelson@thompsoncoe.com
    **SARAH L. ROGERS**
    Texas Bar No. 24046239
    Email: srogers@thompsoncoe.com

**ATTORNEYS FOR POST PROPERTIES, INC. AND
POST ADDISON CIRCLE LIMITED PARTNERSHIP**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document has been forwarded to the following counsel of record by e-service, email, certified mail, return receipt requested, and/or regular U.S. mail on this 14th day of April, 2015:

Trey Crawford
Gruber Hurst Johansen Hail Shank
1445 Ross Avenue, Suite 2500
Dallas, TX 75202-2711
fax: 214.855.6808
*Attorney for Plaintiff*

Dritan Kreka
5549 Big River Drive
The Colony, TX 75056
*Defendant Kreka*

Samuel H. Johnson
Johnson Broome, PC
2591 Dallas Parkway, Suite 300
Frisco, TX 75034
fax: 972.584.6054
*Attorney for Defendants Deari &*
*Pastazios Pizza*

Randy A. Nelson
Thompson Coe Cousins & Irons
700 North Pearl Street
25th Floor – Plaza of the Americas
Dallas, TX 75201
*Attorney for Post Properties*

**RAMONA MARTINEZ**
**DAVID S. DENTON**

# Exhibit 1

## Matthew E. Last

| | |
|---|---|
| **From:** | Kymberlee Wright <kwright@ghjhlaw.com> |
| **Sent:** | Tuesday, December 16, 2014 9:19 AM |
| **To:** | Matthew E. Last; Ramona Martinez; rnelson@thompsoncoe.com; Samuel H. Johnson (sam@johnsonlaw-pllc.com); srogers@thompsoncoe.com |
| **Cc:** | Trey Crawford; Eric Policastro |
| **Subject:** | Doe |

Counsel,

Below is a link containing Dr. William Flynn's expert file, Bates labeled PLTF001731 - 002657.

https://www.dropbox.com/sh/wwc5jroguqevd84/AAD25Ng9w4D4QU8omY7kIiVZa?dl=0

Please advise if you have any issues opening the attachment.

Thank you,

Kymberlee Wright,
Paralegal

**GRUBER | HURST | JOHANSEN | HAIL | SHANK**
1445 Ross Avenue | Suite 2500
Dallas, Texas 75202-2711
214.855.6875 Voice
214.855.6808 Fax
Email: **kwright@ghjhlaw.com**
**www.ghjhlaw.com**

Gruber Hurst Johansen Hail Shank is a Limited Liability Partnership formed under the laws of the State of Texas. This message (and any attached files) is intended only for the use of the addressee(s). This electronic transmission (and the documents accompanying it) may contain trade secrets, copyrighted materials, and confidential information belonging to the sender that is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510 and 2521 and may be legally privileged. If you are not the intended recipient, any dissemination, copying or distribution of this message or files attached with it is strictly prohibited. If you have received this communication in error, please notify Gruber Hurst Johansen Hail Shank LLP immediately by telephone (214-855-6800) and destroy the original message.

# Exhibit 2

Forensic and Clinical Psychology
100 Highland Park Village
Suite 200
Dallas, TX 75205

# Invoice

| Bill To: |
| --- |
| Mr. Eric Policastro |
| 1445 Ross Avenue |
| Suite 2500 |
| Dallas, Texas 75202-2711 |

| Date | Invoice No. | P.O. Number | Terms | Client |
| --- | --- | --- | --- | --- |
| 06/02/14 | 13047 | | Net 30 | Shields, Mckensie |

| Item | Description | Quantity | Rate | Amount |
| --- | --- | --- | --- | --- |
| Consultation with Attorney | Consultation with Attorney:1/2 Hour Case facts, Referral questions  Date: | 0.5 | 350.00 | 175.00 |
| Record Review | Review of Records: Medical, deposition, Petetion 4 Hours  Date: 6/2/14 | 4 | 350.00 | 1,400.00 |
| Record Review | Review of Records:1 Hour, summarize medical, deposition, Petition  Date: 6/3/14 | 1 | 350.00 | 350.00 |
| Consultation with Attorney | Consultation with Attorney & M. Shields: 2.5 Hours, Interview, referal question of monetary damages  Date: 6/4/2014 | 2.5 | 350.00 | 875.00 |
| Record Review | Review of Records:1 Hour, arrest report. Date:6/6/14 | 1 | 350.00 | 350.00 |
| Record Review | Review of Records:2 Hours, Ted Miller, Social and economic costs.......  Date: 6/14/14 | 2 | 350.00 | 700.00 |
| Consultation with Attorney | Consultation with Attorney Policastro:1/2 Hour, apptmt w/Shields, PTSD  Date:6/16/14 | 0.5 | 350.00 | 175.00 |
| Psychological Evaluation | Psychological Evaluation: 2.5 Hours, SCID, PAI, history, event, post event  Date: | 2.5 | 350.00 | 875.00 |
| Psychological Testing | Psychological Testing:1 Hours  Date:8/24/14 | 1 | 350.00 | 350.00 |
| Psychological Evaluation | Psychological Evaluation: 1/2 Hour  Date:8/25/14 | 0.5 | 350.00 | 175.00 |
| Consultation with Attorney | Consultation with Attorney:1/2 Hour,  Date: | 0.5 | 350.00 | 175.00 |
| Consultation with Attorney | Consultation with Attorney:2 Hours, current findings  Date: | 2 | 350.00 | 700.00 |
| Consultation with Attorney | Consultation with Attorney:1/2 Hour, meeting w/economist, Shields, costs  Date:9/2/14 | 0.5 | 350.00 | 175.00 |
| | | | Total | |

Page 1

PLTF002050

MANDAMUS RECORD - TAB 8

# Invoice

Forensic and Clinical Psychology
100 Highland Park Village
Suite 200
Dallas, TX 75205

| Bill To: |
| --- |
| Mr. Eric Policastro |
| 1445 Ross Avenue |
| Suite 2500 |
| Dallas, Texas 75202-2711 |

| Date | Invoice No. | P.O. Number | Terms | Client |
| --- | --- | --- | --- | --- |
| 06/02/14 | 13047 | | Net 30 | Shields, Mckensie |

| Item | Description | Quantity | Rate | Amount |
| --- | --- | --- | --- | --- |
| Psychological Evaluation | Psychological Evaluation: 2.5 Hours, CAPS, score Date: 9/2/14 | 2.5 | 350.00 | 875.00 |
| Consultation with Attorney | Consultation with Attorney:1/2 Hour, CAPS Date:9/3/14 | 0.5 | 350.00 | 175.00 |
| Consultation with Attorney | Consultation with Attorney:1 Hour, Schweiger Date: 9/5/14 | 1 | 350.00 | 350.00 |
| Interview witness | Interview witness:1 Hour, Randall Shields, Date: 9/12/14 | 1 | 350.00 | 350.00 |
| Interview witness | Interview witness:1/2 Hours Date:9/15/14; Robin Shields | 0.5 | 350.00 | 175.00 |
| Record Review | Review of Records:1 Hours Date: 7/17/2014; organize file | 1 | 350.00 | 350.00 |
| Record Review | Review of Records:1 Hours Date: 9/22/14; create outline | 1 | 350.00 | 350.00 |
| Consultation with Attorney | Consultation with Attorney:1/2 hour, outline, fax, deposition Date: 9/24/14 | 0.5 | 350.00 | 175.00 |
| Deposition | Deposition 1 hour | 1 | 350.00 | 350.00 |
| Record Review | Review of Records:2 Hours Date:9/24/14, deposition, medicalx2 (therapy) | 2 | 350.00 | 700.00 |
| | | | Total | $10,325.00 |

Page 2

**PLTF002051**

MANDAMUS RECORD - TAB 8

# Exhibit 3

WILLIAM E. FLYNN, PH.D. VOLUME I
DOE vs. AJREDIN "DANNY" DEARI

December 19, 2014
1—4

**Page 1**

NO. DC-1304564-L

JANE DOE,                                    )        IN THE DISTRICT COURT
        Plaintiff,                           )
                                             )
VS.                                          )        193RD JUDICIAL DISTRICT
                                             )
AJREDIN "DANNY" DEARI;                       )
DRITAN KREKA; PASTAZIOS                       )
PIZZA, INC.; ISLAND                          )
HOSPITALITY MANAGEMENT,                       )
INC.; HYATT HOTELS                           )
CORPORATION; HYATT HOUSE                      )
FRANCHISING, LLC; GRAND                      )
PRIX FLOATING LESSEE,                        )
LLC; INK ACQUISITION,                        )
LLC; INK ACQUISITION, II,                    )
LLC; INK ACQUISITION,                        )
III, LLC; INK LESSEE,                        )
LLC; INK LESSEE HOLDING,                      )
LLC; CHATHAM TRS HOLDING,                     )
LLC; CHATHAM LODGING, LP;                      )
JEFFREY H. FISHER,                           )
Individually; POST                           )
PROPERTIES, INC; and DOES                     )
1-25,                                        )
        Defendants.                          )        DALLAS COUNTY, TEXAS

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

        ORAL AND VIDEOTAPED DEPOSITION OF
                WILLIAM E. FLYNN, Ph.D.
                DECEMBER 19, 2014
                        VOLUME 1
* * * * * * * * * * * * * * * * * * * * * * * * * * * *

        ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM E.
FLYNN, Ph.D., produced as a witness at the instance of

**Page 2**

the Hotel Defendants, and duly sworn, was taken in the

above-styled and -numbed cause on the 19th day of

December, A.D., 2014, from 10:12 a.m. to 6:31 p.m.,

before Carrie del Angel, CSR in and for the State of

Texas, reported by machine shorthand, at the offices of

Gruber Hurst Johansen Hail Shank, LLP, located at 1445

Ross Avenue, Suite 2500, Dallas, Texas, pursuant to Texas

Rules of Civil Procedure and the provisions stated on the

record or attached hereto.

**Page 3**

                A P P E A R A N C E S

FOR THE PLAINTIFF:
        MR. TREY H. CRAWFORD
        Gruber Hurst Johansen Hail Shank, LLP
        1445 Ross Avenue, Suite 2500
        Dallas, Texas 75202
        214.855.6800
        214.855.6808 FAX
        tcrawford@ghjhlaw.com
FOR THE HOTEL DEFENDANTS:
        MR. DAVID S. DENTON
        Cobb Martinez Woodward
        1700 Pacific Avenue, Suite 3100
        Dallas, Texas  75201
        214.220.5200
        214.220.5299 FAX
        ddenton@cobbmartinez.com
FOR THE DEFENDANT, POST PROPERTIES:
        MR. RANDY A. NELSON
        Thompson Coe Cousins & Irons
        700 North Pearl Street
        25th Floor - Plaza of the Americas
        Dallas, Texas  75201
        214.871.8200
        214.871.8209 FAX
        rnelson@thompsoncoe.com


ALSO PRESENT:  Anthony Marlar - Videographer

**Page 4**

                I N D E X

Appearances...................................Page    3
Exhibit List..................................Page    5
Examination by Mr. Denton.....................Page    6
Examination by Mr. Nelson.....................Page 206
Examination by Mr. Crawford...................Page 210
Further Examination by Mr. Denton.............Page 228
Further Examination by Mr. Crawford...........Page 231
Further Examination by Mr. Denton.............Page 233
Further Examination by Mr. Crawford...........Page 234
Signature and Corrections.....................Page 236
Reporter's Certificate........................Page 238



WILLIAM E. FLYNN, PH.D. VOLUME I
DOE vs. AJREDIN "DANNY" DEARI

December 19, 2014
5–8

Page 5

```
            E X H I B I T     L I S T
No.   Description                        Page      Page
                                         Marked    Ident.

1    Printout of LegalPsychologist.com
     Web Site                               8         8

2    Handwritten Notes                     11        11

3    Invoice                               16        16

4    Handwritten Notes                     52        52

5    The Forensic History Questionnaire   120       120

6    Medical Center of Plano
     Medical Records                      130       130
7    User's Guide for the Structured
     Clinical Interview for DSM-IV
     Axis I Disorders                     149       149
8    SCID-CV Diagnostic Summary           167       167
9    National Center for PTSD
     Clinician-Administered PTSD Scale
     for DSM-IV Current and Lifetime
     Diagnostic Version (CAPS-DX)         174       174

10   Harold Neil Jacobson, M.D.
     Patient Face Sheet 5/23/2014         183       183
11   Texas Behavioral Health Systems,
     PA Initial Psychiatric Assessment    187       188

14   BDI-II 8/18/2014                     233       233


Reporter's Note - Exhibit Nos. 12-13 were inadvertently
                   skipped and not marked.
```

Page 6

PROCEEDINGS

THE VIDEOGRAPHER: We're now on the record for the videotaped deposition of Dr. William E. Flynn. The date today is December 19th, 2014. The time is 10:12 a.m. The case is entitled Jane Doe versus Ajredin "Danny" Deari, et al. Today's deposition is being held at Gruber Hurst, 1445 Ross Avenue, Dallas, Texas.

Will counsel please state your appearance for the record.

MR. CRAWFORD: Trey Crawford on behalf of the plaintiff.

MR. DENTON: Good morning. David Denton on behalf of the hotel defendants.

MR. NELSON: Randy Nelson on behalf of Post Properties.

DR. FLYNN: William Flynn, psychologist.

WILLIAM E. FLYNN, Ph.D.,
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. DENTON:

Q. Good morning, Dr. Flynn.

A. Good morning.

Q. My name is David Denton. I'm here -- I represent the hotel defendants. And, if you would, please, introduce yourself to the ladies and gentlemen of

Page 7

the jury.

A. My name is William Flynn, F-l-y-n-n.

Q. And is it okay if I refer to you as Dr. Flynn --

A. It --

Q. -- today?

A. It is.

Q. And you are a -- you have a Ph.D. in psychology, do you not?

A. Yes, sir.

Q. Okay. And that's not a doctor in terms of an M.D., a medical degree, correct?

A. That's correct.

Q. Today you're here to testify as an expert witness on behalf of the plaintiff, are you not?

A. I am.

Q. And just to get started, I want to have just a little bit of background. Have you ever given your deposition before?

A. I have.

Q. How many times have you given your deposition before?

A. I don't have an exact number, but somewhere between 15 and 50. I know that's a wide margin, but I haven't been keeping track.

Q. And all of your depositions that you've given,

Page 8

have you given them in the capacity as an expert witness?

A. I don't know what that means, but I think the answer's yes.

Q. Okay. Let me ask it this way: Have you ever been a party to a piece of litigation?

A. No.

Q. When you've given the 15 or 50 -- between 15 to 50 depositions, were those depositions given by you in the capacity as a psychologist?

A. Yes, sir.

Q. Okay. Do you know anyone at Gruber Hurst before you were hired for this assignment?

A. I do not -- did not.

Q. Did you know McKenzie Shields before you were hired for this piece of civil litigation?

A. I did not.

Q. What is the name of your business?

A. William Flynn, Psychologist.

Q. And you have a web page, do you not?

A. Yes, sir.

Q. I'm going to hand you what I've marked as Exhibit No. 1.

(Exhibit No. 1 was marked.)

Q. (BY MR. DENTON) Exhibit No. 1 has a title of LegalPsychologist.com, does it not?



MANDAMUS RECORD - TAB 8

WILLIAM E. FLYNN, PH.D. VOLUME I
DOE vs. AJREDIN "DANNY" DEARI

December 19, 2014
45–48

Page 45

look at all the disorders of the DSM-IV.

Q. I tell you what.

A. I --

Q. Let me -- let's do it this way: The question that I have right now --

A. Yes, sir.

Q. -- is just what tests did you perform, and we'll talk later -- I'll ask you some questions later about what each one of those tests are intended to find, okay?

A. Great.

Q. So right now, the only question that I have pending is what tests did you administer to Ms. Shields, McKenzie?

A. I administered the CAPS-DX, C-A-P-S, hyphen, D-X;, I administered the PAI; I administered the SCID-I; I administered the BDI; and I administered the SIRS.

Q. Okay. And on Exhibit 3, it shows that you administered the SCID, which is the one that we talked about a moment ago, it's -- it's the SCID-CV, and the Personality Assessment Inventory, that was done on what you believe was 8/18/2014, correct?

A. Yes, sir.

Q. And then when did you -- when did you administer the BDI-II -- and BDI stands for Beck Depression Inventory, does it not?

Page 46

A. Yes, sir.

Q. And then SIRS -- SIRS-II, S-I-R-S-2 -- and that stands for -- well, what does that stand for?

A. It -- it would help me -- my memory if -- if your question -- if we did those one at a time.

Q. Okay. The question I have pending right now is what does the SIRS-II stand for?

A. It stands for the Structured Interview of Reported Symptoms, comma, Second Edition.

Q. And as an expert witness in the field of psychology, did you need that document to go to find out what the SIRS-II stand for?

A. No.

Q. Okay. I didn't think so. I thought you were doing that just for my benefit.

A. I was being helpful --

Q. Thank you very much.

A. -- which is always an error in this circumstance.

Q. Just a question came up when I -- when I saw you go to it. Okay. When did you administer the BDI-II, the SIRS-II and then the CAPS-DX?

A. May I consult my notes?

Q. Yes, sir.

A. So, again, multiple questions. Could you say it again so that I can remember the sequence that you asked

Page 47

them in?

Q. Sure. And all I'm trying to do is figure out when you administered the testing to --

A. Okay.

Q. -- McKenzie Shields. I know we've got the SCID-CV and the Personality Assessment Inventory. I'm just trying to figure out the other three.

A. Okay. The BDI was administered on 8/18/2014, and that is the Beck Depression Inventory II. The SIRS, the Structured Interview Reported Symptoms was administered on 8/18/2014. The PAI was administered on 8/18/2014. And what was your other question? I'm sorry.

Q. The CAPS-DX. When was the CAPS-DX administered?

(Witness's microphone falls off.)

A. Oh, I know we're not allowed to curse. Was administered on 9/2/2014.

Q. (BY MR. DENTON) And then you'd agree with me that the SCID was administered as well on 8/18/2014, correct?

A. I don't -- I don't know. Let me check.

Q. If you'd take a look at Exhibit No. 3 --

A. Yes, sir.

Q. -- under that one that was previously undated that you said that -- that, based on your notes, that you thought that that psychological evaluation happened on

Page 48

8/18/14?

A. Yes, sir.

Q. Under that time entry for 2.5 hours, it does say the SCID, does it not?

A. Yes, sir, it does.

Q. So on 8/18, if I understand you correct -- your testimony correctly, you administered the SCID-CV, correct?

A. Yes, sir.

Q. Also on 8/18/2014, you administered the Personality Assessment Inventory?

A. Yes, sir.

Q. Also on 8/18/2014, you administered the BDI-II, correct?

A. Yes, sir.

Q. And you administered the SIRS-II on 8/18/2014, correct?

A. Yes, sir.

Q. And you were able to administer those four tests, conduct a history, discuss the event, the post event with Ms. Shields for a total time of 2.5 hours; is --

A. Yes, sir.

Q. And then just skipping over to Page 2 of Exhibit No. 3, at the very top, that's where -- the very first entry on September 2nd, 2014, that reflects your



MANDAMUS RECORD - TAB 8

WILLIAM E. FLYNN, PH.D. VOLUME I
DOE vs. AJREDIN "DANNY" DEARI

December 19, 2014
85–88

Page 85

breathing, all the internal organs operating faster than they should be. So she re-experiences the rape itself because of the fierciveness -- the fearfulness of that event. She also avoids her feelings and has what's called numbing.

And finally, she is super aroused or hyperaroused. She has difficulty falling asleep. She walks up in the middle of the night sometimes screaming and crying. She has irritability and outbursts of anger. She has difficulty concentrating, and she's looking over her -- she is hypervigilant. She's looking over her shoulder a lot and -- with what we call an exaggerated startle response.

So she -- to repeat, she has panic attacks, depression, frequent and severe symptoms of posttraumatic stress disorder, and these have affected her work, her school and her social life. And finally, to make certain that these symptoms that she's reporting and the collateral witnesses have verified, in order to make sure that she is not feigning or malingering these symptoms, I've also tested her for feigning and malingering and have found that she is not exaggerating or making up these symptoms.

Q. Do you have any other opinions --

MR. CRAWFORD: Objection --

Page 86

Q. (BY MR. DENTON) -- about Ms. Shields in relation to your work on this file as an expert witness?

MR. CRAWFORD: Objection, form.

A. At this time, I -- I don't have any, but there -- but there might be some that I've forgotten about or -- but these -- these are the main things that are impairing her life.

Q. (BY MR. DENTON) The last two times that I've asked you questions, you've started with "at this time." When I hear that, the question comes into my mind, do you have any intention of providing additional work on this file to provide more or additional testimony -- more or additional opinions?

MR. CRAWFORD: Objection, form.

Q. (BY MR. DENTON) Do you understand what I'm asking?

A. Yeah, I do. Am I going to do further interviews, further testing, call additional people, review additional records? No, sir. Again, I know you don't like the phrase "at this time," but at this time, I have no plans to do any additional work.

Q. It's not -- it's not whether I like it or not, it's just one of those things that I just want to make sure that you don't have a present intention to formulate additional future opinions?

Page 87

MR. CRAWFORD: Object -- objection, form. He is going to do additional work. I -- to be clear, I -- he will be asked --

THE WITNESS: I didn't hear.

MR. CRAWFORD: He will be asked to do some additional work. David, I'm not trying to -- his opinions are not going to change from his designation, but as stuff comes in, they'll be reviewed, and he'll -- he will share that with other experts that he needs to share it, just for fair notice, to the extent he's willing.

Q. (BY MR. DENTON) As you sit here today, the opinions that you've told us about a few minutes ago, are those all of the opinions that you have about Ms. Shields in relation to the work that you're doing on this file?

MR. CRAWFORD: Objection, form.

A. I'd like to be able to give something rather than a yes or no. Is that okay or not?

Q. (BY MR. DENTON) Yes, sir. You answer --

A. Okay.

Q. All that I -- the only deal that I have is --

A. Just asking.

Q. -- that you answer the question, and then you can say whatever you want to, okay?

A. Great.

Q. So just answer the question --

Page 88

A. So -- so to the question you've just asked, and the reason why I have said "at this time" is I've done follow-up with Ms. Shields, and as new information comes in -- like, for example, she has said that things are getting worse, not better -- it depends on what questions I'm asked in the future as to whether I'll provide something in addition to what I've already said.

For example, you didn't ask me -- you asked me what my opinion was, and my opinion -- I gave opinion. But you really didn't ask about is it getting worse, is it getting better, how old is she, does she -- so depending upon what questions are asked of me, I'll simply give honest answers to whatever I'm asked. Does that make sense?

Q. Yes, sir. Thank you, Dr. Flynn. Do you have an opinion that her conditions are getting worse?

A. I do.

Q. What is that based upon?

A. That's based upon my initial interview and testing of her and then a subsequent telephone follow-up. In the telephone follow-up, she said that she has fragile sleep, she has fear of being alone, that she -- that these fearful anxiety panic symptoms are set off by what she calls triggers; namely, the smell of pizza, proximity to the restaurant where she first started walking to her car


MANDAMUS RECORD - TAB 8

WILLIAM E. FLYNN, PH.D. VOLUME I
DOE vs. AJREDIN "DANNY" DEARI

December 19, 2014
157–160

Page 157

clinician administering the SCID has subjective discretion to rate an item as present -- I'm sorry, as not present if the clinician doubts that a symptom is present even after the patient describes it?

MR. CRAWFORD: Objection, form.

A. Can you help me understand --

Q. (BY MR. DENTON) Sure.

A. -- where you're reading that from so I can understand the question, please?

Q. Yeah. If you go to Page 7 --

A. Yes.

Q. -- and it's Bates labeled?

MR. CRAWFORD: I'm sorry, 7 in the same document?

MR. DENTON: Yes. I'm still in the guide.

MR. CRAWFORD: 7 of Exhibit 7?

MR. DENTON: Yes, sir. And it's Bates labeled PLTF1738.

A. And where are you on Page 7? Which column? Which paragraph?

Q. (BY MR. DENTON) Give me just a meant and I'll point you to the language.

A. Sure.

Q. Okay. On the very first full paragraph on Page 7, it begins with the word "ultimately."

Page 158

A. Yes, sir.

Q. Let me read this to you, and then I'll ask my question, okay?

A. Okay.

Q. It says, Ultimately, the clinician must make a clinical judgment as to whether a diagnostic criterion is met. If the clinician is convinced that a particular symptom is present, he or she should not allow the patient's denial of the symptom to go unchallenged.

A. Okay.

Q. In rare -- in rare cases, an item may be coded as present everybody when the patient steadfastly denies it, e.g., a patient who claims that spending two hours a day in a handwashing ritual is not excessive or unreasonable, yet if the clinician doubts that a symptom is present, even after hearing the patient describe it, the item should be rated as not presented. It is not necessary to get the patient to agree that the symptom is not present. The question that I had based on that paragraph is isn't it true that a clinician administering the SCID-I has subjective discretion to rate an item as not present if the clinician doubts that a symptom is present even after the patient describes it?

MR. CRAWFORD: Objection, form.

A. I understand the nature of the question, but I

Page 159

think you may have it backwards --

Q. (BY MR. DENTON) Okay.

A. -- in that if I believe or the clinician believes that a sym -- a symptom is not present and the patient disagrees with us, I'm going to put down it's not present. Not the other way around. So if -- if the -- so -- do you understand what I'm saying?

Q. What you're saying is that, if the patient is saying that a symptom is present --

A. Right.

Q. -- but you believe it is not present --

A. Right.

Q. -- you've got the subjective --

A. Yes.

Q. -- ability to say that it's not present?

MR. CRAWFORD: Object to the word "subjective" being inserted in that question. So I object to the form?

A. Yes, sir.

Q. (BY MR. DENTON) Similarly, I'm looking at this very first sentence on that paragraph, and it says, Ultimately, the clinician must make a clinical judgment as to whether a diagnostic criterion is met. Now, would that also mean that you have the judgment, the discretion to find or not find whether a diagnostic criterion is met?

Page 160

A. It does.

MR. CRAWFORD: Object to form.

Q. (BY MR. DENTON) You can --

A. It does.

Q. What module did you use to -- to test Ms. Shields?

A. I used mood disorders.

Q. Would that be mood disorder due to general medical condition or --

A. Major depressive episode criteria.

Q. Which module is that? Is it under --

A. It's A.

Q. A?

A. Module A.

Q. Okay. Thank you.

A. Sure. I used Module F.

Q. Why did you use Module F?

A. Anxiety and other disorders.

Q. What type of disorders are you testing for under Module F?

A. Panic attacks.

Q. What else?

A. Agoraphobia.

Q. Are you sure that's under Module F? Yes. I see that now. Okay. What else? It would be panic disorder



MANDAMUS RECORD - TAB 8

WILLIAM E. FLYNN, PH.D. VOLUME I
DOE vs. AJREDIN "DANNY" DEARI

December 19, 2014
213–216

Page 213

Dr. Hamilton administered a SIRS-II test to Ms. Shields?

A. I don't know.

Q. Do you know whether or not they administered the BDI test to Ms. Shields?

A. I do not know.

Q. What about the SCID-I test to Ms. Shields?

A. I don't know.

Q. What about any of the tests that you took the time to administer to Ms. Shields? Do you know if Dr. Jacobson or Dr. Hamilton administered any of those tests to Ms. Shields?

A. I don't know.

Q. But you did?

A. I did.

Q. And are those tests the tests that you performed on Ms. Shields regularly accepted in the professional community which you're a part of?

A. Yes, sir. These are reliable and valid instruments for the symptoms that I was testing for.

Q. Did I ever suggest to you before you did these tests that we want you to find anything about Ms. Shields' mental state one way or another?

A. No, sir.

Q. Even suggest it to you?

A. No, sir.

Page 214

Q. What'd I tell you to do?

A. You told me to look at what her emotional condition was before the alleged rape versus after the alleged rape.

Q. And did the methodology that you used to do that, is that methodology consistent or inconsistent with regularly accepted methodologies from others in your chosen field?

A. It is.

Q. Is it objective -- or is it objective data from which you used in arriving at your opinions?

A. It is mostly objective and some clinical judgment or subjective.

Q. And that's a part of any medical profession, is the clinical judgment, correct?

A. Yes, sir.

Q. Let's talk about this -- this other alleged statutory sexual assault --

MR. DENTON: Objection, form.

Q. (BY MR. CRAWFORD) -- for a minute. You remember when Mr. Denton was asking you questions about the other alleged sexual assault? I think those are the words he used. Do you recall that?

A. I do.

MR. DENTON: Objection, form.

Page 215

Q. (BY MR. CRAWFORD) I couldn't hear your answer.

A. I do recall that.

Q. All right. Was that instance something that you specifically and in-depth discussed with Ms. Shields prior to arriving at your opinions?

A. Absolutely.

MR. NELSON: Objection, form.

THE WITNESS: I'm sorry, I'm a little -- I didn't hear.

MR. NELSON: I wasn't talking to you. I was making an objection.

THE WITNESS: I beg your pardon.

MR. NELSON: I'm making an objection.

MR. CRAWFORD: He's just making an objection.

A. I understand. I like to hear what's going on in case someone is talking to me.

MR. CRAWFORD: That's all right. Do you mind repeating the question, please?

MR. DENTON: It was so good, you can't remember.

MR. CRAWFORD: I'll repeat it.

(Reporter starts to read back the last question.)

MR. CRAWFORD: I'll repeat it.

Q. (BY MR. CRAWFORD) Was the other sexual encounter

Page 216

that Ms. Shields had with -- I think he was Asian according to the records in California something that you discussed with Ms. Shields and considered prior to arriving at your opinions?

A. I did.

Q. Does the fact that it's referenced in some medical doctors' notes make you want to ask Ms. Shields any additional questions or examine her further with respect to that particular encounter, or does it have no effect on what she informed you about that particular encounter?

MR. DENTON: Objection, form.

A. I would like to know why she went to the hospital, whether her parents made her go, what the nature of that was about -- yeah, I would like to ask her some questions.

Q. (BY MR. CRAWFORD) Okay. And I'll -- I'll absolutely afford you that opportunity. Have you ever had any discussions with Ms. Shields' mother or Ms. Shields about that particular encounter -- or let me strike that.

Have you ever had any conversations with Ms. Shields or her mother or father about the reporting of that encounter or whose idea it was?

MR. DENTON: Objection, form.

A. About --



MANDAMUS RECORD - TAB 8

WILLIAM E. FLYNN, PH.D. VOLUME I
DOE vs. AJREDIN "DANNY" DEARI

December 19, 2014
237-240

Page 237

I, WILLIAM E. FLYNN, Ph.D., have read the foregoing deposition and hereby affix my signature that same is true and correct except as noted herein.

_____
WILLIAM E. FLYNN, Ph.D.

THE STATE OF _____ )

COUNTY OF _____ )

Before me, _____, on this day personally appeared _____, known to me _____ or proved to me under oath or through _____ to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2014.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

Page 238

NO. DC-1304564-L

JANE DOE,                    )    IN THE DISTRICT COURT
        Plaintiff,           )
                             )
VS.                          )    193RD JUDICIAL DISTRICT
                             )
AJREDIN "DANNY" DEARI;       )
DRITAN KREKA; PASTAZIOS      )
PIZZA, INC.; ISLAND          )
HOSPITALITY MANAGEMENT,      )
INC.; HYATT HOTELS           )
CORPORATION; HYATT HOUSE     )
FRANCHISING, LLC; GRAND      )
PRIX FLOATING LESSEE,        )
LLC; INK ACQUISITION,        )
LLC; INK ACQUISITION, II,    )
LLC; INK ACQUISITION,        )
III, LLC; INK LESSEE,        )
LLC; INK LESSEE HOLDING,     )
LLC; CHATHAM TRS HOLDING,    )
LLC; CHATHAM LODGING, LP;    )
JEFFREY H. FISHER,           )
Individually; POST           )
PROPERTIES, INC; and DOES    )
1-25,                        )
        Defendants.          )    DALLAS COUNTY, TEXAS

REPORTER'S CERTIFICATION
DEPOSITION OF WILLIAM E. FLYNN, Ph.D.
DECEMBER 19, 2014

I, Carrie del Angel, a Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, WILLIAM E. FLYNN, Ph.D., was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given

Page 239

by the witness;

That the deposition transcript was submitted on _____ to the witness or to the attorney for the witness for examination, signature and return to me by _____ ;

That the amount of time used by each party at the deposition is as follows:

Mr. Trey H. Crawford - 0 hours, 25 minutes,

Mr. David S. Denton - 6 hours, 2 minutes,

Mr. Randy A. Nelson - 0 hours, 5 minutes;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record;

Mr. Trey H. Crawford, Attorney for Plaintiff,

Mr. David S. Denton, Attorney for the Hotel Defendants,

Mr. Randy A. Nelson, Attorney for Post Properties;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have

Page 240

occurred.

Certified to by me this the 23rd day of December, 2014.

_____
CARRIE DEL ANGEL, CSR
TEXAS CSR NO.: 6036
Expiration Date: 12\31\15

Esquire Solutions
Firm Registration No. 286
1700 Pacific Ave., Suite 1000
Dallas, Texas 75201
(214) 257-1436



MANDAMUS RECORD - TAB 8

WILLIAM E. FLYNN, PH.D. VOLUME I
DOE vs. AJREDIN "DANNY" DEARI

December 19, 2014
241

Page 241

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was _____ was not _____ returned to the deposition officer on _____.

If returned, the attached Changes and Signature page contains any changes and the reason therefore;

If returned, the original deposition was delivered to _____, Custodian Attorney;

That $_____ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me this _____ day of _____, 2014.

_____
CARRIE DEL ANGEL, CSR
TEXAS CSR No. 6036
Expiration Date:  12/31/15

Esquire Solutions
1700 Pacific Ave., Suite 1000
Dallas, Texas  75201
(214) 257-1436



MANDAMUS RECORD - TAB 8

# Exhibit 4

Cause Number: DC-13-04564

| | | |
|---|---|---|
| JANE DOE, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | 193rd JUDICIAL DISTRICT COURT |
| | § | |
| ISLAND HOSPITALITY MANAGEMENT, INC.; | § | |
| HYATT HOTELS CORPORATION; HYATT HOUSE | § | |
| FRANCHISING, L.L.C.; GRAND PRIX FLOATING | § | |
| LESSEE, LLC; INK ACQUISITION, LLC; INK | § | |
| ACQUISITION II, LLC; INK ACQUISITION III, | § | |
| LLC; INK LESSEE, LLC; INK LESSEE HOLDING, | § | |
| LLC; CHATHAM TRS HOLDING, INC.; | § | |
| CHATHAM LODGING, L.P.; JEFFREY H. FISHER, | § | |
| Individually; POST PROPERTIES, INC.; POST | § | |
| ADDISION CIRCLE LIMITED PARTNERSHIP; | § | |
| PASTAZIOS PIZZA, INC.; AJREDIN "DANNY" | § | |
| DEARI; DRITAN KREKA; and DOES 1-25, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | DALLAS COUNTY, TEXAS |

### AFFIDAVIT OF LISA K. CLAYTON, M.D.

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Lisa K. Clayton, M.D., who being duly sworn upon his oath deposed and stated as follows:

1. "My name is Lisa K. Clayton, M.D. I am over the age of eighteen (18) years, have never been convicted of a felony, and I am of sound mind. I am competent to testify to the matters stated herein. The matters stated herein are based on my personal knowledge and are true and correct.

2. I am a medical doctor, and I hold board certifications in psychiatry and forensic psychiatry. I have been designated as a testifying expert in this lawsuit. The areas of my testimony are set

Page 1 of 3

forth in my expert designation. Among other subject matters, I will testify in response to Plaintiff's psychology expert's opinions.

3.  I have formed opinions based upon my review of the file of Plaintiff's psychology expert, Dr. William Flynn, including the records and raw data from the mental examinations conducted by Dr. Flynn or at his direction. However, Dr. Flynn's raw data is partially based on his subjective interpretation of Plaintiff's responses after observing her, and I would like to conduct my own independent examination of Plaintiff to contest Dr. Flynn's opinions based on my own observations regarding Plaintiff.

4.  Dr. Flynn administered to Plaintiff the CAPS-DX, the Personality Assessment Inventory ("PAI"), the Structured Clinical Interview for DSM Disorders ("SCID-1"), the Beck Depression Inventory ("BDI"), and the Structured Interview of Reported Symptoms, Second Edition ("SIRS II"). All of these tests are proprietary and copyrighted and can be administered and utilized only when they are paid for. While Dr. Flynn administered many tests, he did not administer the test utilized to determine genuine verses malingered or feigned Post Traumatic Stress Disorder ("PTSD") with a party in litigation. Hence, Dr. Flynn's examination was incomplete.

5.  The scope of my proposed examination is: (a) a clinical interview lasting no more than four hours where Plaintiff's history and personality disorders would be discussed, and (b) a Minnesota Multiphasic Personality Inventory -2 ("MMPI-2"). The interview and MMPI-2 are intended to explore Plaintiff's alleged PTSD, and other mental issues, as the alleged issues relate to the sexual assault that is the subject of this lawsuit.

6.  The MMPI-2 is commonly used and relied upon for clinical treatment, as well as in the area of forensic psychiatry. Further, it is the most widely recognized tool to diagnose genuine verses malingered or feigned PTSD within the forensic psychiatric community. The MMPI-2 consists of 567 questions and takes approximately 60 to 120 minutes to complete. I will administer, score, and interpret Plaintiff's responses to the questions. This test will be used in collaboration with the clinical interview. The clinical interview is necessary to interpret the results to the MMPI-2.

7.  The clinical interview will be no more than four hours. The topics covered during the interview include identification of Plaintiff's symptoms, the history of Plaintiff's present mental disorders, psychiatric history, medical history, family history, social history, sexual history, substance use and abuse, and mental status examination (i.e., behavior, speech, judgment, mood, insight and judgment). The interview will be held at my Southlake Office between Plaintiff and me. I will take notes of the interview, and they will be made available to Plaintiff's counsel and Dr. Flynn. The clinical interview allows me to obtain information that is not available from any other source than Plaintiff. In order for me to have all the information to challenge Dr. Flynn's opinions, I need to be able to conduct an independent evaluation of Plaintiff. Unless I am allowed to examine Plaintiff, my analysis will be limited to a review of Plaintiff's records and Dr. Flynn's testimony. Without an independent examination, I would be precluded from examining matters not covered by Dr. Flynn, and I

Page 2 of 3

would be precluded from making my own observations of Plaintiff. Furthermore, without an independent examination, the Hotel Defendants would be restricted from the opportunity to discover facts that may contradict Dr. Flynn's opinions.

8. The requested clinical interview and MMPI-2 would both provide additional information relating to Plaintiff's historical, current, and future mental health symptoms, diagnoses, problems, and treatments. For example, the requested examination would provide information regarding the impact of the sexual assault that is the subject of this lawsuit on Plaintiff's past and future mental health, events in Plaintiff's life other than the sexual assault that impact her mental health, Plaintiffs' mental health issues existing prior to or unrelated to the sexual assault, and whether - and the extent to which - future mental health treatment is needed. Such information directly bears on the alleged past and future mental anguish injuries and damages that are at issue in this lawsuit. The requested examination is intended to explore Plaintiff's allegations of mental anguish as they relate to her ability (or inability) to go to college, explore certain career paths, and otherwise live a normal life.

9. I am unable to observe Plaintiff's reactions to the tests administered by Dr. Flynn and this data is not available through less intrusive means than conducting (a) a clinical interview lasting no more than four hours where Plaintiff's history and personality disorders would be discussed, and (b) a MMPI-2. This is because the raw data and examination records from Dr. Flynn were based on, at least in part, his subjective interpretation of Plaintiff's responses to his questions. His data and records were also based, in part, on his subjective or clinical judgment, including which subject matters and events to cover or not cover. As a result, I do not have all the data and records regarding Plaintiff. For example, reviewing Dr. Flynn's raw data and Dr. Flynn's deposition transcript only allows me to form opinions based upon the subjective and selective information obtained by Dr. Flynn. The requested examination would enable me to explore the opinions of Dr. Flynn and potentially discover additional facts that may contradict or bear upon his opinions."

10. Further, affiant sayeth not.

_____
Lisa K. Clayton, M.D.

SUBSCRIBED AND SWORN TO BEFORE ME on this the _10_ day of ___April___, 2015, to

certify which witness my hand and seal of office.

_____
Notary Public in and for
the State of Texas

Doc No. 135925

Joseph Yoo
Commission Expires
04-23-2016

# Exhibit 5

| | | |
|---|---|---|
| JANE DOE, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | 193rd JUDICIAL DISTRICT COURT |
| | § | |
| ISLAND HOSPITALITY MANAGEMENT, | § | |
| INC.; HYATT HOTELS CORPORATION; | § | |
| HYATT HOUSE FRANCHISING, L.L.C.; | § | |
| GRAND PRIX FLOATING LESSEE, LLC; | § | |
| INK ACQUISITION, LLC; INK | § | |
| ACQUISITION II, LLC; INK | § | |
| ACQUISITION III, LLC; INK LESSEE, | § | |
| LLC; INK LESSEE HOLDING, LLC; | § | |
| CHATHAM TRS HOLDING, INC.; | § | |
| CHATHAM LODGING, L.P.; JEFFREY | § | |
| H. FISHER, Individually; POST | § | |
| PROPERTIES, INC.; POST ADDISION | § | |
| CIRCLE LIMITED PARTNERSHIP; | § | |
| PASTAZIOS PIZZA, INC.; AJREDIN | § | |
| "DANNY" DEARI; DRITAN KREKA; and | § | |
| DOES 1-25, | § | |
| | § | |
| *Defendants.* | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S TEX. R. CIV. P. 194.2(F) EXPERT WITNESS DESIGNATIONS

Pursuant to the 193rd Judicial District Court's Standing Scheduling Order and TEX. R. CIV. P. 194.2(f), Plaintiff Jane Doe ("Plaintiff") hereby makes and serves *Plaintiff's TEX. R. CIV. P. 194.2(f) Expert Witness Designations*. Plaintiff reserves the right to designate rebuttal expert witnesses, designate expert witnesses identified by Defendants, and supplement and/or amend these expert witness designations as discovery continues and additional facts and evidence have been learned and produced.

MANDAMUS RECORD - TAB 8

Respectfully submitted,



**ROYCE WEST**
State Bar No. 21206800
royce.w@westllp.com
**VERETTA FRAZIER**
State Bar No. 00793264
veretta.f@westllp.com
**NIGEL REDMOND**
State Bar No. 24058852
nigel.r@westllp.com
**WEST & ASSOCIATES, L.L.P.**
P.O. Box 3960
Dallas, Texas 75208-1260
Ofc.:   (214) 941-1881
Fax:    (214) 941-1399

**G. MICHAEL GRUBER**
State Bar No. 08555400
mgruber@ghjhlaw.com
**ERIC POLICASTRO**
State Bar No. 24068809
epolicastro@ghjhlaw.com
**TREY CRAWFORD**
State Bar No. 24059623
tcrawford@ghjhlaw.com
**GRUBER HURST JOHANSEN HAIL SHANK LLP**
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
214.855.6800 (main)
214.855.6808 (facsimile)

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of *Plaintiff's TEX. R. CIV. P. 194.2(f) Expert Witness Designations* were served—in accordance with TEX. R. CIV. P. 21, 21a—on April 30, 2014 via certified mail, return receipt requested to all counsel of record.

Eric Policastro

MANDAMUS RECORD - TAB 8

(f)     For any testifying expert:

(1) the expert's name, address, and telephone number;

(2) the subject matter on which the expert will testify;

(3) the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information;

(4) if the expert is retained by, employed by, or otherwise subject to the control of the responding party:

> (A) all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony; and

> (B) the expert's current resume and bibliography;

**RESPONSE:**

The following individuals have been retained by Plaintiff in this case to help the jury and Court better understand various medical, scientific, professional, technical, and/or scientific aspects of the claims brought by Plaintiff due to the damages she incurred that were caused by Defendants' tortious conduct:

I.     **RETAINED TESTIFYING EXPERTS**

**Dr. Claire E. Brenner, M.D.**

Dr. Claire E. Brenner, M.D.—(972) 494-1155, 2241 Peggy Lane Suite E, Garland, Texas 75042—is a medical doctor who holds board certifications in infectious disease and internal

medicine. Please see the attached **Exhibit A** for a copy of Dr. Brenner's resume and/or bibliography. In this case, Dr. Brenner may testify concerning the clinical course of infectious diseases, including the herpes virus, generally, as well as in Plaintiff's case. Dr. Brenner may testify about the general nature, incubation, presentment, recurrence, and effects of the herpes virus related to an individual who is infected with the disease, including Plaintiff. Dr. Brenner may testify concerning the clinical course, progression, treatment, effects (physical, emotional, financial, etc.), and prognosis of an individual diagnosed with the herpes virus, and the fact that there is no cure for the herpes virus, generally, as well as the same categories of testimony regarding Plaintiff. Additionally, Dr. Brenner may testify generally as to the human anatomy, the effect of the herpes virus on an infected individual's body, mind, and quality of life, as well as the irreversible effects of the herpes virus, complications caused by the herpes virus throughout an individual's life including during pregnancy/labor and the effects it may have on a newborn child. Dr. Brenner may testify about the effect the herpes virus has on an infected individual's immune system throughout said individual's life. Dr. Brenner may testify about the progression of the disease in Plaintiff, and the mental, physical, psychological, financial, and physiological obstacles Plaintiff will encounter throughout her life as a result of the rape and the disease. She may also testify concerning the scientific literature on the biological, physical, physiological, social, and mental effects of infectious diseases—including the herpes virus—authored by Dr. Brenner and others. Dr. Brenner may testify as to Plaintiff's and Defendant Deari's medical history, respectively. She may testify concerning the transmission of the herpes virus from one individual to another, including the same for Plaintiff. Dr. Brenner may testify as to the procedures, protocols, tests, and science behind the same that a medical staff could and would observe and/or perform for an individual who is suspected to have been the victim of a sexual

assault, including what was done for Plaintiff on April 26, 2011. Dr. Brenner may testify as to the results of the rape kit performed on Plaintiff on April 26, 2011, as well as the results of the State of Texas's sexually transmitted disease test of Defendant Deari. Dr. Brenner may testify that the herpes virus that Plaintiff presented to Parkland hospital in May 2011 was consistent with an initial outbreak of herpes that took place during and/or immediately after the generally accepted incubation time for the disease after an individual's first exposure. Dr. Brenner may testify that Plaintiff may require medical monitoring, treatment, and/or hospitalization as a result of the disease. Dr. Brenner may also testify that Plaintiff has incurred in the past, and will incur in the future, medical expenses as a result of the herpes virus she contracted from the sexual assault that took place at the Hyatt House hotel. Dr. Brenner may also testify that said past and future medical expenses are reasonable and necessary, especially in light of the incurable nature of the disease for which Plaintiff has been diagnosed. Dr. Brenner may further testify as to facts and circumstances regarding the nature of the injuries and damages that are the subject of this action. Dr. Brenner's testimony will be based upon her skill, knowledge, education, experience, and training, as well as her review of Plaintiff's medical records and diagnoses, scientific literature and studies, and the evidence, pleadings, and discovery served, produced, and/or elicited in this case and based upon a reasonable degree of medical and scientific probability and/or certainty. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

### Mr. John A. Harris, CPA, CPP, PSP

Mr. John A. Harris, CPP, PSP, CPA—(404) 888-0060, 1170 Peachtree Street, Suite 1200, Atlanta, Georgia 30309—is a premises liability and forensic security expert. Please see the

attached **Exhibit B** for a copy of Mr. Harris's resume and/or bibliography. Mr. Harris is board certified in security management (CPP) and Physical Security (PSP) by the professional certification board of ASIS International, an ANSI accredited standards development organization with worldwide membership of over 37,000 security professionals. Mr. Harris's CPP certification is the preeminent designation awarded to individuals whose primary responsibilities are in security management and who have demonstrated advanced knowledge in security solutions and best business practices. Mr. Harris's experience in physical security began over 40 years ago when he was undergoing training to become a commissioned officer in the United States Marine Corps, and he has conducted over 1,200 security risk assessments of various types of commercial properties including apartments, hotels, office buildings, parking lots, and malls located in 43 states as well as in Puerto Rico, the Virgin Islands, and Colombia, South America. In this case, Mr. Harris may testify that the sexual assault of Plaintiff on April 26, 2011, while the guest of an invitee and/or invitee at the Hyatt House located at 4900 Edwin Lewis Drive in Addison, Texas, was reasonably foreseeable and should have been anticipated by the "Hotel Defendants"[1] based on the crimes committed on the premises and the surrounding area in the five years preceding April 26, 2011. Mr. Harris may testify that, prior to April 26, 2011, there had been sufficient crime committed at the Hyatt Hotel—including an armed robbery of an employee of the Hotel Defendants' just months before Plaintiff was raped on the same premises—and in the immediate vicinity to put the Hotel Defendants on notice that reasonable security measures were needed for the security, safety and well-being of their guests, invitees, and other people legally on their property. Mr. Harris may testify that in the five years preceding

---

[1] As used herein, "Hotel Defendants" refers to Island Hospitality Management, Inc., Grand Prix Floating Lessee, LLC, Hyatt Hotels Corporation, Hyatt House Franchising, LLC, Jeffrey H. Fisher, Chatham Lodging, L.P., Chatham TRS Holding, LLC, Ink Acquisition, LLC, Ink Acquisition II, LLC, Ink Acquisition III, LLC, Ink Lessee Holding, LLC, and Ink Lessee LLC.

the attack on Plaintiff at the hotel, that there had been a significant number of criminal incidents reported to the Addison Police Department (including multiple crimes at the Hyatt House hotel and other hotels immediately in the vicinity of the Hyatt House hotel) such that the real potential of a violent crime taking place at the hotel was reasonably foreseeable. Mr. Harris may testify that these reported offenses included violent crime that the Hotel Defendants either knew or reasonably should have known about and should have taken proactive steps to ensure the security of its premises but did not. Mr. Harris may testify that the Hotel Defendants negligently failed to analyze the level of crime at or near the Hyatt House hotel provided by the Addison Police Department and the Texas Department of Public Safety and to utilize those analyses in determining the security needs of the property, and that the Hotel Defendants negligently failed to request any information from the Addison Police Department regarding past or current criminal incidents on the premises and in the immediate vicinity as a reasonably prudent hotel operator would and should have done. Mr. Harris may testify that the Hotel Defendants failed to conduct either component of a security risk assessment, including the failure to conduct a threat assessment (based upon historical information of past criminal events, actual threats, inherent threats, and potential threats by virtue of the vulnerabilities around the hotel or weaknesses in the security program which produce opportunities for crime to occur) and the negligent failure to conduct a vulnerability assessment to analyze the weaknesses of the Hotel Defendants' security program or, alternatively, that the Hotel Defendants negligently failed to engage a professional security consultant to conduct the analysis. Mr. Harris may testify that the Hotel Defendants' negligent failure to conduct a security risk assessment made it impossible for the Hotel Defendants to assess the likelihood that criminals could and would exploit vulnerabilities or compromise security countermeasures at the hotel. Mr. Harris may testify that, based upon the

Hotel Defendants' experience in the lodging industry, the Hotel Defendants knew or should have known that their guests, invitees, and other people legally on their property were at risk to criminal activities if reasonable security measures were not undertaken, and that the Hotel Defendants knew or should have known that in the absence of reasonable security measures, the multiple property crimes (e.g., theft, vehicle break-ins, etc.) that were reported at the Hyatt House hotel can lead to violent crimes against persons. Mr. Harris may testify that it is generally accepted that most crimes are not random events, but planned events in environments which provide the opportunity to commit a crime with the least likelihood of detection, intervention and apprehension and, further, that these conditions existed at the Hyatt House hotel on, and prior to, the April 26, 2011 attack on Plaintiff yet the Hotel Defendants did nothing. Mr. Harris may testify that the Hotel Defendants negligently failed to have security and/or adequate security at the Hyatt House hotel and that the Hotel Defendants knew or should have known that they did not have security and/or adequate security and that the inadequate security was unreasonably safe. Mr. Harris may testify that, at all pertinent times, the Hotel Defendants owned, operated, and/or controlled the Hyatt House hotel, and that the Hotel Defendants owed a duty to Plaintiff to exercise reasonable care (at a minimum) to protect Plaintiff from criminal attacks and other reasonably foreseeable injuries. Mr. Harris may testify that the Hotel Defendants breached its duties by committing the following non-exhaustive list of acts or omissions: (1) the Hotel Defendants negligently failed to exercise reasonable care in providing security guard services (the same services that were once provided but eliminated due to an attempted cost savings measure by the Hotel Defendants); (2) the Hotel Defendants' failure to implement sufficient security measures and conduct any type of threat assessment or security assessment for the Hyatt House hotel at any point in time (including to this day); (3) the Hotel Defendants' negligent

failure to properly train any of its employees on adequate security measures for the safe operation of a hotel; (4) the Hotel Defendants' negligent failure to have more than one employee working during the hours of 7:00 p.m. and 11:00 p.m. when Plaintiff was being sexually assaulted at the hotel; (5) the Hotel Defendants' negligent failure to implement security policies and procedures that adhere to industry best practices of identifying, addressing, and mitigating security vulnerabilities at the hotel; (6) the Hotel Defendants' negligent failure to adhere to its own security policies and procedures (despite the fact that said policies and procedures fall far below the industry standard of care); (7) the Hotel Defendants' negligent failure to provide any security personnel at the hotel (which, naturally, caused the Hotel Defendants to fail to train said personnel properly); (8) the Hotel Defendants' negligent failure to properly or adequately train management personnel for oversight of security and safety issues; (9) the Hotel Defendants' negligent failure to provide appropriate and adequate physical security measures commensurate with the risk that existed on the premises—including, but not limited to, the lack of any patrols (i.e., off-duty police officers, private security guards, etc.); (10) the Hotel Defendants' negligent failure to have any system, procedure, or policy in place to detect, monitor, and control access to the hotel; (11) the Hotel Defendants' negligent failure to enforce procedures regarding suspicious guests and suspicious prospective guests during the check-in process; (12) the Hotel Defendants' negligent failure to have operable closed circuit television (CCTV) cameras installed in any area of the hotel that would be conducive to guest safety and security and, further, conducive to deterring, detecting, monitoring, or preventing crime; (13) the Hotel Defendants' negligent failure to even know about—let alone implement—the generally accepted industry standards for premises security and premises security at a lodging facility found in NFPA 370 and 371; (14) the Hotel Defendants' negligent failure to adhere to industry best practices by failing to identify

and address measures to mitigate security vulnerabilities at the hotel; (15) the Hotel Defendants' negligent failure to exercise reasonable care in providing adequate security and failing to implement sufficient security measures; (16) the Hotel Defendants' negligent failure to conduct periodic reviews and recapitulations of security incident reports at the Hyatt House hotel and remedy the security deficiencies that it knew or should have known about; and (17) the Hotel Defendants' negligent failure to remedy the glaring security concerns noted on its own internal audits for years prior to the attack on Plaintiff. Mr. Harris may testify that the negligent acts and omissions by the Hotel Defendants to discharge the duties of a reasonably prudent property owner/manager/operator to provide reasonable security and property management measures at the Hyatt Hotel was a substantial factor and/or proximate cause of the attack on Plaintiff and damages she incurred. Mr. Harris may testify that had the Hotel Defendants acted as a reasonably prudent property owner/manager/operator would have acted in the same or similar circumstances (given the amount, similarity, proximity, frequency, and publicity of crime at or in the immediate vicinity of the Hyatt House Hotel) to provide reasonable security and property management measures at the Hyatt House hotel, it is more probable than not that the sexual assault of Plaintiff would not have occurred. Mr. Harris may testify that due to the violent criminal atmosphere that existed at the Hyatt House hotel and in its immediate vicinity, that the Hotel Defendants' failure to provide security guards, operable closed-circuit televisions, and other reasonable security measures was in gross breach of minimum standards of care for an innkeeper. Mr. Harris may testify that the Hotel Defendants' acts or omissions, when viewed objectively from the standpoint of the Hotel Defendants at the time of its occurrence involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and that the Hotel Defendants had actual, subjective awareness of the risk involved, but

nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others, including Plaintiff. With respect to Pastazios Pizza, Inc., Post Addison Circle Limited Partnership, and Post Properties, Inc., Plaintiff expects that Mr. Harris may testify in a similar fashion as he may testify as to the Hotel Defendants (but, naturally, with respect to a restaurant/restaurant common area that is open to the public such that the owners of said premises know that alcohol is consumed on said premises by the public on a daily basis). Mr. Harris may testify that the Post entities were negligent and grossly negligent for failing to terminate its lease with Pastazios Pizza, Inc. after Pastazios violated the Texas Alcohol and Beverage Code on multiple occasions, including a publicly known sale of alcohol to an 18 year old female in 2002 during a law enforcement sting operation. Mr. Harris may further testify as to facts and circumstances regarding the nature of the injuries and damages that are the subject of this action. Mr. Harris's testimony will be based upon his skill, knowledge, education, experience, and training, as well as his review of the pertinent authoritative publications written by him and others, and the evidence, pleadings, and discovery served, produced, and/or elicited in this case and based upon a reasonable degree of professional probability and/or certainty. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

### Dr. William E. Flynn, Ph.D.

Dr. William E. Flynn, Ph.D.—(214) 202-7344, 100 Highland Park Village, Suite 200, Dallas, Texas 75205—is a forensic and clinical psychologist. Please see the attached **Exhibit C** for a copy of Dr. Flynn's resume and/or bibliography. In this case, Dr. Flynn may testify, generally, about the psychological, medical, behavioral, educational, physiological, vocational, and social trauma that a victim of a sexual assault—including a sexual assault that ultimately

causes the transmission of an incurable disease—can experience, including Plaintiff. Dr. Flynn may testify about Post-Traumatic Stress Disorder ("PTSD") in general and as applied to victims of rape, including Plaintiff. Dr. Flynn may testify about other medical and psychological conditions—including, but not limited to, depression, PTSD, sleep disorders, eating disorders, substance abuse, self-harm/self-injury, flashbacks, personality disorders, suicide, etc.—that are reasonably likely to arise in victims of rape, including Plaintiff. Dr. Flynn may testify regarding the need for medical and/or psychological treatment throughout the course of a rape victim's life—generally, as well as with respect to Plaintiff—and he may also testify as to the reasonable and necessary future psychiatric expenses that Plaintiff is, in all reasonable probability, likely to incur in the future as a result of Defendants' tortious conduct and the permanent and incurable nature of the herpes virus. Dr. Flynn may testify as to the permanent and incurable nature of Plaintiff's injuries and disease—as well as the impact of said injuries and disease on Plaintiff's life, education, future earning capacity, mental state, etc.—from a forensic and clinical psychology perspective. Dr. Flynn may further testify as to facts and circumstances regarding the nature of the injuries and damages that are the subject of this action. Dr. Flynn's testimony will be based upon his skill, knowledge, education, experience, and training, as well as his review of the pertinent authoritative publications written by him and others, and the evidence, pleadings, and discovery served, produced, and/or elicited in this case and based upon a reasonable degree of professional, medical, and scientific probability and/or certainty. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

**Dr. Joe G. Gonzales, M.D., FAAPMR, CLCP**

Dr. Joe G. Gonzales—(210) 501-0995, 11550 IH 10 West, Suite 375, San Antonio, Texas

78230—is a Physical Medicine & Rehabilitation specialist (board certified), Pain Management specialist (board certified), Occupational & Environmental Medicine specialist (board certified), and certified life care planner who has practiced Medicine in Texas since 1985 and is certified by the American Academy of Physical Medicine & Rehabilitation, the American Board of Pain Medicine, and the American College of Occupational & Environmental Medicine. Dr. Gonzales is a Diplomat of the American Academy of Pain Management, a Designated Physician of the Texas Workers' Compensation Commission, and a Certified Life Care Planner as designated by the Commission on Health Care Certification. Dr. Gonzales is the President of the Texas Physical Medicine & Rehabilitation Institute, and the Founder and Medical Director of Physician Life Care Planning, LLC. Dr. Gonzales is a licensed physician in the State of Texas. Please see the attached **Exhibit D** for a copy of Dr. Gonzales's resume and/or bibliography. Dr. Gonzales may testify about vocational feasibility or disabled related needs of injured people and/or individuals with disabilities or life-altering and permanent diseases (such as Plaintiff), determine the need for medical, psychological and vocational services, identify functional limitations and need for assistive devices for Plaintiff, conduct job and task analyses as well as labor market surveys. Dr. Gonzales may be called to testify with regard to life care planning for Plaintiff, and the value of such assistance and/or care, for those—such as Plaintiff—who are injured or those with disabilities. Dr. Gonzales may testify as to the permanent and incurable nature of Plaintiff's injuries and disease—as well as the impact of said injuries and disease on Plaintiff's life, education, future earning capacity, mental state, etc.—from a physical, psychological, and/or social perspective, and he may testify as to what Plaintiff would have been capable of earning— as well as Plaintiff's other economic losses—had she never been subject to the injuries caused by Defendants' tortious conduct. Dr. Gonzales may testify as to the reasonable and necessary future

medical expenses that Plaintiff is, in all reasonable probability, likely to incur in the future as a result of Defendants' tortious conduct and the permanent and incurable nature of the herpes virus. Dr. Gonzales may testify as to the economic loss incurred by Plaintiff in the past to treat the injuries she sustained that were caused by Defendants, as well as Plaintiff's future loss of earning capacity based upon Plaintiff's earnings, medical condition, stamina, efficiency, ability to work in light of the injuries sustained, the weaknesses and changes that will naturally result from Plaintiff's injuries, and Plaintiff's work-life expectancy. Dr. Gonzales may testify as to a life care plan for Plaintiff's lifetime that determines her lifetime needs and costs of care (e.g., Plaintiff's medical, psychiatric, psychological, behavioral, educational, vocational and social needs, etc.) for her chronic disease and psychological trauma caused by Defendants' tortious conduct. Dr. Gonzales may further testify as to facts and circumstances regarding the nature of the injuries and damages that are the subject of this action. Dr. Gonzales's testimony will be based upon his skill, knowledge, education, experience, and training, as well as his review of the pertinent authoritative publications written by him and others, and the evidence, pleadings, and discovery served, produced, and/or elicited in this case and based upon a reasonable degree of professional, medical, and scientific probability and/or certainty. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

### Dr. John A. Swiger, Ph.D.

Dr. John A. Swiger, Ph.D.—(210) 434-6711, 411 S.W. 24th Street, San Antonio, Texas 78207—is a Doctor of Finance and is an economist. Please see the attached **Exhibit E** for a copy of Dr. Swiger's resume and/or bibliography. As an expert economist, Dr. Swiger may testify as to the economic loss, discounted to present value, which Plaintiff has incurred due to the tortious

conduct of Defendants. Dr. Swiger may also testify generally regarding the concept of present value and its application to economic losses, particularly loss of earning capacity, past and future medical expenses, lost wages, loss and future medical costs. Dr. Swiger may testify as to the reasonable and necessary future medical expenses that Plaintiff is, in all reasonable probability, likely to incur in the future as a result of Defendants' tortious conduct and the permanent and incurable nature of the herpes virus. Dr. Swiger may testify as to the economic loss incurred by Plaintiff in the past to treat the injuries she sustained that were caused by Defendants, as well as Plaintiff's future loss of earning capacity based upon Plaintiff's earnings, medical condition, stamina, efficiency, ability to work in light of the injuries sustained, the weaknesses and changes that will naturally result from Plaintiff's injuries, and Plaintiff's work-life expectancy. Dr. Swiger may testify as to Plaintiff's past lost wages, the economic value of the loss of enjoyment of life, and other economic losses incurred by Plaintiff as a result of Defendants' tortious conduct. Dr. Swiger may also testify about Defendants' financial conditions, the net worth and profits of Defendants, and/or Defendants' current fiscal policies and/or practices for purposes of establishing Defendants' wealth during the punitive damages phase of trial. Dr. Swiger may further testify as to facts and circumstances regarding the nature of the injuries and damages that are the subject of this action. Dr. Swiger's testimony will be based upon his skill, knowledge, education, experience, and training, as well as his review of the pertinent authoritative publications written by him and others in the field of economics, and the evidence, pleadings, and discovery served, produced, and/or elicited in this case and based upon a reasonable degree of professional and scientific probability and/or certainty. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

## II. UNRETAINED TESTIFYING EXPERTS

Plaintiff hereby designates the following individuals as "unretained testifying experts" as these individuals are not retained by, employed by, or otherwise subject to the control of Plaintiff. *See* TEX. R. CIV. P. 194.2(f)(3).

### Detective Katie Spencer

Detective Katie Spencer—(972) 450-7100, c/o Addison Police Department, 4799 Airport Parkway, Addison, Texas 75001—is a detective with the Addison Police Department. Detective Spencer investigated the rape of Plaintiff such that, in addition to testifying with respect to her expertise in criminal investigations and criminal conduct in Addison, Texas (of this case and other criminal cases in Addison, Texas from 2005 to the present)—Detective Spencer is also a percipient witness of the circumstances surrounding the sexual assault on Plaintiff and the lack of security and safety measures in place at the Hyatt House hotel on April 26, 2011. Documents reflecting Detective Spencer's investigation of the sexual assault of Plaintiff have previously been produced to Defendants. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

### Officer Isaac Gloger

Officer Isaac Gloger—(972) 450-7100, c/o Addison Police Department, 4799 Airport Parkway, Addison, Texas 75001—is a police officer with the Addison Police Department. Officer Gloger was the arresting officer of Defendant Deari on April 26, 2011 and interviewed Defendant Deari at the crime scene where Plaintiff was raped such that, in addition to testifying with respect to his expertise in criminal investigations and criminal conduct in Addison, Texas (of this case and other criminal cases in Addison, Texas from 2005 to the present)— Officer

MANDAMUS RECORD - TAB 8

Gloger is also a percipient witness of the evidence and circumstances surrounding the sexual assault on Plaintiff and the lack of security and safety measures in place at the Hyatt House hotel on April 26, 2011. Documents reflecting Officer Gloger's investigation of the sexual assault of Plaintiff have previously been produced to Defendants. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

## Mr. Kenneth Sherman

Mr. Kenneth Sherman—(817) 652-5912, c/o Arlington Regional Office of Texas Alcoholic Beverage Commission, 2225 East Randol Mill Road, Suite 200, Arlington, Texas 76011—is a licensed peace officer in the State of Texas and is employed by the Texas Alcoholic Beverage Commission as an Enforcement Agent. Mr. Sherman investigated the violations of the Texas Alcoholic and Beverage Code committed by Pastazios Pizza, Inc., as well as photographed the "common area" shared between Post and Pastazios Pizza on which Plaintiff became obviously intoxicated, as well as interviewed Plaintiff, Defendant Deari, and Defendant Kreka. Mr. Sherman may testify as to his personal knowledge of the facts of this case (including his investigation), as well as based upon his skill, knowledge, education, experience, and training as to criminal and administrative investigations and violations of the Texas Alcoholic Beverage Code (in this case and other cases in Addison, Texas from 2005 to the present), the standard of care required of a business that knowingly and intentionally leaves its property open for the public to consume alcoholic beverages on, the Texas Alcoholic Beverage Code (in general and as applied to this case), and the incidence of intoxicated minors in general, and those subject to a criminal attack, in the Addison, Texas area from 2005 to the present (including the resulting damages that arise therefrom). Documents reflecting Mr. Sherman's investigation related to this

MANDAMUS RECORD - TAB 8

case have previously been produced to Defendants. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

### Dr. Allison Jeanne Brooks-Heinzman, M.D.

Dr. Allison Jeanne Brooks-Heinzman, M.D.—(512) 324-9650, 313 E. 12th Street #101, Austin, Texas 78701—is a medical doctor who is board certified in obstetrics and gynecology. Dr. Brooks-Heinzman was Plaintiff's treating physician on the night of April 26, 2011 after Plaintiff was sexually assaulted at the Hyatt House hotel and subsequently transferred to Parkland Hospital for testing, treatment, and evaluation. Dr. Brooks-Heinzman may testify— based upon her perceptions and skill, knowledge, education, experience, and training—about her treatment of Plaintiff (including the results of any tests conducted during, or as a result of, said treatment), Plaintiff's physical, mental, physiological, and psychological condition of the night of April 26, 2011, obstetrics and gynecology in general, and the physical, emotional, mental, social, and biological effects and trauma associated with rape victims and rape victims who are infected with an incurable sexually transmitted disease during the course of the rape. Documents (as well as an executed HIPAA authorization) reflecting Dr. Brooks-Heinzman's treatment of Plaintiff in this case have previously been produced to Defendants. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

### Dr. Dustin B. Manders, M.D.

Dr. Dustin B. Manders, M.D.—(214) 648-3639, c/o University of Texas Southwestern, 5323 Harry Hines Boulevard, Dallas, Texas 75390—is a medical doctor who is board certified in obstetrics and gynecology. Dr. Manders was Plaintiff's treating physician on May 6, 2011 when

Plaintiff returned to Parkland Hospital with a "chief complaint" that "it feels like someone hit me in the crotch with a hammer covered in razors." Dr. Manders diagnosed subsequently diagnosed Plaintiff with a "primary outbreak" of herpes. Dr. Manders may testify—based upon his perceptions and skill, knowledge, education, experience, and training—about his treatment of Plaintiff (including the results of any tests conducted during, or as a result of, said treatment), Plaintiff's physical, mental, physiological, and psychological condition on May 6, 2011, obstetrics and gynecology in general, the generally accepted incubation period from exposure to outbreak of the herpes virus, and the physical, emotional, mental, social, and biological effects and trauma associated with rape victims and rape victims who are infected with an incurable sexually transmitted disease during the course of the rape. Documents (as well as an executed HIPAA authorization) reflecting Dr. Manders's treatment of Plaintiff in this case have previously been produced to Defendants. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

## III. ATTORNEYS' FEES EXPERTS

Eric Policastro and Tom H. Crawford III—(214) 855-6800, c/o Gruber Hurst Johansen Hail Shank LLP, 1445 Ross Avenue, Suite 2500, Dallas, Texas 75202—are the attorneys for Plaintiff and expect to testify to the reasonable and necessary attorneys' fees for the prosecution of Plaintiff's claims against Defendants. Plaintiff's attorneys expect to testify that the attorneys' fees incurred by Plaintiff in this litigation were reasonable and necessary for the prosecution of her claims against Defendants. They will testify that the total fees as well as the hourly rates charged by Plaintiff's counsel were reasonable in the State of Texas as well as in Dallas County, specifically. They will testify based on their education, skill, knowledge, training, and experience

in the practice of law as licensed attorneys in the State of Texas, their knowledge about this case, and upon a review of the fee statements reflecting the fees incurred by Plaintiff. Plaintiff's attorneys will further testify as to the reasonable and necessary attorneys' fees likely to be incurred by Plaintiff in the event that a jury verdict is appealed to the Court of Appeals and/or the Texas Supreme Court, as well as the total number of hours worked in this matter and will offer an opinion as to the total reasonable fee for said necessary work. Plaintiff's attorneys are familiar with all of the pleadings and discovery transmitted by the parties in this case Plaintiff's attorneys' resumes can be found at http://www.ghjhlaw.com/. Plaintiff reserves the right to supplement and/or amend this expert witness designation as discovery continues and additional facts and evidence have been learned and produced.

MANDAMUS RECORD - TAB 8

# EXHIBIT A

# CLAIRE E. BRENNER, M.D.

2241 Peggy Lane, Suite E.
Garland, Texas 75042
972-494-1155 (W)    972-494-6572 (F)    214-507-8339 (M)

**PRESENT POSITION**

INFECTIOUS DISEASE PHYSICIAN
FOUNDING PHYSICIAN OF CLAIRE BRENNER, M.D., P.A. – 2004
MEDICAL DIRECTOR OF INFECTION CONTROL - BAYLOR GARLAND HOSPITAL – 2003
BAYLOR GARLAND WOUND CARE CLINIC – 2006

**PREVIOUS POSITION**

NORTH TEXAS INFECTIOUS DISEASE CONSULTANTS - 8/1/2001 – 1/20/2004

**HOSPITAL PRIVILEGES**

Baylor of Garland Medical Center, Garland, TX 2001-present
Lake Pointe Medical Center, Rowlett, TX 2008-present
Presbyterian Hospital of Rockwall, Rockwall, TX 2008-present
Forest Park Medical Center, Dallas, TX 2010-present
Kindred Hospital of Dallas, Dallas, TX 2013-present
Methodist Hospital for Surgery, Addison, TX 2012-present
Methodist Richardson Medical Center, Richardson, TX 2013-present

**EDUCATION**

1996 M.D.    University of Texas Southwestern Medical School - Dallas, Texas
1991 B.S.    University of Texas at San Antonio, Major:  Biology

**POSTGRADUATE TRAINING**

1999-2001    Infectious Diseases Fellowship, Barnes Jewish Hospital,
             Washington University School of Medicine, St. Louis, Missouri
1997-1999    Residency, Depart. of Internal Medicine, Barnes Jewish Hospital,
             Washington University School of Medicine, St. Louis, Missouri
1996-1997    Internship, Depart. of Internal Medicine, Barnes Jewish Hospital,
             Washington University School of Medicine, St. Louis, Missouri

**MEDICAL LICENSURE AND BOARD CERTIFICATION**

Board Certified, Infectious Disease – October 2001; Recertification, Infectious Disease – 2012
Board Certified, Internal Medicine – August 1999 – Certificate # 1945635; Recertification, Internal Medicine – 1999
Certification of Attendance Principles of Wound Healing and Hyperbaric Medicine – 2006
Texas Medical License - #L1533
United States Medical Licensing Exam – July 1998

**HONORS AND AWARDS**

Medical School Class Rank:  Top 20%
Southwestern Medical Foundation Scholarship, 1992

**PROFESSIONAL SOCIETIES AND ORGANIZATIONS**

Infectious Diseases Society of America – 2000
Society of Hospital Epidemiology – 2003

**TEACHING EXPERIENCE**

Histology Course Teaching Assistant, University of Texas Southwestern Medical School – 1995
Baylor Garland Family Practice Residence/Infectious Disease Rotation – 2004-present
Podiatric Residency Program/Infectious Disease Rotation – 2007-present

**ABSTRACTS**

1) Warren RQ, Brenner CE, Holf H., Kanda P., Boswell RN, Kennedy RC. Characterization of longitudinal sera samples from HIV-1 infected individuals for antibodies reactive to gp160 synthetic peptides *International Conference on Advances in AIDS Vaccine Development: Third Annual Meeting of the National Cooperative Vaccine Development Groups for AIDS,* Clearwater, Florida. 1990.

2) Warren RQ, Holf H., Nkya WM, Brenner CE, Anderson SA, Boswell RN, Kanda P., Kennedy RC. Comparison of antibody specificities to HIV-1 gp160 epitopes defined by synthetic peptides in sera from infected individuals from Tanzania and the United States. *International Conference on Advances in AIDS Vaccine Development: Third Annual Meeting of the National Cooperative Vaccine Development Groups for AIDS.* Clearwater, Florida. 1990.

3) Shao JF, Holf H., Warren RQ, Brenner CE, Kennedy RC. Reactivity of HIV-1 Infected Individuals from Tanzania with an Immunodominant B-Cell Epitope on gp41. *International Conference on Advances in AIDS Vaccine Development: Thirds Annual Meeting of the National Cooperative Vaccine Development Groups for AIDS.* Clearwater, Florida. 1990.

4) Nkya WM, Warren RQ, Holf H., Brenner CE, Tesha J., Kanda P., Kennedy RC. Fine Specificity of the Humeral Immune Response to HIV-1 gp160 in HIV-1 infected individuals from Tanzania. *Fifth International Conference on AIDS in Africa.* Kinshasha, Zaire. 1990.

5) Warren RQ, Holf H., Brenner CE, Kanda P., Boswell RN, Kennedy RC. Decline in Antibody Reactivity to specific HIV-1 gp160 epitopes in associated with CD4+ cell levels below 200/mm in infected individuals. *Conference of the Federation of American Societies for Experimental Biology.* 1991.

6) Hollingsworth RE, Brenner CE, Zhu X-L, Lee WH. Regulation of the RB Protein by the CDC2 cell cycle kinase. *The Symposium on Cancer Research.* San Antonio, Texas. 1992.

**RESEARCH EXPERIENCE**

1) Mapping the Antibody Reactivity to Human Immunodeficiency Virus Envelope Antigens in Infected Individuals, University of Texas at San Antonio, 1990

2) Preparation of Boc-threonine-4-oxymethyD-phenylacetic acid for use as a linker in solid phase peptide synthesis, University of Texas at San Antonio, 1991

3) Institute of Biotechnology, worked on DNA sequencing of tumor suppressor genes as a full-time research assistant with Dr. Wen-Hwa Lee, San Antonio, Texas 1989-1991

4) Southwest Foundation for Biomedical Research, studied the Humeral Immune Response to HIV with Dr. Ronald Kennedy, San Antonio, Texas 1991

5) BMS Protocol AI455-135 ZEST QDAY-Phase IIIB, Open Label, Randomized, Multicenter Study Switching HIV-1 Infected Subjects with a Viral Load of <50 copies/ml on a BID Regimen or More Frequent Initial HAART Regimen to a Once Daily Regimen Including Stavudine XR, Lamivudine and Efavirenz. 2002

# EXHIBIT B

# CURRICULUM VITA
## JOHN A. HARRIS, CPP, PSP
### THG PREMISES LIABILITY CONSULTANTS, LLC
1170 PEACHTREE STREET NE
SUITE 1200
ATLANTA, GA 30309
404.888.0060
www.thgconsult.com

John Harris' multi-disciplined background is the basis of his comprehensive approach to premises liability consulting. Mr. Harris is board certified in security management (CPP) and physical security (PSP) and is also a retired Certified Public Accountant (CPA). He holds an M.S. degree in real estate and a B.S. degree in accounting.

Mr. Harris received his first experience in physical security when he was training to become a commissioned officer in the United States Marine Corps.

He has conducted over 1,200 security risk assessments of premises including multi-family, lodging, resorts, casinos, retail, office, medical and industrial properties located in 43 states and in Puerto Rico, the Virgin Islands, and Colombia, South America.

Mr. Harris is experienced in developing, implementing, managing and maintaining physical security programs with personally-owned properties as well as fiduciary responsibility as a general partner in real estate investments and as consultant to developers, owners, managers, and insurers of properties.

Mr. Harris' body of knowledge and experience in premises security, real estate, and accounting combined with his forensic work in multi-state jurisdictions involving varied types of premises, each with its own set of facts and circumstances, is the basis of his specialized expertise in premises security risk identification and liability mitigation.

A court-qualified forensic security expert, John Harris consults with defense and plaintiff counsel in the civil dispute resolution process regarding premises liability related to negligence and third party criminal acts such as assault, homicide, kidnapping, rape and robbery.

## AREAS OF EXPERTISE
Adequacy of security
Negligent hiring, retention and supervision
Workplace violence

MANDAMUS RECORD - TAB 8

## EDUCATION
M.S., Real Estate
B.S., Accounting

## CERTIFICATIONS
### Certified Protection Professional (CPP)
Board Certified in Security Management by the Professional Certification Board (PCB) of ASIS International, an ANSI accredited standards development organization with worldwide membership of over 38,000 security professionals. This designation is acknowledged as the security profession's highest recognition of practitioners who have demonstrated competency in the areas of security solutions and best business practices. Requirements for certification: passage of a written exam, bachelor's degree from an accredited university and seven years of security experience. Continuing education required for recertification. Certified through 2014.

### Physical Security Professional (PSP)
Board Certified in Physical Security by the Professional Certification Board (PCB) of ASIS International. This technical designation is awarded to those individuals whose primary responsibilities are to conduct physical security surveys, design integrated security systems and who have demonstrated in-depth operations knowledge and competence in this area. Requirements for certification: passage of a written exam and five years' experience in physical security. Continuing education required for recertification. Certified through 2015.

### Certified Public Accountant (CPA)
Retired – Georgia CPA008884
Requirements for certification: pass uniform CPA examination, hold baccalaureate degree from an accredited university with a concentration in accounting of at least 30 quarter or 20 semester hours, and a two year or 4000 hours of continuous experience in public accounting. Continuing education required for maintaining license.

## PUBLICATIONS & PRESENTATIONS
"Finding a Remedy for Renters", *TRIAL* magazine published by the Association of Trial Lawyers of America (ATLA). The article addressed premises liability issues in multi-family residential properties. (December 2002)

Appeared on the NBC's *Today* show segment on hotel thefts (2007)

Presentation "Using Experts in Sexual Assault Cases" ATLA annual convention Inadequate Security Litigation Group and Schools: Violence, Misconduct, and Safety Litigation Group, Seattle, WA (July 2006)

MANDAMUS RECORD - TAB 8

Speaker "Unique Issues in Apartment Security Cases", The National Crime Victim Bar Association national conference on Civil Actions for Criminal Acts, Washington, DC (May 2006)

Instructor on premises liability at an ASIS security seminar in Los Angeles, CA (2004)

Designated instructor for the premises liability section of the ASIS International Physical Security Council professional development program, "Managing Your Physical Security", Toronto, Canada (2003)

Guest lecturer on premises liability at the Georgia State University Department of Criminal Justice, Atlanta, GA. (2003)

Security consultant for a *Dateline NBC* segment on hotel security (2003)

Interviews:
Security issues in lodging facilities for *20/20 ABC* (2002)

Parking lot crimes at "big-box retailers" for *ABC's Good Morning America and 20/20* (2000)

Security at hotels/motels have been published in several issues of the *Hotel Security Report*

## PROFESSIONAL MEMBERSHIPS
American Institute of Certified Public Accountants (AICPA)

ASIS International (formerly the American Society for Industrial Security International)

## PREVIOUS PROFESSIONAL MEMBERSHIPS
Commercial Real Estate Council, ASIS International

Physical Security Council, Education Committee, ASIS International

Editorial Advisory Board of the Hotel/Casino/Resort Security Report and the School Security Report, published by Rusting Publications, Westbury, NY

American Hotel and Lodging Association

Atlanta Apartment Association

National Apartment Association

MANDAMUS RECORD - TAB 8

## CURRENT POSITION

### THG PREMISES LIABILITY CONSULTANTS, LLC (2000–Present)
(LLC formation January 2014. Previously sole proprietor, The Harris Group)

Consults on premises liability issues related to risk identification and liability mitigation

Audits premises security programs for compliance with security industry standards, guidelines and best business practices

Conducts security risk assessments

Determines appropriate countermeasures to be utilized in integrated security plans

Performs forensic evaluations to draw conclusions regarding adequacy of premises security

Opines on findings of forensic evaluations regarding threat and vulnerabilities, reasonable care, and causation

Testifies as a forensic security expert in civil litigation

## PREVIOUS EXPERIENCE

### LARRY TALLEY & ASSOCIATES, INC., ASSOCIATE (1994–2000)
Conducted premises security risk assessments

Determined appropriate countermeasures

Analyzed crime to made determinations regarding foreseeability and produced demonstrative exhibits for testimony and for exhibits to the record

Produced working papers for testimony and for exhibits to the record in support of conclusions regarding standard of care and causation

Developed crime analysis model

### REITRAC, PRINCIPAL AND DIRECTOR OF ANALYTICS (1991–1994)
Real estate investment trust (REIT) data and analyses for Wall Street investment banking firms.

Performance indices developed for real estate investment trusts (REITS) in conjunction with the Wharton Econometric Forecasting Associates (WEFA).

MANDAMUS RECORD - TAB 8

**BDO SEIDMAN, DIRECTOR OF REAL ESTATE CONSULTING (1990–1991)**
Portfolios of real estate valued in excess of $2.5 billion

**AKINS SECURITY, OPERATIONS TROUBLESHOOTER (1989–1990)**
Security services including security guards

**DIVISION ROCKEFELLER GROUP, REAL ESTATE CONSULTANT (1986–1989)**
Portfolios of office buildings, apartments, industrial facilities, malls, shopping centers, and lodging facilities throughout the United States

**EQUITY OWNER OF APARTMENTS (1979–1986)**
**FIRST PROPERTIES, SHAREHOLDER (1979–1983)**
Real estate investments in apartments

**UNITED STATES MARINE CORPS (1969-1975)**
Active duty — 1969–1973
Attained the rank of Captain
Awarded Certificate of Commendation

**RELATED TRAINING**
**U.S. Army Physical Security Field Manual, FM 19-30**, published February 1965. United States Marine Corps officer training. Implemented, supervised, maintained and monitored physical security plans developed from this training. Areas of instruction and training included physical protection, perimeter barriers, protective lighting, alarms, lock and key systems, guard force selection, and organization, training and supervision of guard force, vulnerability assessment, physical security surveys, and investigation of breaches of physical security. The principles of this military training form the foundation for physical security in the public and private sectors.

**Crime Prevention through Environmental Design (CPTED)** course at the National Crime Prevention Institute, University of Louisville. The security concept taught here is expressed as: "The proper design and effective use of the built environment can lead to a reduction in the fear and incidence of predatory stranger to stranger crime, as well as an improvement of the quality of life". Law enforcement officers worldwide are sent to this program for security training.

**Crime Free Multi-Housing** program at the Albuquerque Police Department, Albuquerque, NM. This nationally recognized program is the model for communities developing systems to reduce illegal activity in rental property. It administers a three phase program for certification of APD Certified Crime Free Multi-Housing Designation for property owners. This program requires the owners to implement a security training program, receive CPTED training, and establish a neighborhood watch training program. In addition, owners must meet

MANDAMUS RECORD - TAB 8

the following requirements: crime free lease addendums, tenant screening, and criminal background checks.

## SPECIALIZED SECURITY COURSES

**Assets Protection Course I, II and III, a series of security management programs (2011, 2005)**

**Assets Protection Course I**, Concepts and Methods: Security Vulnerability, Barriers, Locking Concepts, Intrusion Detection, Ethics, Security Lighting, Emergency Planning, Security Management, Security and the Law, Workplace Violence, Investigations, Deception Detection, CPTED, Access Control.

**Assets Protection Course II**, Practical Applications: Financial Forensic Investigations for Asset Recovery, Violence Risk Assessment and Intervention, Interrogation Techniques, Executive Communication, Internal Controls, Organizational Development for Security Professionals, Critical Success Strategies for New Leaders, Employment Law for the Security Professional, Information Security.

**Assets Protection Course III**, Functional Management: How to Become a Trusted Strategic Advisor, Strategy in Action, Business Continuity, Standards, Crisis Management, Unleashing your Leadership Potential, Unity and Leadership.

**Security Officer Management (2007)**

Contract Security: Developing a Decision-making Process, Workplace Violence Planning and Response: Lessons Learned from Virginia Tech, Contract Security: What's Fair and Balanced-Liability and Insurance, Private Security Industry: Trends and Perspective, Contract Security Standards and Guidelines: Application and Compliance, Comparing Apples to Apples: Understanding the Pros and Cons of Outsourcing, Contract Measurement, Performance-based Contracts, and Other Quality Measurements, Contracts: Sharing Risk and Protecting Your Business, RFPs: Developing Practical Business Tools that Work, A Legal Prospective: How To Manage a Contract Security Relationship With a Customer

**CCTV: From Contractors to Courtrooms (2005)**

Using CCTV to mitigate threats and vulnerabilities at facilities. Working knowledge of the latest equipment, systems, and application technologies for CCTV. Assessing digital video applications and the selection of appropriate systems.

**Physical Security: Advanced Applications & Technology (2002)**

Understanding of emerging trends and latest technology in control systems. Integrating physical components, staff, and procedures for cost effective systems. Planning for perimeter barrier systems. Screening processes for

MANDAMUS RECORD - TAB 8

people, vehicles, and materials at sites. Operating systems, database management and enhancements to security control systems.

**Facility Security Design (2002)**
Instruction in design of fully-integrated physical security programs. Integration of multiple security systems in layered effect including environmental security, infrastructure protection, building designs, interior/exterior layout, detections systems, structural barriers, access controls, communications and CCTV assessment.

**Physical Security: Technology Applications (2001)**
Security Risk and Vulnerability Assessment, Conducting a Site Survey, Intrusion Alarms, Fire Alarms, Access Control, CCTV, Physical Barriers and Perimeter Protection, Security Personnel, CPTED, Security Lighting, Security Litigation, Security Engineering

MANDAMUS RECORD - TAB 8

# EXHIBIT C

**RESUME**                                    **Wednesday, February 1, 2013**

**Personal Information:**
Name: William E. Flynn
Address: 100 Highland Park Village
Suite 200
Dallas, Texas 75205
Mobile: 214-202-7344
Fax: 214-902-1766
E-mail: weflynn@legalpsychologist.com

**Academic History:**
Internship: 1977-1978, Bureau of Prisons, Federal Correctional Institute, Seagoville, Texas.
PhD: 1970; University of South Carolina, Columbia, South Carolina. Psychology.
B.A: 1965; Wayne State University, Detroit, Michigan. Psychology.

**Professional Experience:**
1978-2012: Independent Practice of Forensic and Clinical Psychology; Dallas, Texas.
1976-2012: Licensed Psychologist, Texas license #21400.
1999-2009: Consultant, Texas Department of Criminal justice, State Council for Offenders, Huntsville, Texas.
1996-2002: Clinical Committee, Survivors of Torture, Dallas, Texas.
1978-1980: Clinical Director of Psychology, Metroplex Clinics; Richardson, Texas.
1977-1978: Clinical and Research Psychologist, Bureau of Prisons, Federal Correctional Institute, Seagoville, Texas.
1970-1978: Assistant Professor of Psychology, Department of Psychology, Southern Methodist University, Dallas, Texas; Director of Graduate Studies in Psychology.
1969-1970: Instructor, School of Nursing, University of South Carolina, and Columbia, South Carolina.
1968-1970: Research Fellow, V.A. Hospital; Columbia, South Carolina.
1966-1967: Alcohol abuse counselor/research assistant, Georgia Department of Mental Health; Atlanta, Georgia.
1963-1965: Research Associate, Department of Otology, Henry Ford Hospital; Detroit, Michigan.

**Memberships:**
American Psychological Association
National Academy of Neuropsychology
American Association of Correctional Psychology

# EXHIBIT D

MANDAMUS RECORD - TAB 8

## Joe G. Gonzales
### MD, FAAPMR, CLCP

## BIOGRAPHY

**Dr. Joe G. Gonzales** is a Physical Medicine & Rehabilitation, Pain Medicine, and Occupational & Environmental Medicine specialist who has practiced Medicine in Texas since 1985.

He is the President of the Texas Physical Medicine & Rehabilitation Institute, and the Founder and Medical Director of Physician Life Care Planning, LLC.

Dr. Gonzales is a licensed physician in the State of Texas; he is certified by the American Academy of Physical Medicine & Rehabilitation, the American Board of Pain Medicine, and the American College of Occupational & Environmental Medicine.

Dr. Gonzales is a Diplomat of the American Academy of Pain Management, a Designated Physician of the Texas Workers' Compensation Commission, and a Certified Life Care Planner as designated by the Commission on Health Care Certification.

His professional affiliations include the American Medical Association, the Texas Medical Association, the Texas Physical Medicine & Rehabilitation Society, the American Academy of Physical Medicine & Rehabilitation, the American Congress of Rehabilitation Medicine, the American College of Occupational & Environmental Medicine, the Mexican American Physician's Association, the International Academy of Life Care Planners, and the International Association of Rehabilitation.

Dr. Gonzales earned his M.D. from Texas Tech University's Health Science Center, and his Bachelors of Health Science degree from Baylor College of Medicine.

### ⊕ Physician Life Care Planning
America's Leading Life Care Planner

11550 IH 10 West
Suite 375
San Antonio, Texas 78230
Phone: (210) 501-0995
email: jgomd@physicianLCP.com

Page 1 of 1

## Joe G. Gonzales
### MD, FAAPMR, CLCP

## CURRICULUM VITAE

**(+) Physician Life Care Planning**
America's Leading Life Care Planner

11550 IH 10 West
Suite 375
San Antonio, Texas 78230
Phone: (210) 501-0995
email: jgomd@physicianLCP.com

## SPECIALTIES

Physical Medicine & Rehabilitation (Board Certified)
Pain Management (Board Certified)
Occupational & Environmental Medicine (Board Certified)
Certified Life Care Planner

## EDUCATIONAL BACKGROUND

Texas Tech University Health Science Center
Degree: Doctor Of Medicine
Lubbock, Texas
1980-1984

Baylor College of Medicine, Texas Medical Center
Degree: Bachelor of Health Science Degree,
Physician Assistant Certification
Awards: Henry D. McIntosh Award for Clinical Excellence
Houston, Texas
1975-1977

Angelo State University
Department of Nursing
Degree: Associate of Science & Nursing (R.N.)
San Angelo, Texas
1971-1973

San Angelo School of Vocational Nursing
Degree: Diploma & Certification (Licensed)
San Angelo, Texas
1970-1971

## POST GRADUATE TRAINING

Department of Physical Medicine & Rehabilitation
University of TexasHealth Science Center
Residency, Physical Medicine & Rehabilitation
San Antonio, Texas
1985 - 1988

Department of Family Practice
Texas Tech University Health Science Center
Internship, Family Medicine
Lubbock, Texas
1984 – 1985

Page 1 of 4

## Joe G. Gonzales
### MD, FAAPMR, CLCP

## CURRICULUM VITAE

## LICENSES & CERTIFICATIONS

Texas Medical License – Physician Permit
License Number: G8135
Issued: August 1985

American Board Physical Medicine & Rehabilitation
Board Certification
Certificate Number: 3039
Issued: May 1989

American Board of Pain Medicine
Board Certification
Issued: 1994

American College of Occupational & Environmental Medicine
Board Certification
Status: Active Member
Issued: 1992

American Academy of Pain Management
Diplomate
1992

Texas Workers' Compensation Commission
Approved Doctor List Certification
Issued: 2003 (Re-certified, 2009)

Texas Workers' Compensation Commission
Certificate, Maximum Medical Improvement & Assignment of Impairment Ratings
Issued: 2003 (Re-certified, 2009)

Texas Workers' Compensation Commission
Designated Doctor List Certification
Issued: 2003 (Re-certified, 2009)

Commission on Health Care Certification
Certified Life Care Planner
Issued: 2006 (Re-certified, 2009)

The University of Florida & MediPro Seminars, LLC
Post Graduate Course Study in Life Care Planning
Certificate of Completion
Issued: 2006

## PROFESSIONAL ASSOCIATIONS

American Medical Association
Texas Medical Association

MANDAMUS RECORD - TAB 8

# CURRICULUM VITAE

Bexar County Medical Society
Texas Physical Medicine & Rehabilitation Society
American Academy of Physical Medicine & Rehabilitation
American Congress of Rehabilitation Medicine
American College of Occupational & Environmental Medicine
American Academy of Pain Management – Diplomate
Mexican American Hispanic Physician's Association
International Academy of Life Care Planners
The International Academy of Life Care Planners
The International Association of Rehabilitation Professionals

## PROFESSIONAL EXPERIENCE

Physician Life Care Panning , LLC
Founder & Medical Director
San Antonio, Texas
2011 - Present

Texas Physical Medicine & Rehabilitation Institute
President
San Antonio, Texas
1998 - Present

Hyperbaric & Wound Care Associates, P.A.
President
San Antonio, Texas
2003 - 2006

Christus Santa Rosa Wound Care and Hyperbaric Center
Medical Director
San Antonio, Texas
2004 - 2006

South Texas PM&R Group
Founder & Past President
San Antonio, Texas
1987 - 1998

Hyperbaric Oxygen, Inc. Total Wound Treatment Centers
Corporate Medical Director
San Antonio, Texas
1995 - 2000

Warm Springs & Baptist Rehabilitation Network
Hyperbaric Medicine & Wound Care Center
Medical Director
San Antonio, Texas
1995 - 2000

MANDAMUS RECORD - TAB 8

## Joe G. Gonzales
### MD, FAAPMR, CLCP

**CURRICULUM VITAE**

Warm Springs Rehabilitation Center
NW Clinic & System Outpatient Medical Director
San Antonio, Texas
1994 - 1998

South Texas Rehabilitation Center
(San Antonio's first Comprehensive Outpatient Physical Medicine & Rehabilitation Center)
Development & Medical Director
San Antonio, Texas
1987 - 1993

Rehabilitation Institute of San Antonio (RIOSA)
Medical Director, Physical Medicine & Rehabilitation
Medical Director, Spinal Cord Injury Rehabilitation Program
Medical Director, Orthopedic Rehabilitation Program
San Antonio, Texas
1988 - 1993

South Plains Rehabilitation Center
(Lubbock's first Comprehensive Outpatient Physical Medicine & Rehabilitation Center)
Associate & Active Developer
Lubbock, Texas

(This Space Left Intentionally Blank)

MANDAMUS RECORD - TAB 8

# EXHIBIT E

MANDAMUS RECORD - TAB 8

# JOHN A SWIGER, PH.D.
411 S.W. 24th Street, San Antonio, Texas 78207
(210) 434-6711 ex2499    FAX: (210) 434-0821
cell: (210) 861-2772 home office 210-694-9111
jaswiger@ollusa.edu

## CAREER HISTORY/ACADEMIC

| | |
|---|---|
| 2003 - Present | Our Lady of the Lake University, San Antonio, Texas<br>Professor of Finance |
| 1999 - 2006 | Our Lady of the Lake University, San Antonio, Texas<br>Chairman of Accounting, Economics and Finance Department |
| 1991 - 2003 | Our Lady of the Lake University, San Antonio, Texas<br>Associate Professor of Finance<br>Taught graduate and undergraduate courses in Finance, Investments, International Finance, Economics, Modern Banking and International Business.<br>Received Tenure-1998 |
| Summer 1991<br>Summer 1992 | University of Texas at Austin<br>Senior Lecturer of Finance<br>Taught Investments in the MBA Program. Courses concentrated on investment valuation and included a section on the economic valuation of human life. |
| 1976-1980 | University of Texas, San Antonio, Texas<br>Assistant Professor of Finance<br>Taught courses in Capital Budgeting, Financial Management, Investment Analysis and Portfolio Management. |

## PUBLICATIONS:

Swiger, J., Hammons, R., Robinett, S., and Winney, K., "Management of Technological Change and Sustainable Economic Growth: Economic Factors (2011) Management of Technological Changes: Proceedings of the 7th International    Conference on Management of Technolocial Changes, September 1-3, Alexandroupolis, Greece.

Swiger, J., Hammons, R., Robinett, S., and Winney, K., "Management of Technological Change and Sustainable Economic Growth: Economic Recovery (2011) Management of Technological Changes: Proceedings of the 7th International    Conference on Management of Technolocial Changes, September 1-3, Alexandroupolis, Greece.

1

Swiger, J., Winney, K., and Bender, B.," IFRS Convergence: A Crossroads For Post Secondary Accounting Education Programs" (2010) *Quality Management in Higher Education: Proceedings of the 6th International Seminar on the Quality Management in Higher Education* (pp.). Tulcea, Romania.

Swiger, J. & Mudge, S. (2008). The Effect of Higher Education on Human Capital Formation: A Multinational study. *The International Journal of Learning*, 15(9), 227-236.

Swiger, J., Mudge, S., & Wise, S. (2008). U.S. and European Trends that Impact Human Capital Formation through Higher Education, Part 1: Rising Enrollment and Rising Costs of Higher Education. *Quality Management in Higher Education: Proceedings of the 5th International Seminar on the Quality Management in Higher Education* (pp.). Tulcea, Romania.

Swiger, J., Mudge, S., & Wise, S. (2008). U.S. and European Trends that Impact Human Capital Formation through Higher Education, Part 2: Human capital Formation Through Higher Education. *Quality Management in Higher Education: Proceedings of the 5th International Seminar on the Quality Management in Higher Education* (pp.). Tulcea, Romania.

Swiger, J., Mudge, S., & Pennington, A. (2007). Combating Capital Flight Facilitated by Illegal Money Laundering – Challenges and Strategies: Part I: Rising Incidence and Excessive Costs. In N. Badea and C. Rusu (Eds.), *Management of Technological Changes: Proceedings of the 5th International Conference on the Management of Technological Changes – Volume 1* (pp. 145-150). Alexandroupolis, Greece: Democritus University of Thrace.

Swiger, J., Pennington, A., & Mudge, S. (2007). Combating Capital Flight Facilitated by Illegal Money Laundering – Challenges and Strategies: Part II: Legislative and Technological Responses. *Management of Technological changes: Proceedings of the 5th International Conference on the Management of Technological Changes – Volume 1* (pp. 139-144). Alexandroupolis, Greece: Democritus University of Thrace.

Swiger, John & Mudge, Susan, "Managing Trends That Impact Human Capital Formation Through Higher Education, Part I: Rising Enrollment and Rising Costs of Higher Education" Proceedings of the 4th International Seminar on the Quality Management in Higher Education, held in Sinaia, Romania, June 9-10, 2006.

Swiger, John & Mudge, Susan, "Managing Trends That Impact Human Capital Formation Through Higher Education, Part II: Preserving the Benefits of Human Capital Formation" Proceedings of the 4th International Seminar on the Quality Management in Higher Education, held in Sinaia, Romania, June 9-10, 2006.

Swiger, John & Maloney, Tim, "A Reexamination of the Value of a Homemaker Necessitated by Legal, Demographic and Business Changes and Trends—Part I" Proceedings at the 4th Management of Technological Changes Conference in Chaina, Crete, Greece, August 2005.

2

Swiger, John & Maloney, Tim, "A Reexamination of the Value of a Homemaker Necessitated by Legal, Demographic and Business Changes and Trends—Part II" Proceedings at the 4th Management of Technological Changes Conference in Chaina, Crete, Greece, August 2005.

Swiger, John, & Krause, Kent C., "Analysis of the Department of Justice Regulations for the September 11th Victim Compensation Fund." *Journal of Air Law and Commerce*, 67(1). (Winter 2002). Southern Methodist University School of Law.

Swiger, John, & Krause, Kent C., "Analysis of the Department of Justice Regulations for the September 11th Victim Compensation Fund." *Lawyer Pilots Bar Association Journal, XXIV No. 1,* Spring. 2002.

Swiger, John, & Krause, Charles F. "Proving Damages for Foreign Litigants." *New York Bar Journal,* July, 1997.

Swiger, John & Klaus, Allen. "Capital Budgeting Guidelines for the Small Private University." *Business Officer,* March 1996.

Swiger, John. Study Guide: The Basics of Investing. John Wiley & Sons, New York, 1979.

Swiger, John, and Scott Jones. Simplified Forecasting Techniques for Finance and Industry. U.T.S.A. Continuing Education Department, 1979.

Numerous reviews of finance and investment texts written on an honorarium basis for the editors of McGraw-Hill, Wiley/Hamilton, and West Educational Publishing.

**WORKING PAPERS**

"Determining Economic Damages for the High Income Executive"

**PRESENTATIONS AND SEMINARS**

"Successful Handling of Wrongful Death Cases in Texas" a presentation conducted for attorneys and sponsored by Lorman Education Service. Dallas, Texas, July 27, 2004.

"An Economic Analysis of the Department of Justice Victim Compensation Fund." Presented to the Aviation Law Section of the State Bar of Texas, 2002 Annual meeting, June 14, 2002.

"The Airline Industry: A Time for Maximum Pessimism?" Presented to the Aviation Law Section of the State Bar of Texas, 2002 Annual meeting, June 14, 2002.

"What Every Trial Attorney Should Know About Proving Economic Damages." A presentation to the Bexar County Women's Bar Association. October 20, 2000.

3

"Financial Analysis and Credit Evaluation." Prepared expressly for and presented to the senior marketing staff of Fairchild Aviation, San Antonio, Texas on March 17, 1995.

"Proving Economic Damages for Litigants of Mexican Citizenry." A research paper presented at the Western Economic Association International Conference, San Diego, California, on July 6, 1995.

"Is a Minimum Wage Increase Justified?" A seminar at the First Friday Forum, KLRN Studio, San Antonio, Texas, February 3, 1995.

"Proving Damages for Foreign Litigants." Presented to the Aviation Law Section of the State Bar of Texas, 1993 Annual meeting, June 18, 1993.

Conducted seminars in Financial Forecasting for U.T.S.A. Continuing Education Department.

Conducted seminars in Financial Statement Analysis for the Small Business Administration.

**MEDIA INTERVIEWS**

Interview with KENS TV regarding the impact of the Toyota recall on the San Antonio Toyota Tundra Manufacturing Plant, February 2010.

Numerous interviews with business reporters from the San Antonio Express-News radio talk shows and television news programs regarding issues ranging from minimum wage legislation to stock market activity to the closing of Kelly Air Force Base.

**EDUCATION**

University of North Carolina at Chapel Hill, Ph.D. 1976
 Major: Finance
 Minor: Management
 Thesis Title: Commercial Strategy and Performance and Financial Policy

University of Richmond, B.S. in Business Administration
 Major: Marketing
 Minor: Economics

**CAREER HISTORY/BUSINESS**

1990 - Present  **Business and Economic Consultant**
Provide economic and financial analysis to law firms, business firms and government agencies. Consulting activities include the determination of economic damages and losses in the following types of cases:

4

- Wrongful death and serious injury
- Business Valuation
- Business interruption and the abrogation of contracts
- Sexual harassment, discrimination and wrongful termination
- Tortious interference of business relationships and contracts

**Other consulting activities include:**
- Feasibility studies for manufacturing operations
- Valuation analysis for closely held corporations

**Sample Clients:**
- Engstrom, Lipscomb & Lack
- Podhurst Orseck
- Craddock Davis and Crouse
- USAA
- Mission City Management
- Estate and Gift Division of the Internal Revenue Service

**1977-1990**   TNL Financial Inc., San Antonio, Texas
<u>President and Founder</u>

Organized the firm in May 1977. By 1990, TNL comprised 34 vendors, 8,000 accounts, 18 employees, and $40,000,000 in assets. Administered day-to-day operations with emphasis in the areas of marketing, financial planning and control, and banking relations.

**1968-1969**   First & Merchants National Bank. Richmond, VA (now Bank of America)
<u>Credit Analyst</u>

5

CAUSE NO. DC-13-04564-L

| | | |
|---|---|---|
| JANE DOE | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | |
| | § | |
| AJREDIN "DANNY" DEARI; DRITAN | § | |
| KREKA; PASTAZIOS PIZZA, INC.; | § | |
| ISLAND HOSPITALITY MANAGE- | § | |
| MENT, INC.; HYATT HOTELS | § | |
| CORPORATION; HYATT HOUSE | § | |
| FRANCHISING, LLC; GRAND PRIX | § | DALLAS COUNTY, TEXAS |
| FLOATING LESSEE, LLC; INK | § | |
| ACQUISITION, LLC; INK | § | |
| ACQUISITION II, LLC; INK | § | |
| ACQUISITION III, LLC; INK LESSEE, | § | |
| LLC; INK LESSEE HOLDING, LLC; | § | |
| CHATHAM TRS HOLDING, INC.; | § | |
| CHATHAM LODGING, LP; JEFFREY | § | |
| H. FISHER, Individually; POST | § | |
| PROPERTIES, INC.; and DOES 1-25 | § | 193RD JUDICIAL DISTRICT |

---

**DEFENDANTS' JOINT MOTION FOR EMERGENCY HEARING ON DEFENDANTS' JOINT MOTION FOR RECONSIDERATION TO EXAMINE JANE DOE**

---

TO THE HONORABLE COURT:

NOW COMES Defendants Island Hospitality Management, Inc., Post Properties, Inc., and Post Addison Circle Limited Partnership (referred collectively herein as "Defendants"), and file this Motion for Emergency Hearing on their Joint Motion for Reconsideration to Examine Plaintiff Jane Doe for the following reasons:

1.     Contemporaneously with the filing of this motion, Defendants are filing Defendants Island Hospitality Management, Inc.'s, Post Properties, Inc.'s and Post Addison Circle Limited Partnership's Joint Motion for Reconsideration to Examine Plaintiff Jane Doe. Defendants' psychiatrist

MANDAMUS RECORD - TAB 9

expert's (Dr. Lisa Clayton) deposition is currently set for Friday, April 17, 2015. As stated in the motion for reconsideration, Dr. Clayton's opinions challenging Plaintiff's expert are currently based on the information and data Plaintiff's expert obtained during his evaluation of Plaintiff. Unlike Plaintiff's expert psychologist, Dr. Clayton has not had the opportunity to examine Plaintiff. The requested examination would enable Dr. Clayton to explore Plaintiff's psychologist expert's opinions and potentially discover additional facts that may contradict or bear upon his opinions. In the event the Court grants the Joint Motion for Reconsideration, Dr. Clayton will have additional opinions in this case, and Plaintiff will likely request a second deposition. In order to eliminate these contingencies, Defendants request Dr. Clayton's deposition be postponed until after the Joint Motion for Reconsideration is determined by the Court and the Court set the hearing on Defendants' Joint Motion for Reconsideration on April 15 or 16, 2015.

FOR THESE REASONS, Defendants Island Hospitality Management, Inc., Post Properties, Inc., and Post Addison Circle Limited Partnership, respectfully request that this Honorable Court order an emergency hearing on April 15 or 16 on Defendants Island Hospitality Management, Inc.'s, Post Properties, Inc.'s, and Post Addison Circle Limited Partnership's Joint Motion for Reconsideration to Examine Plaintiff Jane Doe, postpone Dr. Clayton's deposition set for April 17, 2015, and grant such further relief to which they are justly entitled.

Respectfully submitted,

COBB MARTINEZ WOODWARD PLLC
1700 Pacific Avenue, Suite 3100
Dallas, TX 75201
(214) 220-5202 (direct phone)
(214) 220-5252 (direct fax)

By: _____
      **RAMONA MARTINEZ**
      Texas Bar No. 13144010
      email: rmartinez@cobbmartinez.com
      **DAVID S. DENTON**
      Texas Bar No. 24036471
      email: ddenton@cobbmartinez.com
      **MATTHEW E. LAST**
      Texas Bar No. 24054910
      email: mlast@cobbmartinez.com

**ATTORNEYS FOR DEFENDANT ISLAND HOSPITALITY MANAGEMENT, INC.**

and

**THOMPSON, COE, COUSINGS, & IRONS, L.L.P.**
700 N. Pearl, 25th Floor
Dallas, Texas 75201
(214) 871-8228 (direct phone)
(214) 871-8209

By: _____
      **RANDY A. NELSON** N/PERMISSION
      Texas Bar No. 14904800
      email: rnelson@thompsoncoe.com
      **SARAH L. ROGERS**
      Texas Bar No. 24046239
      Email: srogers@thompsoncoe.com

**ATTORNEYS FOR POST PROPERTIES, INC. AND POST ADDISON CIRCLE LIMITED PARTNERSHIP**

## CERTIFICATE OF CONFERENCE

Counsel for movant and counsel for respondent have personally conducted a conference at which there was a substantive discussion of every item presented to the Court in this motion, and despite best efforts, the counsel have not been able to resolve those matters presented.

Certified to this 14th day of April, 2015.

_____
**DAVID S. DENTON**

I hereby certify that a true and correct copy of this document has been forwarded to the following counsel of record by e-service, email, certified mail, return receipt requested, and/or regular U.S. mail on this 14th day of April, 2015:

Trey Crawford
Gruber Hurst Johansen Hail Shank
1445 Ross Avenue, Suite 2500
Dallas, TX 75202-2711
fax: 214.855.6808
*Attorney for Plaintiff*

Dritan Kreka
5549 Big River Drive
The Colony, TX 75056
*Defendant Kreka*

Samuel H. Johnson
Johnson Broome, PC
2591 Dallas Parkway, Suite 300
Frisco, TX 75034
fax: 972.584.6054
*Attorney for Defendants Deari &*
*Pastazios Pizza*

Randy A. Nelson
Thompson Coe Cousins & Irons
700 North Pearl Street
25th Floor – Plaza of the Americas
Dallas, TX 75201
*Attorney for Post Properties*

_____
**RAMONA MARTINEZ**
**DAVID S. DENTON**

Doc. # 136066



DC-13-04564

JANE DOE,

*Plaintiff(s),*

v.

AJREDIN "DANNY" DEARI; ET. AL.

*Defendant(s).*

In the District Court
of Dallas County
193rd Judicial
District

## ORDER DENYING MOTIONS TO RECONSIDER MOTION TO ALLOW PSYCHOLOGICAL EXAMINATION

ON THIS DAY came to be heard, by submission, Defendants' Motions to Reconsider Motion to Allow Psychological Examination. Having considered the motions, the Court hereby **DENIES** them.

SO ORDERED this Thursday, April 16, 2015.

_____
CARL GINSBERG, *District Judge*
193rd Judicial District Court

---

ORDER DENYING MOTIONS TO RECONSIDER MOTION TO ALLOW PSYCHOLOGICAL EXAMINATION
Page Solo